**Exhibit D**

SUPREME COURT OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------------------x
VICTORIA MALONE,                :

         Plaintiff,           :

      v.                   :

TOWN OF CLARKSTOWN,       :
TOWN OF CLARKSTOWN HIGHWAY
DEPARTMENT, WAYNE BALLARD, *in*  :
*his personal and official capacity as*
*Clarkstown Highway Superintendent,*  :
FRANK DIZENZO, *in his personal and*  :
*official capacity as Clarkstown Highway*
*Superintendent*, ANDREW LAWRENCE, *in*:
*his personal and official capacity*, DAVID  :
SALVO, *in his personal and official*
*capacity*, ROBERT KLEIN, *in his*  :
*personal and official capacity,*
TUCKER CONNINGTON, *in his personal*  :
*and official capacity*, and BRIAN LILLO,  :
*in his personal and official capacity,*
                             :
        Defendants.       :
-------------------------------------------------------x

                            **SUPPLEMENTAL NOTICE OF CLAIM**

**To the attention of:**

Town of Clarkstown
Town Attorney
10 Maple Avenue
New City, NY 10956

       Please take notice that Victoria Malone, an employee of the Town of Clarkstown

Highway Department (the "Department"), claims damages against the Town of Clarkstown (the

"Town"), the Department, Wayne Ballard, Frank DiZenzo, Andrew Lawrence, David Salvo,

Robert Klein, Tucker Connington, and Brian Lillo in their personal and official capacities as

employees of the Department, and in accordance with the requirements of New York Municipal

Law § 50-e, states as follows:

## INTRODUCTION

1.     Claimant Victoria Malone is a 34-year-old woman residing at 135 West Nyack

Road, Apartment 48, Nanuet, NY 10954.  Ms. Malone is an employee of the Department holding

the rank of Machine Equipment Operator ("MEO") II.

2.     In the era of "me too," it is difficult to be surprised by the abuse suffered by

women at the hands of their co-workers and superiors.  However, even in this day and age, the

years-long abuse suffered by Victoria Malone, while employed by the Town, is so appalling that

it will shock even the most jaded of senses.

3.     Ms. Malone is represented by Catherine M. Foti and Curtis B. Leitner of Morvillo

Abramowitz Grand Iason & Anello P.C., 565 Fifth Avenue, New York, NY 10017.

4.     Ms. Malone's claims include common law torts, failure to protect, gender

discrimination, hostile work environment, and retaliation.  Her damages include personal and

physical injury, lost income, pain and suffering, and other economic, consequential, reputational,

emotional, and punitive damages to the extent permitted under state and federal law.

5.     The actions giving rise to Ms. Malone's claims began when she was hired as a

summer worker by the Department in 2003 and constitute a pattern of conduct by the Town, the

Department, and their leadership and employees that continues through the present day.  These

actions occurred, at least in part, at the Department, which is located at 12 Seeger Drive, Nanuet,

NY 10954.

6.     Dating back to 2003, Ms. Malone has been subjected to gender-based harassment

and discrimination, as well as retaliation.  This conduct was condoned and, at times, personally

committed by Wayne Ballard, the Highway Superintendent from Ms. Malone's hiring until approximately 2015.   Then this conduct continued to be condoned and committed by Frank DiZenzo, who became the Highway Superintendent in early 2016.  In fact, since DiZenzo became Highway Superintendent, Ms. Malone has suffered ever more severe verbal and physical harassment, as well as retaliation because she had the courage to complain to supervisors and file grievances with the Civil Service Employee Association (the "Union").  In 2018, the harassment and retaliation escalated to include multiple physical attacks.

## ALLEGATIONS

7.     In 2003, Ms. Malone began her tenure at the Department as a student worker.  She was then, and continues to be, the only female non-administrative employee of the Department. Ms. Malone worked part-time for the Department for six years while she was a college student and was willing and available to be hired as a full-time employee.  Ms. Malone was told, however, that she would never be hired as a full-time employee because she was a woman.   In the meantime, men who had not previously worked at the Department were hired to fill full-time positions.  Ms. Malone was not hired full-time until 2009, when her father, who was also a Town employee, intervened with a senior Town official who directed Wayne Ballard, then-Highway Superintendent, to hire her.

