UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VICTORIA MALONE,

    Plaintiff,

    - against -

TOWN OF CLARKSTOWN, WAYNE BALLARD, *in his personal and official capacity as Clarkstown Highway Superintendent*, FRANK DIZENZO, *in his personal and official capacity as Clarkstown Highway Superintendent*, ANDREW LAWRENCE, *in his personal and official capacity*, DAVID SALVO, *in his personal and official capacity*, ROBERT KLEIN, *in his personal and official capacity*, TUCKER CONNINGTON, *in his personal and official capacity*, and BRIAN LILLO, *in his personal and official capacity*,

    Defendants.

---

Case No.: 7:19-cv-05503 (VB)

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Victoria Malone, by her attorneys, complaining of defendant Town of Clarkstown (the "Town"), Wayne Ballard, Frank DiZenzo, Andrew Lawrence, David Salvo, Robert Klein, Tucker Connington, and Brian Lillo in their personal and official capacities (the "Individual Defendants," and collectively with the Town, the "Defendants"), alleges as follows:

## NATURE OF CLAIMS

1.    In the era of "me too," it is difficult to be surprised by the abuse suffered by women at the hands of their co-workers and superiors. However, even in this day and age, the years-long abuse suffered by Victoria Malone, while employed by the Town of Clarkstown, is so appalling that it will shock even the most jaded of senses.

2.    The actions giving rise to Ms. Malone's claims began when she was hired as a summer worker by the Town of Clarkstown Highway Department (interchangeably the "Department" or the "Highway Department") in 2003 and constitute a widespread pattern of

conduct by the Town and the Department, and their leadership and employees, that continues through the present day.

3.      Dating back to 2003, Ms. Malone has been subjected to gender-based harassment and discrimination, as well as retaliation.  Wayne Ballard, the Highway Superintendent from Ms. Malone's hiring until approximately 2015, condoned and, at times, personally participated in this misconduct.  Frank DiZenzo, who became the Highway Superintendent in early 2016, also condoned and personally participated in the misconduct.  In fact, since DiZenzo became Highway Superintendent, Ms. Malone has suffered ever more severe verbal and physical harassment, as well as retaliation because she had the courage to complain to supervisors and file grievances with the Civil Service Employee Association (the "Union").

4.      Under DiZenzo, the harassment and retaliation escalated to include multiple physical attacks.  Among other things, Ms. Malone was pushed to the ground, had her shirt pulled off, had poison ivy and debris sprayed at her—and even had a chainsaw swung at her head.

5.      Ms. Malone brings this action to stand up to and remedy Defendants' longstanding discrimination, retaliation, and other illegal and tortious conduct.  Specifically, Ms. Malone asserts claims of gender discrimination and/or retaliation under 42 U.S.C. § 1983 for the violation of her rights under the Equal Protection Clause of the Fourteenth Amendment; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et al., as amended; and the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290 et seq., as amended by the 2019 Session Laws of New York, Chapter 160 (A. 8241), certain provisions of which became effective on October 11, 2019.  She also asserts claims of witness intimidation and/or deterrence under 42 U.S.C. § 1985(2); and common law claims of assault and battery and intentional infliction of emotional distress.

**JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS**

6.      This Court has jurisdiction over Ms. Malone's Section 1983 claims under 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over Ms. Malone's NYSHRL, failure to protect, and common law tort claims under 28 U.S.C. § 1367.

8.      Ms. Malone filed a Notice of Claim and Supplemental Notice of Claim with the Town on September 21, 2018 and February 4, 2019, respectively.  She completed a hearing pursuant to New York Municipal Law § 50-h on May 2 and 6, 2019.

9.      Ms. Malone filed a charge of discrimination with Equal Employment Opportunity Commission ("EEOC") on March 18, 2019.  She received a right-to-sue letter from the EEOC, dated August 15, 2019, authorizing her to bring federal discrimination and retaliation claims under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e et seq.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the Defendants reside in the Southern District of New York and/or are subject to the Court's personal jurisdiction in this District, and a substantial portion of the acts and omissions giving rise to Ms. Malone's claims occurred in this District.

