UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK

---

VICTORIA MALONE,

    Plaintiff,

    - against -

TOWN OF CLARKSTOWN, WAYNE
BALLARD, *in his personal and official capacity as
Clarkstown Highway Superintendent*, FRANK
DIZENZO, *in his personal and official capacity as
Clarkstown Highway Superintendent*, ANDREW
LAWRENCE, *in his personal and official capacity*,
DAVID SALVO, *in his personal and official
capacity*, ROBERT KLEIN, *in his personal and
official capacity*, TUCKER CONNINGTON, *in his
personal and official capacity*, and BRIAN LILLO,
*in his personal and official capacity*,

    Defendants.

---

No.: 7:19-cv-05503 (VB) (PED)

 

**Plaintiff Victoria Malone's Opposition to the
Town's Partial Motion for Summary Judgment**

POLLOCK COHEN LLP
60 Broad St., 24th Fl.
New York, NY 10004
(212) 337-5361
*Attorneys for Plaintiff*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

STANDARD ........................................................................................................... 2

ARGUMENT ........................................................................................................... 3

    1.    There is a genuine issue of material fact as to the retaliation claims. ................... 3

        1.1.    Elements of Retaliation ............................................................................... 3

        1.2.    Ms. Malone's engaged in protected activity by opposing the Town's unlawful discrimination and hostile work environment. ........................... 4

        1.3.    The Town was well aware of Ms. Malone's protected activity. ................. 5

        1.4.    The Town took multiple adverse actions that were reasonably likely to deter future complaints from Ms. Malone. ................................................. 6

        1.5.    The hostile work environment escalated. ................................................... 8

        1.6.    Superintendent DiZenzo gave Ms. Malone the "Go Girl" – after being warned it was inappropriate – as a way to send Ms. Malone a message. ... 9

        1.7.    Ms. Malone was not just harassed but repeatedly assaulted. ................... 12

        1.8.    The Ongoing Bathroom Retaliation ......................................................... 14

        1.9.    The Town's attempt to recast years of retaliation as four distinct acts is unavailing ............................................................................................... 16

        1.10.    The transfer to the Town garage ............................................................. 18

        1.11.    There is a clear causal connection. .......................................................... 20

    2.    The Court should not make a factual finding on the conduct of Tucker Connington. ............................................................................................................. 21

        2.1.    The proposed motion does not exist within the FRCP. ........................... 21

        2.2.    Connington knew about and allowed the harassment, the retaliation, and the hostile work environment – and did absolutely nothing to stop it. ...... 23

CONCLUSION ........................................................................................................ 24

# Table of Authorities

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)........................................................................................ 2

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004) ......................................................................... 2

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................ 2

*Argus Inc. v. Eastman Kodak Co.*,
801 F.2d 38 (2d Cir. 1986) ........................................................................... 2

*Berger-Rothberg v. City of New York*,
803 F. Supp. 2d 155 (E.D.N.Y. 2011) ...................................................... 3

*Bostock v. Clayton County, Georgia*,
140 S. Ct. 1731 (2020)............................................................................ 16, 20

*Brown v. Henderson*,
257 F.3d 246 (2d Cir. 2001) ...................................................................... 20

*Caban v. Richline Group, Inc.*,
2012 WL 2861377 (S.D.N.Y. July 10, 2012) ........................................ 13

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*,
150 F.3d 132 (2d Cir. 1998) ......................................................................... 2

*Cortes v. City of New York*,
700 F. Supp. 2d 474 (S.D.N.Y. 2010) ..................................................... 13

*Gibbs v. N.Y. Dep't of Taxation and Finance*,
2009 WL 754307 (E.D.N.Y. Mar. 20, 2009).......................................... 13

*Hicks v. Baines*,
593 F.3d 159 (2d Cir. 2010) ......................................................................... 7

*Holtz v. Rockefeller & Co.*,
258 F.3d 62 (2d Cir. 2001) ........................................................................... 9

*James v. Countrywide Fin. Corp.*,
849 F. Supp. 2d 296 (E.D.N.Y. 2012) ...................................................... 5

*L. Debenture Tr. Co. of New York v. WMC Mortg., LLC*,
2017 WL 3401254 (D. Conn. Aug. 8, 2017) .......................................... 22

*Mathirampuzha v. Potter*,
548 F.3d 70 (2d Cir. 2008) ......................................................................... 14

*Rasmy v. Marriott Intl., Inc.*,
    952 F.3d 379 (2d Cir. 2020) ............................................................................ 3

*Redd v. N.Y. State Div. of Parole*,
    678 F.3d 166 (2d Cir. 2012) .......................................................... 7, 12, 18, 24

*Robertson v. F. Martin*,
    2021 WL 545895 (C.D. Cal. Jan. 4, 2021) ................................................... 22

*Rosioreanu v. City of New York*,
    526 Fed. Appx. 118 (2d Cir. 2013) .................................................................. 3

*Salerno v. City Univ. of New York*,
    2003 WL 22170609 (S.D.N.Y. Sept. 18, 2003).................................... 3, 8, 11

*Small v. Garland*,
    2021 WL 1226979 (S.D.N.Y. Mar. 31, 2021) ............................................. 15

*Spector v. Bd. of Trustees of Cmty.-Tech. Colleges*,
    463 F. Supp. 2d 234 (D. Conn. 2006) ....................................................... 8, 12

*White v. Browner*,
    2000 WL 1425096 (S.D.N.Y. Sept. 27, 2000)........................................... 8, 12

*Zann Kwan v. Andalex Group LLC*,
    737 F.3d 834 (2d Cir. 2013) ......................................................................... 20

**Statutes and Rules**

Fed. R. Civ. P. 56(a) ............................................................................................. 2

Plaintiff Victoria Malone respectfully submits this memorandum of law in opposition to the Town of Clarkstown's Memorandum of Law in Support of its Motion for Partial Summary Judgment (ECF no. 177, "MSJ").