8.     Throughout her employment with the Department, she was regularly subjected to sexual and gender-based harassment by her peers and supervisors. The Department tolerated and encouraged a toxic atmosphere in which male employees constantly made disgusting and degrading sexual comments in front of Ms. Malone, and within earshot of supervisory employees. The following examples are illustrative of the inappropriate sexual comments Ms. Malone had to endure on a regular basis:

3

- When someone dispenses foam from the hand sanitizer machine in the clock room, men in the room moaned and made sexual sounds.

- Male employees discussed how "eating out" a woman on her period was like a "lion eating a gazelle."

- Male employees discussed whether a coworker who claimed to have found religion was going to give up blow jobs.

- Male employees talked about how another employee ordered a "hooker," asked the service to "send an Asian," and orgasmed before the "hooker" touched him.

- After Ms. Malone spent all night snowplowing, she was told that the next employee to use her truck would be "smelling her seat."

- A male employee made moaning sounds while stuttering and convulsing—to pretend that he was ejaculating.

- A male employee said that he wanted to "shove a pencil up [his] ass" so he could claim that a supervisor had abused him and get medical leave.

- When Ms. Malone's crew passed a house, a male coworker would say he had "banged" the woman who lives there.  When the crew passed a woman, another male coworker would make sexual noises, such as moaning and stating, "mmm, ohh my god."

- Male employees discussed how another female employee's thighs were far part, such that they would have "easy access" with "no friction."

- One of Ms. Malone's male coworkers told her that another male employee said that Ms. Malone "sucked really good dick."

- When an employee leaves the supervisors' office, coworkers often say that the employee should "wipe his face," or that that the employee was "under the desk"—implying that the employee was giving the supervisor oral sex.

- Male employees called David Salvo, an employee who was teased for kissing up to supervisors, "David Swallow"—suggesting that he gave oral sex to supervisors.

- A male employee claimed to be getting lots of blow jobs and anal sex from his girlfriend when she had her period.  Other male employees joked that the girlfriend was a transsexual and asked whether the employee tried a "reach around."

9.    These comments made Ms. Malone uncomfortable.  She regularly told her coworkers that she thought the comments were disgusting and inappropriate, and asked them to stop making them.

4

10.     In addition to being subject to a constant stream of inappropriate sexual comments, Ms. Malone was the direct target of many such comments and gestures. In 2009, after Ms. Malone began working full-time at the Department, she was subjected to extreme verbal abuse and gender discrimination by Ballard because, in Ballard's view, Ms. Malone did not demonstrate the appropriate gratitude for her hiring. Ballard regularly berated Ms. Malone; and he assigned her to cleaning or administrative tasks rather than to the mechanical operation work for which she was hired and qualified. Also, on multiple occasions, Ballard stalked Ms. Malone, following her during her lunch break, including to her home. In addition to Ballard's own harassing conduct, during his leadership, Ms. Malone was regularly harassed and degraded by her other male colleagues for being a woman, and she was regularly subjected to unwanted and inappropriate comments about sex, similar to those described above. Ballard, deputy supervisor Andrew Lawrence, and other supervisory employees were aware of the discriminatory and harassing conduct and did nothing to stop it or discipline the offenders.

11.     For example, in 2009, on a night when Ms. Malone was required to stay overnight at work due to a snow emergency and had, after finishing her shift, fallen asleep, a colleague observed a number of men in the Department making sexual suggestions and gestures while staring at Ms. Malone's body. The colleague reported the incident to his superiors and a "sensitivity training" was conducted.