**PARTIES**

11.      Ms. Malone resides in Rockland County, New York.

12.      Defendant Town of Clarkstown is a municipal corporation located at 10 Maple Avenue, New City, New York.

13.      The Town of Clarkstown Highway Department is a department of the Town, located at 12 Seeger Drive, Nanuet, New York.

14.      Defendant Wayne Ballard was the Superintendent of the Highway Department. Upon information and belief, Ballard resides in Rockland County, New York.

15.     Defendant Frank DiZenzo has been the Superintendent of the Highway Department since January 2016.  Upon information and belief, DiZenzo resides in Rockland County, New York.

16.     Defendant Andy Lawrence was the second highest ranking official in the Highway Department.  Upon information and belief, Lawrence resides in Rockland County, New York.

17.     Defendant David Salvo is an employee of the Highway Department.  Upon information and belief, Salvo resides in Rockland County, New York.

18.     Defendant Robert Klein is a crew foreman at the Highway Department.  Upon information and belief, Klein resides in Rockland County, New York.

19.     Defendant Tucker Connington is the second highest ranking official in the Highway Department.  Upon information and belief, Connington resides in Orange County, New York.

20.     Defendant Brian Lillo is an employee of the Highway Department.  Upon information and belief, Lillo resides in Rockland County, New York.

## HISTORY OF DISCRIMINATION, HARASSMENT, AND ABUSE

21.     In 2003, Ms. Malone began her tenure at the Department as a student worker. She was then, and continues to be, the only female non-administrative employee of the Department.  Ms. Malone worked part-time for the Department for six years while she was a college student and was willing and available to be hired as a full-time employee.  Ms. Malone was told, however, that she would never be hired as a full-time employee because she was a woman.  In the meantime, men who had not previously worked at the Department were hired to fill full-time positions.  Ms. Malone was not hired full-time until 2009, when her father, who was also a Town employee, intervened with a senior Town official who directed Wayne Ballard, then-Highway Superintendent, to hire her.

22.     Throughout her employment with the Department, Ms. Malone was regularly subjected to sexual and gender-based harassment by her peers and supervisors.  The Department tolerated and encouraged a toxic atmosphere in which male employees constantly made disgusting and degrading sexual comments in front of Ms. Malone, and within earshot of supervisory employees.  Many of these comments were made or condoned by supervisors and/or intentionally made in Ms. Malone's presence.  The following examples are illustrative of the inappropriate sexual comments Ms. Malone had to endure on a regular basis:

- When someone dispensed foam from the hand sanitizer machine in the clock room, men in the room moaned and made sexual sounds.

- Male employees discussed how "eating out" a woman on her period was like a "lion eating a gazelle."

- Male employees discussed whether a coworker who claimed to have found religion was going to give up "blow jobs."

- Male employees talked about how another employee ordered a "hooker," asked the service to "send an Asian," and orgasmed before the "hooker" touched him.

- After Ms. Malone spent all night snowplowing, she was told that the next employee to use her truck would be "smelling her seat."

- A male employee made moaning sounds while stuttering and convulsing—to pretend that he was ejaculating.

- A male employee said that he wanted to "shove a pencil up [his] ass" so he could claim that a supervisor had abused him and get medical leave.

- When Ms. Malone's crew passed a house, a male coworker would say he had "banged" the woman who lives there.  When the crew passed a woman, another male coworker would make sexual noises, such as moaning and stating, "mmm, ohh my god."

- Male employees discussed how another female employee's thighs were far part, such that they would have "easy access" with "no friction."

- One of Ms. Malone's male coworkers told her that another male employee said that Ms. Malone "sucked really good dick."

- When an employee leaves the supervisors' office, coworkers often say that the employee should "wipe his face," or that that the employee was "under the desk"—implying that the employee was giving the supervisor oral sex.

- Male employees called David Salvo, an employee who was teased for kissing up to supervisors, "David Swallow"—suggesting that he gave oral sex to supervisors.

- A male employee claimed to be "getting lots of blow jobs" and engaging in anal sex with his girlfriend when she had her period. Other male employees joked that the girlfriend was a transsexual and asked whether the employee tried a "reach around."

23. These comments were unwelcome and made Ms. Malone uncomfortable. She regularly told her coworkers that she thought the comments were disgusting and inappropriate, and asked them to stop making them.