## PRELIMINARY STATEMENT

The Town has moved for partial summary judgment claiming that Ms. Malone's retaliation claims should be dismissed because, variously, they are time barred (they are not) and because they were supposedly "trivial harms" or "mere inconvenience." (They were not: the constant verbal abuse and repeated physical and sexual assaults were severe, as testified to by multiple witnesses.) The Town seeks summary judgment because Ms. Malone's career was supposedly not affected. (It most certainly was and continues to be.) And the Town attempts to rewrite history by dividing the ongoing retaliation into four discrete events, and then having done so, arguing these discrete events did not constitute retaliation.

But the Town has created a straw man, trying to disprove certain allegations (which anyway Ms. Malone will forgo to streamline her case) while ignoring that the reality that Ms. Malone's retaliation claims are established by evidence that is clear, convincing, and overwhelming. Indeed, documentary evidence and deposition testimony from multiple witnesses confirms the allegations underpinning the retaliation counts.

The Town (begrudgingly) acknowledges three retaliatory acts that are part of the continuing retaliation: (1) Ms. Malone being "prohibited from using the restroom on the administrative side of the Highway Department"; (2) "Defendant DiZenzo gave Plaintiff a 'Go Girl' device"; and (3) "the transfer to the Town Garage." (MSJ at 10.) Those retaliatory acts are discussed below. But they represent just the tip of the iceberg. They are examples of the Town's retaliation that were part of a constellation of constant acts, persecution, and intimidation all designed to thwart Ms. Malone from engaging in protected activities. And perhaps more

insidiously, to "keep her in her place": she was unwelcome as a woman working in a misogynistic and highly sexualized environment that many of the workers and so-called leaders in the Highway Department wanted to maintain.

We respectfully submit that there are disputed issues of material fact. The Court should deny the partial motion and allow Plaintiff's claims to proceed to trial.

Finally, the Town also seeks a factual determination as to the conduct of Tucker Connington, although the Town does not seek summary judgment as to any claims in connection to that factual determination. This portion of the motion is not properly asserted by the Town (nor could relief be granted by the Court) under Rule 56. Any evidentiary issues relating to Connington can be addressed, along with all other claims in this case, at trial.

## STANDARD

Summary judgment is appropriate only where the moving party can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may not weigh the evidence (*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)), and should proceed with "caution in granting summary judgment" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)), "resolv[ing] all ambiguities in favor of the non-moving party" (*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)), and giving the non-moving party "the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists" (*Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986)). "As the moving party," the Town of Clarkstown "ha[s] the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

<u>**ARGUMENT**</u>

**1.** <u>**There is a genuine issue of material fact as to the retaliation claims.**</u>

 **1.1.** <u>**Elements of Retaliation**</u>

The elements of a Title VII retaliation and a state law (NYSHRL) retaliation claim are similar. First, under Title VII,

> [t]o establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

*Rosioreanu v. City of New York*, 526 Fed. Appx. 118, 120 (2d Cir. 2013); *see also Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 167 n.7 (E.D.N.Y. 2011) ("Retaliation claims brought pursuant to the NYSHRL are governed by the same standards as federal claims under Title VII….").

Importantly, "[a]n adverse employment action can take the form of a hostile work environment." *Salerno v. City Univ. of New York*, 2003 WL 22170609, at *11 (S.D.N.Y. Sept. 18, 2003) ("Plaintiffs assert that the adverse employment action taken against them, the third required component of a prima facie retaliation case, was the hostile work environment that [the director] created. An adverse employment action can take the form of a hostile work environment."). And where, as here, harassment escalated in response to complaints, summary judgment should be denied. *See Rasmy v. Marriott Intl., Inc*., 952 F.3d 379, 385 (2d Cir. 2020) (holding that material issues of fact precluded summary dismissal of retaliation claims where plaintiff submitted a sworn declaration in opposition to summary judgment indicating that "the harassment he experienced at work [had] 'escalated'" as a result of his reporting the discrimination).

### 1.2. Ms. Malone's engaged in protected activity by opposing the Town's unlawful discrimination and hostile work environment.

Ms. Malone was the only woman working – among approximately 70 men – at the Highway Department in a non-clerical role. From very early-on in her tenure at the Highway Department, Ms. Malone was subjected to a crude, sexualized, and physically dangerous environment.[1] The threats and assaults on her person were ever-present.

The protected activity Ms. Malone engaged in was clear: she repeatedly complained to management about hostile, sexually-based discriminatory conduct, and about unsafe working conditions. By way of examples, she filed a union grievance when improperly passed over for promotion (Ex. 17, MALONE_000182–184); she complained to Deputy Lawrence in March of 2015 about harassment, and again in December 2015 about a physical attack by Rory O'Connell (Malone 50-h, Ex. 7, at 273, 276–77); she repeatedly filed grievances about O'Connell's conduct (Ex. 16, MALONE_000168–170); she complained to Denny Friscoe about Highway Superintendent Wayne Ballard's sexually inappropriate behavior (Friscoe Tr., Ex. 9, at 36:11–21); she filed a grievance about David Salvo's sex-motivated made-up complaint about her road-

---

[1] The record of this abuse, harassment, assault, and hostile work environment described herein, which continued through the time of removing Ms. Malone from the Highway Department is drawn from:

- Ms. Malone's 50-h hearing (Ex. 7, Rule 50-h hearing, May 2, 2019 ("Malone 50-h"));
- the transcripts of her two-day deposition (Ex. 1, Deposition of Victoria Malone, Sept. 24, 2020 ("Malone Dep. Day 1"), and Ex. 2, Deposition of Victoria Malone, Sept. 25, 2020, ("Malone Dep. Day 2")); and
- the depositions of Ms. Malone's co-workers John Luther (Ex. 8, Deposition of John Luther, Nov. 17, 2020 ("Luther Tr.")) and Denny Friscoe (Ex. 9, Deposition of Denny Friscoe, Nov. 17, 2020 ("Friscoe Tr.")); Deputy Dom Santulli (Ex. 10, Deposition of Dominic Santulli, Oct. 26, 2020 ("Santulli Tr.")); and Ms. Malone's supervisor on the tree crew, Defendant Robert "Blue" Klein (Ex. 11, Deposition of Robert Klein, Dec. 4, 2020 ("Klein Tr.")).

flagging (Ex. 14, TOWN001752–1753); she complained to Deputy Dom Santulli about Lillo's dangerous behavior (Santulli Tr., Ex. 10, at 66–67) and about the behavior of HMS-III Tucker Connington (the number two person at the Highway Department) (*Id.* at 72); she filed a workplace violence incident with Deputy Santulli (Malone 50-h, Ex. 7, at 49–50); she complained to the Town Board and to union representative Elaine Apfelbaum about HMS-III Connington (*Id.* at 118–20); she repeatedly complained to union vice-president John Luther, both "officially" and "unofficially" (Luther Tr., Ex. 8, at 19:17–23); she complained about trucks which she wrote up as unsafe, as she believed them to be acts of deliberate, sex-motivated sabotage (Friscoe Tr., Ex. 9, at 56 and Santulli Tr., Ex. 10, at 42); and she complained to Deputy Lawrence about being the only person in the Department who had to clean the floors in the Highway Department building despite there being a cleaning crew, and being told by Lawrence that she had to "because women are good at cleaning, that's what women should be doing is cleaning" (Malone 50-h, Ex. 7, at 170:10–23, 172:20–173:17).[2]

### 1.3.   The Town was well aware of Ms. Malone's protected activity.

Ms. Malone stood up for herself. And senior leadership at the Highway Department never forgot it or forgave her. As demonstrated above, the Town was aware of Ms. Malone's protected activity: she repeatedly complained to supervisors about the dangerous, hostile, or discriminatory

---

[2] Ms. Malone asserts claims only for the Town's conduct that occurred *after* the April 29, 2016 release. Her actions before the release, such as her repeated complaints, are akin to events occurring before a limitations period, and amount only to "'background evidence in support of a timely claim.'" *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 308 (E.D.N.Y. 2012) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

For retaliation claims, the conduct is actionable at the time of the employer's adverse activity, *not* the time of the employee's protected activity. *See, e.g.*, *James*, 849 F. Supp. 2d at 310 ("With respect to plaintiff's retaliation claims under Title VII, it is clear that for statute of limitations purposes, the clock begins to run at the time the adverse employment action occurred—not when the plaintiff engaged in the underlying protected activity.").

conduct at the Highway Department. And much of the discrimination and hostile conduct was carried out by supervisors, who were clearly aware of their own behavior. Even Vincent Toomey – a Town attorney whose belatedly-produced handwritten notes revealed his plan to "undermine her credibility" in his purportedly unbiased investigation of Ms. Malone's report of the Brian Lillo chainsaw incident (Ex. 4, TOWN005570) – noted that "Ms. Malone has a history of grievances and harassment complaints." (Ex. 12, TOWN005228.)

### 1.4. The Town took multiple adverse actions that were reasonably likely to deter future complaints from Ms. Malone.

There were many adverse actions by the Town. First and foremost is the Town's escalation of the hostile work environment and sexually discriminatory conduct, which worsened every time Ms. Malone complained. *See infra* Section 1.5. Additional retaliatory incidents include: (i) DiZenzo, the most senior member of the Highway Department, giving Ms. Malone a "Go Girl," *see infra* Section 1.6; (ii) physical and sexual assaults, *see infra* Section 1.7; (iii) prohibiting Ms. Malone from using the women's bathroom, a prohibition that continued throughout Ms. Malone's time at the Highway Department, *see infra* Section 1.8; (iv) transferring Ms. Malone to the Town Garage, *see infra* Section 1.10; (v) "unfair[ly]" transferring Ms. Malone to less desirable crews (Friscoe Tr., Ex. 9, at 107, 109); (vi) David Salvo's sex-motivated made-up complaint about Ms. Malone's road-flagging (Ex. 14, TOWN001752–1753); and (vii) depriving Ms. Malone of overtime opportunities (Malone 50-h, Ex. 7, at 370–71; Malone Dep. Day 1, Ex. 1, at 97, 102, 130, 174, 241). And significantly, with her transfer to the Town Garage – which was supposedly "for her own safety" and supposedly was to be

"temporary" – Ms. Malone has been deprived of the opportunity to do meaningful work and the opportunity for advancement.[3] (*See* Malone Dep. Day 1, Ex. 1, at 232, 236.)

Further, these actions must be considered in the larger context in which they occurred. "The court must take care … not to view individual incidents in isolation." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012). "Especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion." *Id*. (citation omitted).

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Therefore, an act that would be immaterial in some situations is material in others. … [I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable.

*Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (cleaned up).

This dilemma of silence-versus-exclusion was reinforced early-on in Ms. Malone's tenure at the Highway Department. When Wayne Ballard first banned her from using the women's bathroom, Ms. Malone spoke with Deputy Andrew Lawrence about it. Lawrence told her not to complain, that if she did, her life "would get much worse":

> You complain about somebody, you got to complain about everybody. And you can't - - no one's going to stick up for you. Nobody is going to back you up. You say something, and everybody goes against you. They're not going to want to work with you, they're going to say bad things about you, it's going to be extremely uncomfortable to go to work. Don't complain.