12.     Notwithstanding this supposed training, the conduct of Ms. Malone's male coworkers did not change. The Department took no action to monitor the employees' conduct to ensure that they complied with their training and responsibilities. Indeed, the Department supervisors knowingly allowed Ms. Malone's coworkers to subject her to an ongoing hostile

work environment and the Department took no disciplinary action against the male employees who harassed Ms. Malone.

13.     By way of further example, when Ms. Malone asked if anyone wanted to eat her untouched rice at lunch, another employee, Rob Kaminski, stated, "You know I wouldn't eat the rice out of your bowl but if you sucked my dick I'd kiss you after." On another occasion, Kaminski showed Ms. Malone a picture of a male employee sleeping in a truck with his hands down his pants and asked Ms. Malone if the picture made her "wet." On yet another occasion, when a foreman brought in cannoli for Ms. Malone's team, Kaminski said, "I have your cannoli right here," and thrust his hips towards her face. Additionally, Kaminski often told Ms. Malone that her ass looked nice.

14.     The conduct of DiZenzo, who later became the Highway Superintendent, was just as abhorrent. When DiZenzo saw Ms. Malone, he would ask her if needed a place to sit, wipe his mouth, tilt his head back, and stick out his tongue—inviting Ms. Malone to sit on his face. DiZenzo harassed Ms. Malone in this manner on numerous occasions, including in the presence of supervisors. As another example, when DiZenzo heard Ms. Malone state that she was going to take a bathroom break, he would cup his hands and say, "Do you need help," suggesting that Ms. Malone urinate into his hands. On another occasion, while Ms. Malone and DiZenzo were raking leaves, DiZenzo said he would love to throw Ms. Malone down on top of a pile of leaves and make love to her. And when Ms. Malone asked DiZenzo how to shift gears in their truck, he told her to grasp the shift with two hands, and then, while laughing, directed to her to rub her hands up and down as if the shift were a penis. DiZenzo also pressured Ms. Malone to look at and rank pictures of naked women while they were together in a truck, and even pulled Ms. Malone's pants aside to see her underwear.

6

15.    In 2011 and 2013, Ms. Malone's father ran against Ballard for Superintendent of

the Department.  In retaliation, and at Ballard's direction, Lawrence informed Ms. Malone that

she could no longer use the women's restroom but had to use the men's restroom.  Ballard and

Lawrence also forced Ms. Malone to use an electrical closet as a changing room.  The room did

not lock and was infested with vermin.  Ms. Malone complained to Lawrence, and Lawrence told

Ms. Malone not to complain to the Town or to the Union because doing so would make her life

ten times worse.

16.    In or about 2014, Ms. Malone took a test for promotion to MEO II.  Despite

having passed the test with a high score, the Department failed to promote Ms. Malone and

instead promoted males who had received lower scores and/or had made errors that should have

resulted in an automatic failure.  After attempting to resolve the matter with her supervisors, Ms.

Malone brought a grievance to the Union regarding the Department's failure to promote her

despite her qualification for a promotion.  In order to get her promotion and corresponding pay

increase, which already had been wrongfully withheld for two years, Ms. Malone agreed to settle

the grievance.  Although Ms. Malone was granted the promotion through the settlement, it

granted her less seniority than she was entitled to receive in light of the two-year delay.

17.    Notwithstanding the fact that Ms. Malone had complained and filed a formal

grievance, her coworkers were not deterred in their never-ending campaign to harass and

intimidate her.  For example, during this time, Ms. Malone was harassed by Tucker Connington,

one of her supervisors, who would block the doorway when Ms. Malone was going to or coming

from the women's restroom and would make sexual grunting noises when Ms. Malone walked

near him.