24. In addition to being subject to a constant stream of inappropriate sexual comments, Ms. Malone was the direct target of many such comments and gestures. In 2009, after Ms. Malone began working full-time at the Department, she was subjected to extreme verbal abuse and gender discrimination by Ballard because, in Ballard's view, Ms. Malone did not demonstrate the appropriate gratitude for her hiring. Ballard regularly berated Ms. Malone; and he assigned her to cleaning or administrative tasks rather than to the mechanical operation work for which she was hired and qualified. Also, on multiple occasions, Ballard stalked Ms. Malone, including following her during her lunch break and then to her home. In addition to Ballard's own harassing conduct, during his leadership, Ms. Malone was regularly harassed and degraded by her other male colleagues for being a woman, and she was regularly subjected to unwanted and inappropriate comments about sex, like those described above. Ballard, deputy supervisor Andrew Lawrence, and other supervisory employees were aware of the discriminatory and harassing conduct and did nothing to stop it or discipline the offenders.

25. For example, in 2009, on a night when Ms. Malone was required to stay overnight at work due to a snow emergency and had, after finishing her shift, fallen asleep, a

colleague observed a number of men in the Department making sexual suggestions and gestures while staring at Ms. Malone's body.  The colleague reported the incident to his superiors and a "sensitivity training" was conducted.

26.     Notwithstanding this supposed training, the conduct of Ms. Malone's male coworkers did not change.  The Department took no action to monitor the employees' conduct to ensure that they complied with their training and responsibilities.  Indeed, the Department supervisors knowingly allowed Ms. Malone's coworkers to subject her to an ongoing hostile work environment and the Department took no disciplinary action against the male employees who harassed Ms. Malone.

27.      By way of further example, when Ms. Malone asked if anyone wanted to eat her untouched rice at lunch, another employee, Rob Kaminski, stated, "You know I wouldn't eat the rice out of your bowl but if you sucked my dick I'd kiss you after."  On another occasion, Kaminski showed Ms. Malone a picture of a male employee sleeping in a truck with his hands down his pants and asked Ms. Malone if the picture made her "wet."  On yet another occasion, when a foreman brought in cannoli for Ms. Malone's team, Kaminski said, "I have your cannoli right here," and thrust his hips towards her face.  Additionally, Kaminski often told Ms. Malone that her ass looked nice.

28.     The conduct of DiZenzo, who later became the Highway Superintendent, was just as abhorrent.  When DiZenzo saw Ms. Malone, he would ask her if she needed a place to sit, wipe his mouth, tilt his head back, and stick out his tongue—inviting Ms. Malone to sit on his face.  DiZenzo harassed Ms. Malone in this manner on numerous occasions, including in the presence of supervisors.  As another example, when DiZenzo heard Ms. Malone state that she was going to take a bathroom break, he would cup his hands and say, "Do you need help?" suggesting that Ms. Malone urinate into his hands.  On another occasion, while Ms. Malone and

DiZenzo were raking leaves, DiZenzo said he would love to throw Ms. Malone down on top of a pile of leaves and make love to her.  And when Ms. Malone asked DiZenzo how to shift gears in their truck, he told her to grasp the shift with two hands, and then, while laughing, directed to her to rub her hands up and down as if the gear stick were a penis.  DiZenzo also pressured Ms. Malone to look at and rank pictures of naked women while they were together in a truck.  And appallingly, DiZenzo pulled Ms. Malone's pants aside to see her underwear.

29.     In 2011 and 2013, Ms. Malone's father ran against Ballard for Superintendent of the Department.  In retaliation, and at Ballard's direction, Lawrence informed Ms. Malone that she could no longer use the women's restroom but had to use the men's restroom.  Ballard and Lawrence also forced Ms. Malone to use an electrical closet as a changing room.  The room did not lock and was infested with vermin.  Ms. Malone complained to Lawrence, and Lawrence told Ms. Malone not to complain to the Town or to the Union because doing so would make her life ten times worse.