---

[3] Instead of cleaning up the Highway Department, the Town moved Ms. Malone away. Then they gave her the option of transferring to the Sewer Department. She declined. The Sewer Department is run by John Fay, a "jerk" whom Ms. Malone testified "tried to make out with me at a bar and I pushed his face." (Malone Dep. Day 1, Ex. 1, at 234:5–7.) And, importantly, Ms. Malone drives trucks and operates heavy machinery, not a "bus cleaner" or someone to "sweep floors." (*Id.* at 232.) The Town should fix the Highway Department instead of changing the terms, conditions, and privileges of Ms. Malone's employment.

And I was warned not to complain. I was warned not to say anything by
somebody who was higher in office, because things would get much worse
for me.

(Malone 50-h, Ex. 7, at 248:9–249:8.)

### 1.5. The hostile work environment escalated.

Importantly, the causal connection between the protected activities and the adverse

actions was not merely tit-for-tat, but systemic. When Ms. Malone engaged in protected activity

– challenging the inappropriateness and illegality of discriminatory or unsafe behavior – the

perpetrators not only took concrete actions in retaliation, including the examples enumerated

above, but doubled-down on the hostile activity: creating and reinforcing a hostile work

environment in retaliation for Ms. Malone trying to stick up for herself. And that hostile work

environment, as detailed below, included physical and sexual assaults. *See, e.g.*, *Salerno*, 2003

WL 22170609, at *11 ("An adverse employment action can take the form of a hostile work

environment.").[4]

Significantly, Deputy Santulli, a member of the senior leadership team at the Highway

Department, testified that in his presence he saw "abusive comments" directed towards Ms.

Malone; "sexually suggestive comments or behaviors in her presence"; and concluded that Ms.

Malone was "discriminated against in any way because of her sex." (Santulli Tr., Ex. 10, at

212:7–213:16.) And Deputy Santulli testified that Superintendent DiZenzo "allow[ed] a hostile

work environment to continue while he was Superintendent[.]" (*Id.* at 215.)

---

[4] *See also, e.g.*, *Spector v. Bd. of Trustees of Cmty.-Tech. Colleges*, 463 F. Supp. 2d 234, 249 (D.
Conn. 2006) ("[Plaintiff] has alleged facts sufficient to allow a reasonable inference that the
defendants created a hostile work environment in retaliation for [Plaintiff's] protected speech.");
*White v. Browner*, 2000 WL 1425096, at *4 (S.D.N.Y. Sept. 27, 2000) (upholding, on motion to
dismiss, retaliation claim that "the hostile environment she was required to work in was 'created
in retaliation for her pursuit of the EEOC complaints.'").

Similarly, her co-worker Denny Friscoe recognized the "toxic environment" and that the sexual comments made to Ms. Malone were "prevalent." (Friscoe Tr., Ex. 9, at 25:6–11, 26:21–27:2.) He testified that Ms. Malone "had to endure offensive conduct"; that it was at times "severe", "pervasive", and "abusive". (*Id.* at 126–27.) And union vice-president John Luther testified that Ms. Malone had to endure "offensive conduct," conduct was of a "sexual nature," that some of the conduct was "severe," and some of it was "pervasive." (Luther Tr., Ex. 8, at 86–87.) Luther testified that some of that conduct was "somewhat" "abusive" and that the key box and chainsaw incidents involving Lillo and Ms. Malone were "threatening." (*Id.* at 88.) He testified that he believed Ms. Malone was "discriminated against because of her sex"; that Superintendent Ballard "allowed a hostile work environment to continue while he was Superintendent"; and that "the conduct never changed" under Superintendent DiZenzo. (*Id.* at 88–89.)

At a minimum, there are genuine issues of material fact as to the Town's retaliation, as effected by the Superintendent and Ms. Malone's supervisors.[5]

### 1.6. Superintendent DiZenzo gave Ms. Malone the "Go Girl" – after being warned it was inappropriate – as a way to send Ms. Malone a message.

Superintendent DiZenzo's gift of the "Go Girl" was a strikingly inappropriate act. This sub-section addresses the Town's jaw-dropping argument that it was nothing more than a "gag gift" and its assertion that claims arising from the Go Girl are barred by the April 2016 release.

---

[5] *See, e.g.*, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) ("Were a rational jury to credit [plaintiff's] version of the events, it could find that [the supervisor's] conduct crossed the line between boorish and inappropriate behavior and actionable sexual harassment. Although that line is admittedly indistinct, its haziness counsels against summary judgment in this case. An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury.").



*See* Ex. 15 (MALONE_002367); Am. Compl., Exh. A, ECF no. 75-1.

First, the Town claims that Superintendent DiZenzo's "gift" should not be considered by the Court because the Town alleges it occurred before the April 2016 release. Yet the Town does not and cannot point to any fact suggesting this outrageous event occurred prior to the release. In fact, Deputy Santulli testified he was present when DiZenzo gave the Go Girl to Ms. Malone. (Santulli Tr., Ex. 10, at 59:25–60:8.) Santulli placed the timing of the event sometime after DiZenzo became Superintendent in January 2016, but could not be more specific as to the date. (*Id.* at 60:15–16.[6])

Second, the Town asserts that DiZenzo's gifting of the Go Girl was nothing more than a "trivial" "gag gift." This is an astonishing argument. <u>In no workplace could it possibly be appropriate for a supervisor to give this to an employee as a "gift."</u> Such a "gift" is inherently demeaning and discriminatory, and part and parcel of a sustained pattern of sexual and

---

[6] Since Mr. DiZenzo is well aware his behavior was beyond the pale, he denies it ever happened. This makes it impossible for him to provide details about when it occurred, and so the evidence of when it happened is the recollections of Ms. Malone and Mr. Santulli. The question of timing is a question of fact that should be determined by a jury.

sexualized affronts that targeted Ms. Malone for years. And DiZenzo was even warned by a deputy Santulli that it "was not a good idea" (Santulli Tr., Ex. 10, at 61:19–24) – but he did it anyway.