18.     In addition to the creation of a hostile work environment through sexual comments and gestures, Ms. Malone's coworkers subjected her to physical attacks. For example, in or about 2015, a coworker, Rory O'Connell, pushed Ms. Malone in the supervisors' office and tried to close the office door on her fingers. He taunted her, for example, by telling her to "shut her fucking mouth." And he repeatedly intimidated Ms. Malone by swerving his car towards her when she was walking in the parking lot, nearly hitting her on multiple occasions. Incredibly, when Ms. Malone complained to her supervisors, including Andrew Lawrence and Ballard, about O'Connell's conduct, no corrective action was taken. Rather, Lawrence—exemplifying the Town and the Department's callous and dismissive attitude toward Ms. Malone's complaints—told Ms. Malone that he could not do anything about O'Connell because the conduct at issue took place in the parking lot. Realizing the Department would do nothing to help her, Ms. Malone felt she had no other recourse but to file a Workplace Violence Incident Report.

19.     In 2016, DiZenzo became the Highway Superintendent. Ms. Malone hoped that DiZenzo's promotion would cause him to correct his misconduct and improve her working conditions. But DiZenzo's rise through the ranks actually had precisely the opposite effect. Under DiZenzo, Ms. Malone's harassment escalated. First, DiZenzo continued his own sexually harassing conduct towards Ms. Malone by persisting in his practice of rubbing his mouth and suggesting that Ms. Malone sit on his face, and inviting her to urinate into his cupped hands. DiZenzo was brazen enough to repeatedly engage in this behavior right in the Superintendent's Office.

20.     Additionally, rather than use his position as Superintendent to make the employees under his supervision obey the law, he encouraged them to continue their disgusting

conduct and allowed them to subject Ms. Malone to further discomfort and humiliation. For example, male employees frequently urinated in front of Ms. Malone, and did so in a manner calculated to harass and intimidate her. Upon information and belief, DiZenzo knew the men were urinating in front of Ms. Malone. But rather than stop their behavior, DiZenzo joined in the harassment by giving Ms. Malone a pink "Go Girl"—a female urination device that she could use to urinate outdoors while standing. Significantly, DiZenzo gave Ms. Malone the "Go Girl" despite being warned, upon information and belief, that it would be inappropriate to do so. DiZenzo rejected these warnings and gave Ms. Malone the "Go Girl" in front of a number of supervisors, laughing while he did so. (An image of the "Go Girl" and the procedure for its use is attached as Exhibit A).

21.    From in or around 2016 through 2018, in addition to the constant stream of inappropriate comments that she endured, Ms. Malone was the victim of multiple physical and sexual assaults by her colleagues and supervisors. Supervisor Rob Klein repeatedly pushed Ms. Malone to the ground, and on one occasion sat on her and slapped her buttocks while pressing her face into the ground. On at least two occasions, Klein ripped off Ms. Malone's shirt (once after pushing her to the ground, and again after pushing her face into the seat of a truck). Klein deliberately drove the wheel of his pickup truck into Ms. Malone's leg. Further, Klein assaulted Ms. Malone with a large double-bladed pruning tool known as a "lopper," which he used to cut her leg. (A photograph of the injury caused by Klein's attack is attached as Exhibit B.)

22.    David Salvo, another member of the Department, similarly pushed Ms. Malone to the ground and pressed her face into the dirt. In addition, he often shoved Ms. Malone out of his way, for example, while she was raking or gathering branches. Salvo also deliberately used a Department-issued power tool to cut a log covered in poison ivy, to which he knew Ms. Malone

is severely allergic, in a manner calculated to blow poison ivy shavings all over her. Salvo's attack violated the Department policy requiring that poison ivy be removed from tree detritus before power tools are used to dismantle the detritus. As a result of Salvo's actions, Ms. Malone had to leave work and seek medical treatment.

23.     Moreover, Salvo sexually harassed Ms. Malone, made sexually suggestive comments about her sister, and asked about Ms. Malone's sex life. By way of example, when Ms. Malone's crew passed by Hasidic Jews, Salvo asked Ms. Malone how she would feel with one of "them" on top of her—suggesting that they have sex. Salvo unnecessarily slammed the break of their truck and then stuck his arm in front of Ms. Malone such that his hand was touching her breasts. He often asked Ms. Malone if she was on her period. Further, he asked Ms. Malone why they had never gotten together and told a 7-11 clerk that Ms. Malone was his wife. Salvo said that Ms. Malone's older sister looked like Kim Kardashian and added, "ohh my god, what I would do to her ass." When Malone had a boyfriend, Salvo asked her if she "did it yet."