30.     In or about 2014, Ms. Malone took a test for promotion to Machine Equipment Operator II.  Despite having passed the test with a high score, the Department failed to promote Ms. Malone and instead promoted males who had received lower scores and/or had made errors that should have resulted in an automatic failure.  After attempting to resolve the matter with her supervisors, Ms. Malone brought a grievance to the Union regarding the Department's failure to promote her despite her qualification for a promotion.  In order to get her promotion and corresponding pay increase, which already had been wrongfully withheld for two years, Ms. Malone agreed to settle the grievance.  Although Ms. Malone was granted the promotion through the settlement, it granted her less seniority than she was entitled to receive in light of the two-year delay.

31.     Notwithstanding the fact that Ms. Malone had complained and filed a formal grievance, she continued to be subject to a never-ending campaign to harass and intimidate her. For example, during this time, Ms. Malone was harassed by Tucker Connington, one of her supervisors, who would block the doorway when Ms. Malone was going to or coming from the women's restroom.  He would also make sexual grunting noises when Ms. Malone walked near him.

32.     In addition to the creation of a hostile work environment through sexual comments and gestures, Ms. Malone's coworkers subjected her to physical attacks.  For example, in or about 2015, a coworker, Rory O'Connell, pushed Ms. Malone in the supervisors' office and tried to close the office door on her fingers.  He taunted her, for example, by telling her to "shut her fucking mouth."  And he repeatedly intimidated Ms. Malone by swerving his car towards her when she was walking in the parking lot, nearly hitting her on multiple occasions.  Incredibly, when Ms. Malone complained to her supervisors, including Andrew Lawrence and Ballard, about O'Connell's conduct, no corrective action was taken.  Rather, Lawrence—exemplifying the Town and the Department's callous and dismissive attitude toward Ms. Malone's complaints—told Ms. Malone that he could not do anything about O'Connell because the conduct at issue took place in the parking lot.  Realizing the Department would do nothing to help her, Ms. Malone felt she had no other recourse but to file a Workplace Violence Incident Report.

33.     In 2016, DiZenzo became the Highway Superintendent.  Ms. Malone hoped that DiZenzo's promotion would cause him to correct his misconduct and improve her working conditions.  But DiZenzo's rise through the ranks actually had precisely the opposite effect. Under DiZenzo, Ms. Malone's harassment escalated.  First, DiZenzo continued his own sexually harassing conduct towards Ms. Malone by persisting in his practice of rubbing his mouth and

suggesting that Ms. Malone sit on his face, inviting her to urinate into his cupped hands, and talking about the time he got Ms. Malone to rub a gear stick as if it were a penis.  DiZenzo was brazen enough to repeatedly engage in this behavior right in the Superintendent's Office.

34.    Additionally, rather than use his position as Superintendent to make the employees under his supervision obey the law, he encouraged them to continue their disgusting conduct and allowed them to subject Ms. Malone to further discomfort and humiliation.  For example, male employees frequently urinated in front of Ms. Malone, and did so in a manner calculated to harass and intimidate her.  Upon information and belief, DiZenzo knew the men were urinating in front of Ms. Malone.  But rather than stop their behavior, DiZenzo joined in the harassment by giving Ms. Malone a pink "Go Girl"—a female urination device that could be used to urinate outdoors while standing.  Significantly, DiZenzo gave Ms. Malone the "Go Girl" despite being warned, upon information and belief, that it would be inappropriate to do so. DiZenzo rejected these warnings and gave Ms. Malone the "Go Girl" in front of a number of supervisors, laughing while he did so.  (An image of a "Go Girl" and the procedure for its use is attached as Exhibit A.)

35.    From in or around 2016 through 2018, in addition to the constant stream of inappropriate comments that she endured, Ms. Malone was the victim of multiple physical and sexual assaults by her colleagues and supervisors.  Supervisor Rob Klein repeatedly pushed Ms. Malone to the ground, and on one occasion sat on her and slapped her buttocks while pressing her face into the ground.  On at least two occasions, Klein ripped off Ms. Malone's shirt (once after pushing her to the ground, and again after pushing her face into the seat of a truck).  Klein deliberately drove the wheel of his pickup truck into Ms. Malone's leg.  Further, Klein assaulted Ms. Malone with a large double-bladed pruning tool known as a "lopper," which he used to cut her leg.  (A photograph of the injury caused by Klein's attack is attached as Exhibit B.)