DiZenzo gave Ms. Malone this extraordinarily inappropriate "gift" as part of his ongoing, persistent, and unwelcome campaign of sexual harassment and retaliation. The retaliation occurred after Ms. Malone repeatedly rebuffed DiZenzo's unwanted "offers" to have Ms. Malone to "sit on his face" (Malone 50-h, Ex. 7, at 210). DiZenzo "would ask [Ms. Malone] if she needed a place to sit, wipe his mouth, tilt his head back, and stick out his tongue inviting Malone to sit on his face." (Malone Dep. Day 2, Ex. 2 at 474:18–475:6.) Ms. Malone also rebuffed DiZenzo's efforts to follow her into the bathroom. (Malone 50-h, Ex. 7, at 212.) Indeed, DiZenzo had long known about, participated in, and condoned the unconscionable behavior directed at Ms. Malone, and now that he was the top boss – the Superintendent – he was going to send his own message about keeping in her place. (*See* Santulli Tr., Ex. 10, at 66–68, 72, 146– 47, 215; Friscoe Tr., Ex. 9, at 53, 128; Luther Tr., Ex. 8, at 89.) The timing of this "gift" also conveys its intent—it occurred shortly after Ms. Malone complained about O'Connell's repeated sexual harassment and assault. (Ex. 16, MALONE_000168–170).

There is no question that DiZenzo took actions against Ms. Malone that were hostile and sexual in nature. These actions were sustained and took place over a long period of time. These actions by DiZenzo were in response to Ms. Malone's rebuffing DiZenzo's comments and advances, and her repeated complaints. And significantly, Ms. Malone complained to management about the hostile work environment, and management ignored those complaints, condoned them, or contributed to their escalation. *See Salerno*, 2003 WL 22170609, at *11

(retaliation by creating hostile work environment); *Spector*, 463 F. Supp. 2d at 249; *White*, 2000 WL 1425096, at *4.

In short, there are more than enough facts to show at trial that Ms. Malone suffered retaliation because of the hostile work environment and the Town's failure to take any appropriate action. And when DiZenzo gave Ms. Malone the Go Girl, it was designed, like all the other abuse she suffered, to humiliate Ms. Malone in front of her coworkers and punish her for reporting these abuses. *Redd*, 678 F.3d at 176 ("The court must take care, however, not to view individual incidents in isolation. … The objective hostility of a work environment depends on the totality of the circumstances, … [including] the social context in which particular behavior occurs and is experienced by its target.").

### 1.7. Ms. Malone was not just harassed but repeatedly assaulted.

Ms. Malone was not just the target of constant verbal assaults, but she was the victim of repeated physical assaults. And the severity of these assaults increased over time. The more Ms. Malone tried to stand up for herself in the workplace, the more Defendants worked to keep her silent.

Defendant Klein – Ms. Malone's supervisor on the tree crew – even admitted to sexual assault: ripping off Ms. Malone's shirt over her head in what he called a "[h]ockey fight" (Klein Tr., Ex. 11, at 118), and what Ms. Malone testified "mortified" her. (Malone Dep. Day 2, Ex. 2, at 437.) It bears repeating: Ms. Malone's supervisor, Klein, ripped off Ms. Malone's sweatshirt and later, in testimony, discounted it as "a joke" and "horseplaying," adding, "Who only wears a sports bra under a sweatshirt jacket?" (Klein Tr., Ex. 11, at 120:23–24, 121:9–17.) But ripping off a female coworker's shirt — any coworker's short — is *not* a joke. Here, it was part and parcel of the intimidating, hostile work environment created in retaliation for Ms. Malone's repeated complaints. *See, e.g.*, *Cortes v. City of New York*, 700 F. Supp. 2d 474, 482 (S.D.N.Y.

2010) (assault can "constitute adverse employment action[]"); *Gibbs v. N.Y. Dep't of Taxation and Finance*, 2009 WL 754307 (E.D.N.Y. Mar. 20, 2009) (distinguishing plaintiff's allegation that defendant "threw a file folder at him" from the sort of physical assault that would be 'so severe as to alter materially the plaintiff's working conditions'" (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008)); *cf. Caban v. Richline Group, Inc.*, 2012 WL 2861377 (S.D.N.Y. July 10, 2012) (denying summary judgment on a retaliation claim based on "further subjecting [plaintiff] to a hostile work environment," including "driving [a] car toward [her] in an intimidating manner" after she reported sexual harassment because the conduct "would likely deter a victim of discrimination from complaining in the first place" and "were sufficiently severe and not simply a lack of good manners").

This was not an isolated incident. This incident took place in a culture of repeated physical and sexual assaults. Ms. Malone's supervisor Klein also admitted to cutting Ms. Malone's leg with a pole saw. (Klein Tr., Ex. 11, at 125.) On another occasion, Klein threw her to the ground and smacked her buttocks:

> Q  Sorry. What was the last one?
>    A   Get the fuck off of me.
> Q  When did you say that to someone?
>    A   When I was thrown to the ground.
> Q  When were you thrown to the ground?
>    A   I don't remember exactly a date.
> Q  Who threw you to the ground?
>    A   This instance that I'm talking about, Blue [Robert Klein].
> Q  When he threw you to the ground, you said get the fuck off of me?
>    A   Yes. Because he was sitting on top of me and smacking my ass.

Malone Dep. Day 1, Ex. 1, at 76:13–25.

And Ms. Malone testified that on yet another occasion her coworker Salvo tackled her:

A    Dave [Salvo] pushed me. He was also on top of me and my face was being pushed into the dirt, at a graveyard no less. Everybody laughed.