24.     Another member of the department, Christopher McDermott, deliberately cut a tree in a manner that could have caused the tree to hit Ms. Malone. McDermott often threw sticks, acorns, and other debris down Ms. Malone's shirt—and then asked her if she needed help cleaning out her shirt. On another occasion, an employee in the mechanic shop threw a dirty rag at Ms. Malone's head. When Ms. Malone was standing near the cabinet that holds equipment keys, another employee asked her if he could "shove" his "key" into her "box"—a reference to having sex with her.

25.     Then, in March 2018, Salvo threw out a pair of Ms. Malone's gloves that she had left in a highway truck. Malone confronted Salvo about the incident. In retaliation, Salvo

fabricated the serious charge that Ms. Malone was improperly flagging traffic to endanger Salvo.

A foreman overheard Salvo and others in the locker room discussing the need to get their stories

straight so as to support Salvo's fabricated version of events. As a result of Salvo's false

accusations, Ms. Malone was removed from her crew for approximately two weeks and deprived

of overtime that she would have otherwise received. Salvo's conduct put Ms. Malone's job in

jeopardy. In order to protect her job and her future, Ms. Malone filed a Union grievance.

Notwithstanding her formal grievances and her years of complaints, once again, nothing was

done to help her.

26.     Thereafter, DiZenzo expressed his displeasure with Ms. Malone for filing the

Salvo grievance and defamed her to her coworkers, telling them that any disruption to the

Department was Ms. Malone's fault. This defamation predictably caused Ms. Malone's

coworkers to further harass her.

27.     Connington further discriminated and retaliated against Ms. Malone for her

complaints and Union grievances by changing her daily assignments. Moreover, in May of

2018, Connington retaliated against Ms. Malone by assigning her to drive a truck that was

thereafter declared by the Department's mechanics to be unsafe. After the truck failed to stop

due to its faulty brakes, Ms. Malone turned the truck over to the Department's mechanics for

repair and told Connington that she did not want to drive it. Connington became verbally

abusive. He publicly humiliated Ms. Malone in front of her colleagues, so much so that she felt

unsafe and submitted a complaint to DiZenzo and the Union about Connington's conduct.

28.     The Town's pattern and practice of encouraging, disregarding, and failing to

correct the harassment and abuse suffered by Ms. Malone predictably led to the series of events

in which Brian Lillo, a member of Ms. Malone's work crew (the "tree crew"), attempted to

11

attack Ms. Malone.  Lillo was known to the Department to be dangerous and unstable, having been repeatedly reprimanded for provoking verbal altercations with members of the Department, and having been told by his supervisors that the "next time" he acted out, he would be removed from the tree crew.  Despite these threats of discipline, each of the "next times" that Lillo provoked an incident, Department supervisors took no action, and Lillo began taking out his aggression on Ms. Malone.

29.     On at least one occasion in 2018, Lillo attempted to humiliate Ms. Malone in front of the rest of their crew, declaring that "only a retard would hit on her."  Later, while Lillo was removing a tree, he deliberately positioned Ms. Malone so that she would be hit by wood chips and shavings discharged by his chainsaw running at high speed.  McDermmott, who saw the incident, taunted Ms. Malone by asking her if she needed help getting woodchips and dust out of her shirt.

30.     On June 28, 2018, on or near the premises of the Highway Department, having become angry that Ms. Malone had been assigned by their supervisor to do a job that Lillo preferred, Lillo kicked a chair at her and swung a chainsaw at her head.  Although Ms. Malone informed her supervisor of Lillo's attack, no action was taken until several days after she made her report.  At that point, Ms. Malone filed a criminal complaint against Lillo.  The next day, Ms. Malone was removed from her work crew and given a series of less desirable work assignments. Lillo was permitted to remain in the tree crew, despite his supervisors' previous threats to remove him from the crew if he continued his abusive and harassing conduct.  Lillo's conduct, and the enabling of his conduct by the Town, the Department and DiZenzo, was the subject of a separate Notice of Claim served on the Town on September 21, 2018.