36.     David Salvo, another member of the Department, similarly pushed Ms. Malone to the ground and pressed her face into the dirt.  In addition, Salvo often shoved Ms. Malone out of his way, for example, while she was raking or gathering branches.  Salvo also deliberately used a Department-issued power tool to cut a log covered in poison ivy, to which he knew Ms. Malone is severely allergic, in a manner calculated to blow poison ivy shavings all over her.  Salvo's attack violated the Department policy requiring that poison ivy be removed from tree detritus before power tools are used to dismantle the detritus.  As a result of Salvo's actions, a few days later Ms. Malone had to leave work and seek medical treatment.

37.     Moreover, Salvo sexually harassed Ms. Malone, made sexually suggestive comments about Ms. Malone's sister, and asked about Ms. Malone's sex life.  By way of example, when Ms. Malone's crew passed by Jewish people wearing traditional clothing and hats, Salvo asked Ms. Malone how she would feel with one of "them" on top of her—suggesting that they have sex.  Salvo also unnecessarily slammed the brakes of their truck and then stuck his arm in front of Ms. Malone such that his hand was touching her breasts.  He often asked Ms. Malone if she was on her period.  Further, he asked Ms. Malone why they had never gotten together and told a 7-11 clerk that Ms. Malone was his wife.  And Salvo said that Ms. Malone's older sister looked like Kim Kardashian and added, "ohh my god, what I would do to her ass."  When Malone had a boyfriend, Salvo asked her if she "did it yet."

38.     Another member of the department, Christopher McDermott, deliberately cut a tree in a manner that could have caused the tree to hit Ms. Malone.  McDermott often threw sticks, acorns, and other debris down Ms. Malone's shirt—and then asked her if she needed help cleaning out her shirt.  On another occasion, an employee in the mechanics shop threw a dirty rag at Ms. Malone's head.  When Ms. Malone was standing near the cabinet that holds

equipment keys, another employee asked her if he could "shove" his "key" into her "box"—a reference to having sex with her.

39.     Then, in March 2018, Salvo threw out a pair of Ms. Malone's gloves that she had left in a highway truck.  Malone confronted Salvo about the incident.  In retaliation, Salvo fabricated the serious charge that Ms. Malone was improperly flagging traffic to endanger Salvo. A foreman overheard Salvo and others in the locker room discussing the need to get their stories straight so as to support Salvo's fabricated version of events.  Rather than Salvo experiencing any negative consequences as a result of his harassment, Ms. Malone was removed from her crew for approximately two weeks and deprived of overtime that she would have otherwise earned as a result of Salvo's false accusations.  Salvo's conduct put Ms. Malone's job in jeopardy.  In order to protect her job and her future, Ms. Malone filed a Union grievance.  Notwithstanding her formal grievances and her years of complaints, once again, nothing was done to help her.  Rather, DiZenzo expressed his displeasure with Ms. Malone for filing the Salvo grievance and defamed her to her coworkers, telling them that any disruption to the Department was Ms. Malone's fault. DiZenzo's response to Ms. Malone's complaint predictably caused Ms. Malone's coworkers to further harass her.

40.     Connington further discriminated and retaliated against Ms. Malone for her complaints and Union grievances by changing her daily assignments such that she lost opportunities for overtime pay.  Moreover, in May of 2018, Connington retaliated against Ms. Malone by assigning her to drive a truck that was thereafter declared by the Department's mechanics to be unsafe.  After the truck failed to stop due to its faulty brakes, Ms. Malone turned the truck over to the Department's mechanics for repair and told Connington that she did not want to drive it.  Connington became verbally abusive.  He publicly humiliated Ms. Malone in

front of her colleagues, so much so that she felt unsafe and submitted a complaint to DiZenzo and the Union about Connington's conduct.