Q    Who is everybody?

A    Everybody that was there thought it was hysterical, except for Johnny Velez. And Johnny Velez came up to me at the end of the day and said nobody under any circumstances has a right to put their hands on you for any reason whatsoever.

…

Q    What part of him was on you?

A    I don't know. My face was in the dirt.

Malone Dep. Day 1, Ex. 1, at 89:6–15, 90:10–12. And that was a different event than the time that, as confirmed by Friscoe's testimony, DiZenzo pulled Ms. Malone's "pants aside to see her underwear." (Friscoe Tr., Ex. 9, at 46–48.) These repeated assaults were an "intolerable alteration of the plaintiff's working conditions, so as to substantially interfere with or impair [her] ability to do [her] job…." *Mathirampuzha*, 548 F.3d at 79 (cleaned up) (distinguishing "the brief incident in this case" from "more severe incident[s] or harassment or abuse" that "could constitute an adverse employment action").

### 1.8.    The Ongoing Bathroom Retaliation

The Town's action in banning Ms. Malone from the women's restroom was a calculated and sustained effort not just to embarrass and harass Ms. Malone, but to retaliate against her. It was a constant, clear message: you do not belong here, and you will not report this behavior. And contrary to the Town's assertion, it is not time-barred: although it began before Ms. Malone signed the 2016 release, it continued until the day she was transferred to the Town Garage for her own safety.

The Town claims that Ms. Malone was merely banned from using a restroom in the "administrative side of the Highway Department office." (MSJ at 18.) But this was the only women's bathroom in the entire Highway Department building. (Def. 56.1 ¶ 16.[7])

Prohibited from using the only women's restroom in the Highway Department building, Ms. Malone was forced to use the men's bathroom (also known as the deputies' bathroom). (Malone Dep. Day 1, Ex. 1, at 166.) Occasionally, men would use the bathroom and not lock the door. Ms. Malone would go into the bathroom, thinking it was empty because the door was unlocked, and would find a man on the toilet. (Malone 50-h, Ex. 7, at 231.) And she had to use an electrical closet that was filthy with rat feces to change her clothes. (Malone 50-h, Ex. 7, at 226.) Moreover, that room's lock did not work properly and management knew it. (Santulli Tr., Ex. 10, at 53.)

The Town argues that banning Ms. Malone from using the only women's bathroom in the complex should be time-barred because it happened in 2010; and any and all harassing incidents that occurred before she signed the 2016 Release should be excluded from this case. But Ms. Malone was continually barred from using the women's bathroom until the day she was transferred to the Town Garage in 2018. The so-called leadership of the Highway Department, including DiZenzo and Connington, continued this not-so-petty slight, this harassment, this retaliation long after the 2016 release. *See, e.g.*, *Small v. Garland*, 2021 WL 1226979, at *23 (S.D.N.Y. Mar. 31, 2021) (noting "mandate to consider the alleged acts of retaliation both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in

---

[7] This banning of Ms. Malone from the only women's bathroom originally took place in 2010, and may have been tied to Ms. Malone's father running for the Superintendent's position in an election against Wayne Ballard, the incumbent Superintendent, and Malone's ultimate boss. The women's room was located near Ballard's office, and he allegedly did not want Ms. Malone nearby potentially spying on him. (Malone 50-h, Ex. 7, at 167.)

gross as to be actionable, and because context matters") (cleaned up); *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020) ("a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.").

### 1.9. The Town's attempt to recast years of retaliation as four distinct acts is unavailing.

The Town tries to frame the retaliation in terms of four discrete acts – Brian Lillo harassing Ms. Malone, Ms. Malone being given unsafe vehicles, Connington denying her assignments that would give her overtime, and Ms. Malone's reassignment to the Town Garage—and then painstakingly trying to explain that each incident individually did not amount to retaliation. Ms. Malone already agreed to streamline her case for trial. The last issue, her supposedly "temporary" transfer for her own safety, is discussed in the next sub-section.

The Town, not surprisingly, tries to paint a picture of the Highway Department as a modern-day "Happy Days": small town life, conscientious workers, with on-the-job friends ribbing each other good naturedly, and well, perhaps a bit of boys-will-be-boys insouciance. Nothing could be further from the truth: it was a cesspool of misogyny, harassment, unabashed favoritism, and alleged corruption.

The Town's reframing of the ongoing retaliation against Ms. Malone as four discrete acts is a creative attempt to rewrite history – and misrepresent what Ms. Malone was subjected to for years. The first example of retaliation that the Town sets up as a straw man is Brian Lillo's multiple hostile acts against Ms. Malone. The Town argues that they do not constitute "harassment of any kind, let alone 'severe' harassment." And that "to arise (sic) to a level of a material adverse action for a retaliation claim, co-worker harassment must be 'severe'." (MSJ at 11.) And the Town argues that "there is no basis on which to hold the Town liable for Lillo's

alleged actions as it did not act negligently either before or after the December 2018 incidents were reported." (MSJ at 13.)

The Town misconstrues the record: first, Lillo's actions were not merely alleged, but confirmed by other witnesses. (*See* Santulli Tr., Ex. 10, generally concerning investigation of chainsaw incident; and Klein Tr., Ex. 11, at 186–87, concerning the woodchip incident.) And second, the retaliation was not only Lillo's behavior, but the Town's failure to fully or fairly investigate the allegation. The first example of the Town's failure to appropriately investigate the incident was apparent from the email written by Vincent Toomey, a Town attorney. Toomey described the parties to the incident – Lillo and Ms. Malone – as "combatants" and concluded by saying, "Ms. Malone has a history of grievances and harassment complaints." (Ex. 12, TOWN005228.) But Ms. Malone was not a *combatant*; she was a victim.