31.    Notwithstanding the physical assaults and egregious harassment that she has endured, the Town and the Department have failed to take any corrective action since Lillo swung a chainsaw at Ms. Malone's head in June of 2018.  Instead, the Town has been "investigating" that incident for *over six months* and Lillo has remained in his position, apparently having not been subject to any discipline.  On the other hand, Ms. Malone has been subject to ongoing harassment, intimidation, and retaliation that continues to this day.

## CLAIMS

32.    As a part of an ongoing pattern of discrimination and retaliation, Ms. Malone has been subjected, and continues to be subject, to ongoing adverse employment actions, harassment, and disparate treatment, including, *inter alia*, being reassigned to new work crews despite the Department's general practice of maintaining work crew assignments for months or years at a time, and hostile treatment, verbal harassment, and physical assault by her peers and supervisors.

33.    Ms. Malone has reported the abuse and harassment she suffered to her superiors over and over again, but to no avail.  In fact, despite her repeated attempts to work through the grievance and disciplinary system created by the Town, she suffered escalating harassment and severe retaliation.  Although Ms. Malone has not previously made public the extent of her mistreatment and abuse at the hands of the Department in an effort to preserve the career in which she has invested over 14 years of her life, her health and wellbeing are now in such jeopardy that she has no choice but to go beyond the internal procedures that have done nothing to protect her.  Ms. Malone is now prepared to bring her claims in a judicial forum in order to vindicate her rights and to prevent other women from being forced to endure the abuse she has suffered.

34.     Ms. Malone has claims of gender discrimination, hostile work environment, equal protection violations, retaliation, and failure to protect in violation of federal and state law against the defendants, including but not limited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1983 and 2000e *et seq.*, and the New York State Human Rights Law § 290 *et seq.* The defendants' ongoing illegal conduct consists, *inter alia*, of engaging in, or causing others to engage in, a pattern of adverse employment actions, the creation of a hostile work environment, disparate treatment, and retaliation.

35.     Ms. Malone has claims of retaliation for protected speech under federal and state law against the defendants.  The defendants' ongoing illegal conduct consists, *inter alia*, of attempting to suppress Ms. Malone's legally protected speech, and of engaging in, or causing others to engage in, harassment and adverse employment actions in retaliation for her protected speech.

36.     Ms. Malone has tort claims against the defendants, including but not limited to personal injury, assault and battery, negligence, defamation, negligent infliction of emotional distress, and intentional infliction of emotional distress.

37.     Ms. Malone has suffered severe physical and emotional repercussions from her colleagues' and supervisors' conduct, including but not limited to insomnia, abdominal pain, severe allergic reactions, and panic attacks caused by sustained physical and emotional abuse.

38.     Based on the conduct of the defendants, Ms. Malone is entitled to damages that include but are not limited to: (i) compensatory damages; (ii) consequential damages; (iii) reputational damages; (iv) emotional damages; (v) punitive damages; (vi) back pay and front pay; and (vii) attorneys' fees.  As a result, Ms. Malone has suffered monetary damages of an amount to be proved at trial, not less than $3,000,000.

**EXHIBIT A**



**EXHIBIT B**



Feb  04  2019  01:21PM  HP  FaxRJL  Industries,  Inc  8454596148

I, Victoria Malone, am the Claimant in the above entitled action.  I have read the

foregoing and know the contents thereof.  The contents are true to the best of my own knowledge

except as to matters therein stated to be alleged upon information and belief, and to those matters

I believe them to be true.

Victoria Malone

State of New York
County of Rockland

Sworn to before me this
4 day of February, 2019

Notary Public

JENNA RIFFLARD
Notary Public - State of New York
NO. 01RI6207746
Qualified in Rockland County
My Commission Expires 10|15|21

15