41.     The Town's pattern and practice of encouraging, disregarding, and failing to correct the harassment and abuse suffered by Ms. Malone predictably led to the series of events in which Brian Lillo, a member of Ms. Malone's work crew (the "tree crew"), attempted to attack Ms. Malone.  Lillo was known to the Department to be dangerous and unstable.  Lillo had been repeatedly reprimanded for provoking verbal altercations with members of the Department, and had been told by his supervisors that the "next time" he acted out, he would be removed from the tree crew.  Moreover, a number of Ms. Malone's coworkers—and significantly, Highway Department administrators—apparently were aware that Lillo had a criminal record that purportedly involved violence against a woman.  Despite Lillo's history and these promises of Departmental discipline the "next time" that Lillo provoked an incident, Department supervisors took no action, and eventually Lillo's aggression turned toward Ms. Malone.

42.     On one occasion, while Lillo was removing a tree, he deliberately positioned Ms. Malone so that she would be hit by wood chips and shavings discharged by his chainsaw running at high speed.  This was not a careless or negligent act.  It was a deliberate physical assault. McDermott, who saw the incident, taunted Ms. Malone by asking her if she needed help getting woodchips and dust out of her shirt.  Lillo also, in 2018, harassed, humiliated, and verbally abused Ms. Malone by stating in front of the rest of their crew, in substance, that only a mentally challenged person would hit on her.

43.     On June 28, 2018, on or near the premises of the Highway Department, having become angry that Ms. Malone had been assigned by their supervisor to do a job that Lillo preferred, Lillo kicked a chair at her and swung a chainsaw at her head.  Although Ms. Malone informed her supervisor of Lillo's attack, no action was taken until several days after she made

her report.  At that point, Ms. Malone filed a criminal complaint against Lillo and filed a grievance with the Union.  The next day, Ms. Malone was removed from her work crew and given a series of less desirable work assignments.  Lillo was permitted to remain in the tree crew, despite his supervisors' previous threats to remove him from the crew if he continued his abusive and harassing conduct; and even though other employees in the Highway Department were qualified to take his position.

44.     Notwithstanding the physical assaults and egregious harassment that she has endured, the Town and the Department have failed to take any corrective action since Lillo swung a chainsaw at Ms. Malone's head in June of 2018.  Instead, the Town has been "investigating" that incident for *over a year* and Lillo has remained in his position, apparently having not been subject to any discipline.  Indeed, upon information and belief, the Town's so-called "investigations" into Lillo's conduct and into the widespread misconduct at issue in this lawsuit have been a complete sham—with no employees facing discipline based on the misconduct reported by Ms. Malone.  Indeed, the only person who has suffered negative consequences as a result of the "investigations" is Ms. Malone, who was transferred out a position for which she was trained, operating heavy machinery, to a position washing and moving cars, and answering phone calls.

45.     The Town's "investigations" continued through November 2018 and invited further harassing and retaliatory conduct.  As part of the "investigations," Town employees made wholly fabricated assertions and claims to discredit and disparage Ms. Malone, and to make her a pariah in the Highway Department.  For example, upon information and belief, Lillo, DiZenzo and/or other employees falsely claimed that Ms. Malone welcomed the harassment that she suffered, and that she willingly participated in the conduct about which she now complains.

46.     Ms. Malone has been subject to ongoing harassment, intimidation, and retaliation that continues to this day. For example, in or around December 2018, Brian Lillo repeatedly harassed Ms. Malone by, among other things, slamming a cabinet door near her and whipping an air hose toward her in order to intimidate her.

47.     On January 8, 2019, Ms. Malone's counsel submitted a letter to the Town complaining of ongoing harassment and retaliation.  Shortly thereafter, while the Town supposedly was continuing to investigate this ongoing harassment and retaliation, Ms. Malone experienced two serious, potentially deadly on-the-job accidents.

48.     First, on January 17, 2019, the cable connecting Ms. Malone's roll-off truck to a large metal dumpster snapped while Ms. Malone was lowering the dumpster.  The dumpster crashed on to the road and hit the front loader positioned behind the truck.  Notably, the roll-off truck had been serviced shortly before the incident and it was well-known at the Highway Department that Ms. Malone was assigned to the roll-off truck whose cable snapped that day.

49.     Second, on the evening of February 12, 2019, the back tires on the right side of Ms. Malone's snowplow slid off, causing Ms. Malone's snowplow to tilt over and stop in the middle of the road.  Based on an inspection of the wheel at the scene, it appeared that the pins were not broken and the tires simply slid off, suggesting that the lug nuts were loose.  Again, it was well-known at the Department that Ms. Malone was assigned to the snowplow she was driving that evening.