And the most shocking example of the Town's retaliation is found in the Town attorney's notes as he began the so-called investigation of the chainsaw incident. The handwritten note says, "Undermine her credibility." (Ex. 4, TOWN005570.) (Notably, the Town purposefully withheld this document from its productions and only produced after Court order. ECF no. 147.[8]) This is yet another form of retaliatory discrimination – what employee wouldn't be adversely affected by a concerted attempt to undermine her credibility among her coworkers? This a classic technique for discouraging further complaints. <u>That the Town's *lawyer*, conducting a supposedly independent investigation of Ms. Malone's complaints, put this down in writing is significant evidence of the retaliation campaign against her.</u>

---

[8] In mid-2020, the Town produced thousands of pages of discovery and then fact-witness depositions were completed. The Town's production had included hundreds of pages of attorney notes from the Town's internal investigations. But the Town deliberately withheld this one key page of notes, which was only produced following the Court's order.

The second straw man – indeed twin straw men – set up by the Town are the two truck episodes. In the course of two months, Ms. Malone was assigned to drive two different trucks which experienced serious problems: in one, a cable snapped that was lowering a dumpster. In the other, a wheel fell off a dump truck as Ms. Malone was driving (slowly) down a winter highway, and the truck tipped over on its side. (Deputy Dom Santulli testified that he had seen that happen only twice before in his 23 years on the job. (Santulli Tr., Ex. 10, at 87.)) Ms. Malone was understandably shaken by each incident, and by the proximity of the two happening to her, just weeks apart. Again, in its attempt to flip the narrative, the Town confuses cause and effect. But, anyway, to streamline the issues at trial, Ms. Malone will forgo presenting evidence on the two episodes with the trucks.

The Town's next straw man is Connington denying Ms. Malone opportunities to earn overtime in March 2018. The Town cites a union grievance Ms. Malone filed concerning the incident (MSJ at 22). Whether Ms. Malone – or anyone in a particular crew – earned overtime on a particular day is not the issue. The real issue is that Ms. Malone has been deprived of multiple opportunities for earning overtime, career advancement, and meaningful work, especially during her supposedly temporary transfer to the Town Garage.

Overall, the Town's attempt to have the Court evaluate these incidents in isolation ignores the Second Circuit's instruction that in cases like this "the court should not view the record in piecemeal fashion." *Redd*, 678 F.3d at 176.

### 1.10. <u>The transfer to the Town garage</u>

Following the two truck incidents, the biased investigation of the Lillo chainsaw incident, and the on-going harassment and sexual assaults, it was understandable that Ms. Malone was concerned about her safety. Ms. Malone's prior attorney understandably "demanded that the Town take 'immediate' action to protect her client." (Aff. of Vincent Toomey, Def. Ex. M, ¶ 5.)

Then, on March 1, 2019, DiZenzo transferred Ms. Malone to the Town Garage, allegedly for her safety. DiZenzo wrote: "This transfer is temporary while the Clarkstown Police Department investigates your allegations of two incidents in which you believe your physical safety has been placed at risk." (Ex. 13, MALONE_001675.) It is now nearly three years later, and Ms. Malone is still at the Town Garage.

That is, in response to Ms. Malone's repeated complaints of sexual harassment and physical and sexual assault, the Town did *not* take action to clean up the highway department. Instead, it changed Ms. Malone's working conditions. Dramatically.

The Town argues that this does not constitute retaliation because "voluntary transfers do not constitute adverse employment action." (MSJ at 16.) But Ms. Malone's transfer was anything but voluntary. It was a constructive forced transfer and, in the years since the dangerous episodes, the Town has done absolutely nothing to ameliorate the offending behavior. The so-called investigations were, as discussed above, little more than choreographed shams. Not a single offender was reprimanded.

Instead, Ms. Malone was sent to the Town Garage where she cleaned bird poop off car windows and occasionally moved police cars from one location to another. She has no opportunity for advancement, no chance to earn overtime, and no meaningful work. That is a material deprivation and adverse action:

> Q  Why is it a punishment to have been moved?
>
> A  Because I'm the only one that was moved. I'm the only one that's going through what I'm going through. I'm a machine operator. I'm a truck driver. I'm not a bus cleaner. I don't sweep floors. That's not my job title. Answer phones. I'm literally doing anything I could possibly do to make the day go by. That is not what my title is.

Malone Dep. Day 1, Ex. 1, at 232:14–23.

One might reasonably assume that after the Town was held accountable in 2016 for denying Ms. Malone her hard-earned promotion because of sexual discrimination, its leaders might have said, "Let's take stock, clean up our act, or at least reset how we treat women." But it did no such thing. Instead, it doubled-down, and the misogyny, harassment, and retaliation got worse: underscoring that it was not just individual, but systemic.

### 1.11. There is a clear causal connection.

As detailed in the preceding sections, there is an obvious causal connection between Ms. Malone's complaints and the Town's retaliation. Although "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, a plaintiff must prove that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Ms. Malone has presented extensive evidence that she was singled out and treated differently because she was a woman and because she objected to the discriminatory treatment. Even the Town's attorney was on a mission to "undermine her credibility." And she was subjected to an escalating hostile work environment and specific adverse actions, as described above. "[A] defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020).

Further, the Town's attempt to spin the retaliatory discrimination Ms. Malone suffered as non-existent because the perpetrators were also abusive of other coworkers does not work. Courts have repeatedly rejected this logic. *See, e.g.*, *Brown v. Henderson*, 257 F.3d 246, 254055 (2d Cir. 2001) ("Nonetheless, the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. For it may be the case that a co-worker or supervisor treats both men and women badly, but

women worse."). The evidence shows that Ms. Malone was the target of an ongoing retaliatory harassment campaign the likes of which was not suffered by any other Highway Department worker.