50.     Either or both of these incidents put Ms. Malone's health and welfare in serious jeopardy.  Indeed, upon information and belief, the Town has failed to follow proper procedures to safely maintain the vehicles used by Ms. Malone, and failed to implement measures to adequately secure the vehicles.  Every day Ms. Malone questions the Town's willingness to carry through with its obligation to provide her with a safe and secure workplace environment, and

every day she is faced with the knowledge that her attempts to stand up for herself and just do her job have subjected her to uncontrolled harassment, retaliation, intimidation, and fear.

## WITNESS INTIMIDATION

51.     Rather than encourage employees to come forward with information that would aid the Town in safeguarding the workplace and preventing further discrimination, the Town has undertaken to intimidate employees in an effort to get away with its misconduct.  For example, upon information and belief, DiZenzo asked the Town Supervisor to authorize the expenditure of Town funds to hire a private investigator to surveil one of Ms. Malone's co-workers ("Witness 1") who has valuable information concerning the Town's discrimination, retaliation, and harassment of Ms. Malone and its failure to protect her.

52.     Indeed, upon information and belief, in or around mid-July, another witness ("Witness 2") observed a private investigator surveilling Witness 1 outside of Witness 1's home, and, when questioned, the investigator confirmed that he was surveilling Witness 1.  Witness 2 observed this surveillance just one month after Ms. Malone commenced this lawsuit.  Upon information and belief, the Town's surveillance of Witness 1 through a private investigator caused Witness 1 to fear losing Witness 1's employment, and was calculated to intimidate Witness 1, and to deter Witness 1 from providing information that would assist Ms. Malone in the prosecution of this lawsuit.

## FIRST CAUSE OF ACTION

### Gender Discrimination: Section 1983

### Against the Town

53.     Plaintiff repeats and re-alleges paragraphs 1 through 52 as if fully set forth herein.

54.     By the acts and practices described above, the Town discriminated against Ms. Malone in the terms and conditions of her employment on the basis of her gender, including,

among other things, by creating a hostile work environment because of her gender, in violation

of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

55.     Superintendents Ballard and DiEnzo were policy-makers with respect to the

treatment of employees in the Town's Highway Department, including Ms. Malone.

56.     The widespread harassment of Ms. Malone as the only non-administrative female

employee, which was encouraged and condoned by management of the Town's Highway

Department, amounted a custom, pattern, practice and/or policy of the Town's Highway

Department.

57.     The Town and its Highway Department failed to train, supervise and/or

discipline its supervisors with respect to the equal protection rights of its employees—*i.e.*, the right

to be free from gender-based discrimination and harassment under color of state law—and the

Town's Highway Department acted with deliberate indifference to the equal protection rights of

Ms. Malone.

58.     As a result of the Town and its Highway Department's conduct, Ms. Malone has

suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and

other compensable damages.

## SECOND CAUSE OF ACTION

Gender Discrimination: Section 1983

Against the Individual Defendants

59.     Plaintiff repeats and re-alleges paragraphs 1 through 58 as if fully set forth herein.

60.     By the acts and practices described above, the Individual Defendants

discriminated against Ms. Malone in the terms and conditions of her employment on the basis of

her gender, including, among other things, by creating a hostile work environment because of

her gender, in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

61.     As a result of the Individual Defendants' conduct, Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## THIRD CAUSE OF ACTION

Gender Discrimination: NYSHRL

Against All Defendants

62.     Plaintiff repeats and re-alleges paragraphs 1 through 61 as if fully set forth herein.

63.     By the acts and practices described above, Defendants discriminated against Ms. Malone in the terms and conditions of her employment on the basis of her gender, including, among other things, by creating a hostile work environment because of her gender, in violation of the NYSHRL.

64.     As a result of the Defendants' conduct, Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## FOURTH CAUSE OF ACTION

Retaliation: NYSHRL

Against All Defendants

65.     Plaintiff repeats and re-alleges paragraphs 1 through 64 as if fully set forth herein.

66.     By the acts and practices described above, Defendants retaliated against Ms. Malone for her opposition to unlawful discrimination under the NYSHRL, including, among other things, creating a hostile work environment in violation of the NYSHRL.