**2.      The Court should not make a factual finding on the conduct of Tucker Connington.**

In the second part of its motion, the Town seeks some kind of ruling as to "Plaintiff's hostile work environment claims based on the conduct of Tucker Connington." (MSJ at 24–25.)

**2.1.      The proposed motion does not exist within the FRCP.**

Ms. Malone does not assert a hostile work environment claim based solely on the conduct of Tucker Connington. Instead, she asserts a hostile work environment claim *against the Town*, based on the conduct of various individuals, which include Connington.

*If* the Town had sought summary judgment on the hostile work environment claims — which it did not — and "*if* the court does not grant all the relief requested by the motion, [*then*] it may enter an order stating any material fact … that is not genuinely in dispute and treating the fact as established in the case." F.R.C.P. 56(g) (emphasis added). But here, as discussed at the pre-motion conference, the Town has not sought summary judgment on the hostile work environment claim, so the Court may not enter an order establishing facts related to this claim.

In support of its motion, the Town cites District Court cases from Ohio and Washington. These cases appear to involve claims arising exclusively from conduct by certain individuals, and thus the courts considered them in the "piecemeal fashion" the Second Circuit has rejected. *Redd*, 678 F.3d at 176. In contrast to these two cases, Ms. Malone is not asserting any claim against the Town based solely on the conduct of Connington. Rather, Ms. Malone alleges that Connington (who, according to the contemporaneous notes of a deputy, "violat[ed] the workplace violence policy on a daily basis," Ex. 3, at TOWN004957) was one of many Town

actors who were responsible for establishing and perpetuating a hostile work environment, and actively discouraging complaints.

In other words, Ms. Malone asserts claims against the Town based on the hostile work environment perpetuated by the Town in its totality, and not separate claims based on distinct conduct by different actors. The Town has not moved for summary judgment on those claims. Rule 56 does not provide any mechanism for the Court to rule on isolated matters of fact unrelated to the movant's summary judgment motion.

The Town's proposed summary adjudication of the facts is inconsistent with the FRCP because the result would not be a summary judgment on a claim. As a California federal court explained:

> Consistent with the Advisory Committee Notes, courts throughout the country have held that Rule 56 does not authorize a motion which is solely intended to establish the truth of particular facts. … In the present case, Plaintiff does not seek summary judgment, or summary adjudication, with respect to any claim or defense or any part of any claim or defense. Rather, Plaintiff seeks an adjudication of discrete, assertedly undisputed facts. The use of Rule 56 for this purpose is inappropriate.

*Robertson v. F. Martin*, 2021 WL 545895, at *2 (C.D. Cal. Jan. 4, 2021).

The case of *L. Debenture Tr. Co. of New York v. WMC Mortg., LLC*, 2017 WL 3401254, at *21 (D. Conn. Aug. 8, 2017), is also instructive. That case involved thousands of allegedly deficient mortgage loans. The defendant argued for a "partial summary judgment" ruling excluding certain loans from the case because plaintiffs had failed to adduce specific evidence of deficiency and notice with respect to each individual loan. The court rejected this approach, observing, "[t]he Court construes this aspect of [the defendant]'s motion [for partial summary judgment] as a motion in limine whose purpose is to test the propriety of the proffered sampling evidence at the trial. A motion in limine affects what the trial evidence will consist of." The same analysis is true here.

Thus, there is no procedural basis for excluding this evidence, at least at this time. The proper vehicle for challenging it would be a motion *in limine*, not a motion for "partial summary judgment."

**2.2.    Connington knew about and allowed the harassment, the retaliation, and the hostile work environment – and did absolutely nothing to stop it.**

In any event, the facts as to Connington's conduct and his responsibility are genuinely in dispute and anyway would not be appropriate for such a motion — if it even existed in the FRCP. Connington was the second most senior person in the Highway Department for a large portion of the time Ms. Malone was being harassed, discriminated against, and retaliated against. He was aware of the conduct and allowed the hostile work environment to continue.

Deputy Santulli testified that "Connington allow[ed] the hostile work environment to continue while he was deputy," (Santulli Tr., Ex. 10, at 216) including "tolerat[ing] … a toxic atmosphere in which male employees constantly made disgusting and degrading sexual comments in front of Ms. Malone and within earshot of supervisory employees?" (*Id.* at 24:8–25:24.) And contemporaneous notes kept by Santulli noted that Connington "violat[ed] the [Town's workplace violence policy] on a daily basis." (Ex. 3, at TOWN004957.) Further, union vice-president Luther concurred that "Connington allow[ed] the hostile work environment to continue while he was deputy[.]" (Luther Tr., Ex. 8, at 90.) Overall, Connington's conduct was driven, at least in part, by his animus towards women:

> Q  Did you think that he yelled at you because you were a woman?
>     A  I think that definitely had something to do with it.
> Q  And why do you think that?
>     A  There was no other reason to yell at me.

Ex. 1 (Malone Dep. Day 1) at 189:2–8. Thus, there is also no substantive basis for a summary judgment excluding Connington's conduct from consideration. Further, hiving these allegations

off from the rest of the hostile work environment claims would violate the Second Circuit's instruction that a "court must take care, however, not to view individual incidents in isolation." *Redd,* 678 F.3d at 176.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff Victoria Malone respectfully requests that the Court (1) deny the Town's motion for summary judgment on Plaintiff's claims for retaliation; and (2) deny the Town's motion for a factual judgment on the conduct of Tucker Connington.

Dated: January 3, 2022

> **POLLOCK COHEN LLP**
> By:   /s/ *Steve Cohen*
>        Steve Cohen
>        Adam Pollock
> 60 Broad St., 24th Floor
> New York, NY  10004
> Adam@PollockCohen.com
> (212) 337-5361
> *Counsel for Plaintiff Victoria Malone*