67.     As a result of the Defendants' conduct, Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## FIFTH CAUSE OF ACTION

### Assault and Battery

### Against Klein, Salvo, and Lillo

68.     Plaintiff repeats and re-alleges paragraphs 1 through 67 as if fully set forth herein.

69.     By the acts described above, among others, Defendants Klein, Salvo, and Lillo intentionally placed Ms. Malone in fear of an imminent harmful or offensive touching and/or touched Ms. Malone in harmful or offensive manner.

69.

70.     As a result of the foregoing conduct, Ms. Malone has suffered pain and suffering, emotional distress, and other compensable damages.

## SIXTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### Against  the Individual Defendants

71.     Plaintiff repeats and re-alleges paragraphs 1 through 70 as if fully set forth herein.

72.     By the acts described above, among others, the Individual Defendants engaged in extreme and outrageous conduct that intentionally or recklessly caused Ms. Malone severe emotional distress.

73.      As a result of the foregoing conduct, Ms. Malone has suffered irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## SEVENTH CAUSE OF ACTION

### Gender Discrimination: Title VII

### Against the Town

74.     Plaintiff repeats and re-alleges paragraphs 1 through 73 as if fully set forth herein.

75.     By the acts and practices described above, the Town discriminated against Ms. Malone in the terms and conditions of her employment on the basis of her gender, including, among other things, by creating a hostile work environment because of her gender, in violation of Title VII.

76.     As a result of the Town's conduct, Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## EIGHTH CAUSE OF ACTION

### Retaliation: Title VII

### Against the Town

77.     Plaintiff repeats and re-alleges paragraphs 1 through 76 as if fully set forth herein.

78.     By the acts and practices described above, the Town retaliated against Ms. Malone for her opposition to unlawful discrimination, including, among other things, creating a hostile work environment, in violation of the Title VII.

79.     As a result of the Town's conduct, Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## NINTH CAUSE OF ACTION

### Retaliation by Witness Deterrence/Intimidation: 42 U.S.C. § 1985(2)

### Against the Town and DiZenzo

80.     Plaintiff repeats and re-alleges paragraphs 1 through 79 as if fully set forth herein.

81.     By the acts described above, among others, DiZenzo, the Town, and/or one or more other Town officials or employees conspired to deter, by intimidation or threat, a witness to the conduct about which Ms. Malone complains in this lawsuit, including causing the witness to fear for the loss of the witness's employment or a change in the terms and conditions of employment by having the witness surveilled by a private investigator.  In addition, by the acts described above, among others, DiZenzo, the Town, and/or one of more other Town officials or employees conspired to impede, hinder, obstruct, or defeat the due course of justice in a State, with the intent to deny Ms. Malone the equal protection of the laws.

82.     As a result of the Town's conduct, Ms. Malone's ability to present her case in this lawsuit has or will be hampered, and Ms. Malone has suffered and will continue to suffer irreparable injury, pain and suffering, emotional distress, and other compensable damages.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Ms. Malone respectfully requests that this Court enter a judgment:

(a)   declaring that the acts and practices complained of herein are in violation of 42 U.S.C. §§ 1983 and 1985(2), the NYHRL, and the common law obligations identified above;

(b)   enjoining these violations;

(c)   directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d)  directing Defendants to pay Ms. Malone at least $5 million in  (i) compensatory damages for her pain and suffering, emotional distress, humiliation, and physical injuries, and (ii) punitive damages to the extent permitted by law;

(e)  awarding Ms. Malone pre- and post-judgment interest;

(f)  awarding Ms. Malone the costs of this action along with reasonable attorneys' fees; and

(g)  granting such other and further relief as the Court deems necessary and proper.

## **<u>DEMAND FOR A TRIAL BY JURY</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Malone demands a trial by jury in this action.

Dated:   New York, New York
         October 15, 2019

POLLOCK COHEN LLP

By:   /s/ *Adam Pollock*
      Adam Pollock
      Steve Cohen
60 Broad Street, 24th Floor
New York, NY  10004
(212) 337-5361
Adam@PollockCohen.com
*Attorneys for Plaintiff*

## **EXHIBIT A**



**EXHIBIT B**

