UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK

---

VICTORIA MALONE,

    Plaintiff,

    - against -

TOWN OF CLARKSTOWN, WAYNE
BALLARD, *in his personal and official capacity
as Clarkstown Highway Superintendent*,
FRANK DIZENZO, *in his personal and official
capacity as Clarkstown Highway
Superintendent*, ANDREW LAWRENCE, *in his
personal and official capacity*, DAVID SALVO,
*in his personal and official capacity*, ROBERT
KLEIN, *in his personal and official capacity*,
TUCKER CONNINGTON, *in his personal and
official capacity*, and BRIAN LILLO, *in his
personal and official capacity*,

    Defendants.

No.: 7:19-cv-05503 (VB) (PED)

---

### Plaintiff Victoria Malone's Counterstatement and Statement of Additional Material Facts Pursuant to Local Rule 56.1(b) in Response to the Town's Partial Motion for Summary Judgment

Pursuant to Local Rule 56.1(b), and in opposition to the motion for partial summary judgment by the Defendant Town of Clarkstown ("Clarkstown"), Plaintiff Victoria Malone hereby submits this response to Clarkstown's Rule 56.1 Statement (ECF no. 176).

**<u>Table of Contents</u>**

Rule 56.1(b) Counterstatement.................................................................3

    Introduction .................................................................................3

    Structure of the Highway Department ..........................................5

    Allegations Predating the April 2016 Release ..............................8

    Alleged Loss of Overtime in March 2018 ...................................13

    Allegations Regarding Roll-Off Truck #333 ...............................21

    June 28, 2018 "Chain Saw Incident"..........................................27

    Alleged December 2018 Retaliation by Lillo...............................34

    Alleged Sabotage and Transfer to the Town Garage ...................39

    Procedural History.....................................................................52

Statement of Additional Material Facts .........................................55

# Rule 56.1(b) Counterstatement

## Introduction

1.      Plaintiff, Victoria Malone ("Plaintiff"), began working at the Town of Clarkstown Highway Department as a student laborer in 2003. Ex. C (50-h) at 15:3-14, 30:8-31:23, 32:1933:6. Wayne Ballard was the Highway Superintendent. Ex. C (50-h) at 38:6-17.

**RESPONSE**: Not disputed.

2.      Plaintiff was hired as a full-time employee of the Highway Department in 2009 in the position of Machine Equipment Operator I. Ex. A (Compl.) ¶21; Ex. C (50-h) at 78:2-15.

**RESPONSE**: Not disputed.

3.      The Superintendent of Highways is an elected position, governed by statute. *See generally* N.Y. Town Law § 20(1)(a); N.Y. Town Law § 32; N.Y. Highway Law Article 7.

**RESPONSE**: Not disputed.

4.      In 2014, Plaintiff and another employee, Mike Forenza, filed a union grievance alleging that they had been wrongfully denied promotions to Machine Equipment Operator II ("MEO II"). Ex. Y (Promotion Grievance); Ex. F (Malone Tr. Day 2) at 516:19-22.

**RESPONSE**: Not disputed.

**5.** Plaintiff's promotion grievance was resolved via a Stipulation of Settlement and General Release signed by Plaintiff on April 29, 2016 (the "2016 Settlement"). Ex. Z (Settlement); Ex. F (Malone Tr. Day 2) at 514:24-517:3. Pursuant to the 2016 Settlement, Plaintiff was promoted to MEO II, at the top step of the salary schedule, retroactive to January 1, 2016. Ex. Z (Settlement) at MALONE_000303 ¶2. Additionally, Plaintiff released all claims against the Town and its employees, including, *inter alia*, claims arising under 42 U.S.C. § 1983-1988, Title VII, and the New York State Human Rights Law, claims for retaliation, inter alia, "that Malone had or now has." *Id*. at MALONE_000303 ¶3.

**RESPONSE**: Not disputed.

**6.** Plaintiff was represented by an attorney with respect to her Promotion Grievance and the 2016 Settlement. Ex. Z at MALONE_000303 ¶4; Ex. F (Malone Tr. Day 2) at 517:4-10. At her deposition, Plaintiff claimed to have no recollection of the 2016 Settlement. Ex. F (Malone Tr. Day 2) at 512:16-23, 514:24-23. Plaintiff has never taken any action to complain about the lawyer who represented her in the Promotion Grievance and 2016 Settlement. Ex. F (Malone Tr. Day 2) at 518:5-520:14.

**<u>RESPONSE</u>**: Disputed that "Plaintiff claimed to have no recollection of the 2016 Settlement." Ms. Malone testified that she did not remember the settlement *document*. Ex. 2 (Malone Tr. Day 2) at 515:21–23. She plainly remembered the settlement itself. Ex. 1 (Malone Tr. Day 1) at 227:24–228:3 ("Q    And the MEO II grievance, the promotion grievance, that was the one that you settled with the town in 2016? A    Yes. I believe it was 2016."). The remainder of the statement is not disputed.

## Structure of the Highway Department

7.     The Highway Department has approximately 70-80 employees.  Ex. H (Connington Aff.) at ¶3.  Immediately below the Superintendent is the General Foreman or Highway Maintenance Supervisor III ("HMS" III).  Ex. G (Connington Tr.) at 23:12-24:15.  The General Foreman oversees the entire department, including three deputies, or HMS IIs, and reports to the Highway Superintendent.  Ex. G (Connington Tr.) at 23:24-24:1.

**RESPONSE**:  Not disputed.

8.     Each HMS II deputy is responsible, inter alia, for a sector of the Town. Ex. G (Connington Tr.) at 25:15-16; 51:8-52:13.  There are approximately 14 foreman (holding the position of HMS I) who report to the three deputies.  Ex. I (DiZenzo Tr.) at 29.

**RESPONSE**:  Not disputed.

9.     In the department, laborers and MEOs are generally divided into crews, with a foreman assigned to each crew. Ex. H (Connington Aff.) at ¶4, 6; *e.g.*, Ex. DD at TOWN002197.

**RESPONSE**:  Not disputed.

10.     Each day, the deputies (or the General Foreman) give assignments to the foreman of each crew and the foremen tell the members of the crew which tasks they will be responsible for that day.  Ex. G (Connington Tr.) at 16:232-17:2; Ex. H (Connington Aff.) at ¶4.  A crew foreman does not have authority to make changes to

which workers are assigned to the foreman's crew. Ex. G (Connington Tr.) at 253-254; Ex. E (Malone Tr. Day 1) at 25:25-26:15.

**RESPONSE**: Disputed. A crew foreman can go into the office at any time to get changes made to the crew. Ex. 1 (Malone Tr. Day 1) at 26:4–9.

11.     The shop foreman is responsible for maintenance and repair of all vehicles used by the Highway Department. *See* Ex. G (Connington Tr.) at 69:6-69:18. From approximately mid 2012-mid 2017, the mechanics shop was overseen by the Town Garage, and Plaintiff's father, Dennis Malone, who was the Fleet Manager. Ex. R (DM Tr.) at 23: 23-25:3. However, after an unrelated lawsuit regarding authority over highway mechanics, the mechanics shop was returned to the purview of the Highway Department. *See* Ex. G (Connington Tr.) at 71:1274:3; *Matter of Highway Supt. Assn. of Rockland, Inc. v. Town of Clarkstown*, 150 A.D.3d 731 (2d Dep't 2017), *Ballard v. Gromack*, 47 Misc.3d 802 (Feb. 17, 2015).

**RESPONSE**: Not disputed.

12.     From approximately January 2016 to June 28, 2018, Plaintiff's primary crew assignment was to the tree crew. Ex. E at 36:19-37:4; Ex. G (Connington Tr.) at 262:23-263:6. Robert Klein was the foreman of the tree crew; MEO IIs Chris McDermott, Brian Lillo, and Dave Salvo were also on the tree crew. Ex. I (DiZenzo Tr.) at 26:11-13, 29:25-30:6; Ex. H (Connington Aff.) ¶12; Ex. E at 33:3-9, 42:7-17[.]

**RESPONSE**: Not disputed.

**13.** Connington joined the Clarkstown Highway Department in 1991 as a student worker. Ex. G (Connington Tr.) at 15:19-23. He then worked as a laborer and MEO I. *Id*. at 15:24-16:6, 18:5-8. He was promoted to MEO II in 2002, and was promoted to a foreman, HMS I, in 2008. *Id*. at 20:15-23. From 2011 through February of 2018, Connington was an HMS II, or deputy, covering Area 2. *Id*. at 43:25-44:2. In spring 2018, Connington was promoted to General Foreman, HMS III, after Andrew Lawrence retired. Ex. H (Connington Aff.) at ¶1.

**RESPONSE**: Not disputed.

**14.** Plaintiff has never worked on a crew with Connington. Ex. C (50-h) at 111:7-9; Ex. E (Malone Tr. Day 1) at 159:7-9; Ex. G (Connington Tr.) at 37:20-23; 42:9-16. As an MEO II, Plaintiff rarely interacted with Connington. Ex. E (Malone Tr. Day 1) at 159:4-22, 182:11-1; Ex. G (Connington Tr.) at 59:7-60:19.

**<u>RESPONSE</u>**: Plaintiff never worked on a crew with Connington, but disputed that Ms. Malone "rarely interacted with Connington." To the contrary, she "tried [her] hardest not to" interact with him "[b]ecause he is aggressive, he is arrogant, he is verbally abusive, and he doesn't deserve the job that he has." Ex. 1 (Malone Tr. Day 1) at 159:13–17.

**15.** Plaintiff testified that Connington is "mean," "unapproachable," and "aggressive," that he acts this way with everybody and does not treat her this way because she is a woman, and she does not believe he deserves to be the HMS III. Ex. E (Malone Tr. Day 1) at 159:10-160:5, 187:14-25 (claiming Connington "harassed" male co-workers); Ex. B (7/23 interview) at TOWN00733:4- TOWN00735:12[.]

**RESPONSE**:  Disputed.  Connington's conduct was driven, at least in part, by his animus towards women:

> Q   Did you think that he yelled at you because you were a woman?
>
> A   I think that definitely had something to do with it.
>
> Q   And why do you think that?
>
> A   There was no other reason to yell at me.

Ex. 1 (Malone Tr. Day 1) at 189:2–8.  Union vice-president Luther also testified that Connington allowed a hostile work environment to continue:

> Q   Did Tucker Connington allow a hostile work environment to continue while he was deputy?
>
> A   Yes.

Ex. 8 (Luther Tr.) at 90:7–11.


**Allegations Predating the April 2016 Release**

16.   The Highway Department has four restrooms: (1) a women's restroom in the administrative side/main office of the building which contains the Superintendent's office and the clerical offices, (2) a restroom on the administrative side of the building used by the Superintendent, (3) a restroom near the deputies offices on the operations side of the building, and (4 ) a men's restroom in the men's locker room.  Ex. C (50-h) at 63:9-15; Ex. D at 223:23-224:14.

**RESPONSE**:  Not disputed. Ms. Malone notes that there was *only* one women's restroom and that's the one that Ms. Malone was banned from using.

17.   Plaintiff alleges that when her father ran against Wayne Ballard for Highway Superintendent, in 2010, when her father announced that he would run for

Highway Superintendent against Mr. Ballard, Mr. Ballard decided that Plaintiff could no longer use the women's restroom on the administrative side of the Highway and should instead use the restroom near the deputies' desks on the operations side of the building. Ex. C (50-h) at 165:4-19.

**RESPONSE**: Not disputed.[1]

18.    Subsequently, the deputies-area restroom was designated as a women-only restroom and Plaintiff had a key to access it. The restroom was renovated to include a shower and lockers. Ex. C (50-h) at 62:16-21, 126:21-127:10; Ex. D (50-h) at 225:20-25.

**<u>RESPONSE</u>**: The restroom that Ms. Malone was required to use was initially still used by men as well. It was subsequently designated as a women-only restroom. Nonetheless, "the men still used it." (Malone 50-h, Ex. 7, at 126:5–6, 127:15–19.)

19.    Plaintiff and her mother drafted an unsigned letter dated September 12, 2014, alleging that Connington bullied her by making "disgusting noises" when she passed by and blocking the doorway. Ex. X (9/12/2014 Letter); Ex. C (50-h) at 121-122; Ex. E (Malone Tr. Day 1) at 162:9-12, 163:3-7. Plaintiff does not know whether the letter was ever sent to the Town Board and does not know if anyone on the Town board ever received it. Ex. C (50-h) at 121-122; Ex. E (Malone Tr. Day 1) at 163:8-22.

---

[1] Plaintiff notes that Mr. Ballard was recently arrested on charges of filing false "reports with the intent to defraud the state." *Evergreen Court fatal blaze: Two Spring Valley building department officials indicted*, Rockland/Westchester Journal News, Nov. 15, 2021, *available at*: https://www.lohud.com/story/news/local/rockland/spring-valley/2021/11/15/evergreen-court-fire-spring-valley-building-inspector-ballard-canario-indictment/8623688002/

**RESPONSE**: Not disputed.

20.    Plaintiff testified that, after she wrote the letter in 2014, the alleged

conduct by Connington ceased.  Ex. E (Malone Tr. Day 1) at 164:7-15.

**RESPONSE**:  Disputed.  The 2014 letter complained that Connington "bullied

and harassed" Ms. Malone:

> He makes disgusting noises every time I pass him and he blocks
> the doorways when I try to enter. It happened again today and I
> have had enough. Why a grown man feels the need to bully and
> harass a woman is beyond me. I have tried to overlook this
> disgusting behavior because I am the only woman and did not
> want to rock the boat.

Def. Ex. X (9/12/2014 Letter).  Following Ms. Malone's letter, Connington stopped with

the "disgusting noises" and blocking the door. But he continued to bully and harass Ms.

Malone. For example, on June 1, 2018:

> [Connington] came out of the canopy furious and yelled, "Nobody
> knows what you['re] talking about Tori! You never wrote
> anything up!" ... [Connington] was extremely aggressive with
> me. I felt as if he was trying to bully me into driving an unsafe
> truck. I was embarrassed.  It is my responsibility as a CDL
> driver to determine weather [sic] or not a truck is safe to drive.
> I should not be bullied or intimidated into driving an unsafe
> vehicle. It is one instance out of many.

Town Ex. MM at TOWN001605.

> I told him that I wasn't going to drive a roll-off truck that he
> assigned to me that day.  And he yelled at me and embarrassed
> me in front of people, and made me feel like I was a piece of shit,
> and I complained about it.
>
> ...
>
> Because he screamed at me for no reason.  And he embarrassed
> me.  I'm not saying anything wrong.  I'm telling you that I don't
> feel safe driving a truck that had bald tires and bad brakes.
> That's what I'm saying to you. I don't want to be responsible for
> me getting hurt, the truck something, me killing somebody.
> That's my job as an operator. I'm supposed to deem whether

something is safe or unsafe to drive. But bald tires, it's never safe to drive.

Ex. 1 (Malone Tr. Day 1) at 177:13–17, 180:20–181:7.

Notably, Deputy Dominic Santulli observed: "We received an updated workplace violence policy…. <u>Tucker [Connington] violates it on a daily basis</u>." Ex. 3 (TOWN004949–4957) at TOWN004957 (emphasis added).

21.    In 2015, Plaintiff complained to Andy Lawrence, then-General Foreman, that she was being harassed by another Highway employee, Rory O'Connell. Ex. JJ. The General Foreman held a meeting with O'Connell, Plaintiff, and a union representative and ultimately placed a reprimand in O'Connell's file. Ex. JJ at MALONE_000172-173; Ex. E at 116:23-117:7, Ex. F (Malone Tr. Day 2) at 526:19-529:10.

**RESPONSE**: Mr. O'Connell was reprimanded, but his conduct "didn't stop." Ex. 2 (Malone Tr. Day 2) at 529:14–15.

22.    Frank DiZenzo was elected Highway Superintendent in 2015, to begin a two-year term starting in January 2016; he was re-elected in 2017 for a term beginning in January 2018. Ex. I (DiZenzo Tr.) at 12:8-20, 76:21-10. DiZenzo did not run in 2019. Ex. G at 251:2-12.

**RESPONSE**: Not disputed.

23.    Prior to being elected Highway Superintendent, DiZenzo had worked on crews with Plaintiff. Ex. C at (50-h) at 109:15-110:7.

**RESPONSE**: Not disputed.

**24.** Plaintiff worked on DiZenzo's 2015 campaign for Highway Superintendent. Ex. F (Malone Tr. Day 2) at 548:13-23.

**RESPONSE**: Not disputed. Ms. Malone hoped that DiZenzo's promotion would cause him to correct his misconduct and improve her working conditions. But DiZenzo's rise through the ranks actually had precisely the opposite effect. Under DiZenzo, Ms. Malone's harassment escalated:

> Q And you made allegations that on a regular and repeated basis, Mr. DiZenzo sexually harassed you, right?
>
> A Yes.
>
> Q And he made comments to you that were wholly inappropriate when he was working during the highway department; is that correct?
>
> A Yes.
>
> Q And that behavior only increased as he was elected as highway superintendent; is that correct?
>
> A Yes.

Ex. 2 (Malone Tr. Day 2) at 543:4–15.

**25.** After DiZenzo was elected, in late 2015 or early 2016, Plaintiff alleges that DiZenzo gave her a gift comprised of a GoGirl, a pink cowgirl hat, and a fake sheriff kit including a belt with a toy gun and sheriff's star. Ex. D (50-h) at 294:10-21, 301:24-302:10; Ex. N (Santulli Tr.) at 59:19-60:16 (DiZenzo gave Malone the GoGirl "shortly after he took office"). A GoGirl is a device for women to urinate while standing. Ex. A (Compl.) ¶34.

**RESPONSE**: Disputed that DiZenzo gave the GoGirl to Ms. Malone in late 2015. He actually gave it to her in 2016, as the very evidence cited by the Town

unambiguously confirms.  *See* Malone 50-h, Ex. 7, at 294:14–295:4 ("Q. Who gave it to you? A. Frank DiZenzo. Q. When? A. 2016.  …  Q. Was it a particular time of year, was it at a party, something else?  A. It was just in the office. Q.  Was it at a holiday party? A. No.").

Further, Deputy Santulli testified he was present when DiZenzo gave the Go Girl to Ms. Malone. (Santulli Tr., Ex. 10, at 59:25–60:8.) Santulli placed the timing of the event sometime after DiZenzo became Superintendent in January 2016, but could not be more specific as to the date. (*Id.* at 60:15–16.)

26.     Plaintiff considered the pink cowgirl hat and sheriff's kit to be a joke because she had previously told DiZenzo, while he was running for Highway Superintendent, that she wanted a pink Tahoe and would drive around as "hydration sheriff" bringing water to the Highway Department crews when it was hot.  Ex. D (50-h) at 303:5-304:12.  However, she alleges that she did not consider the GoGirl to be a joke.  Ex. D (50-h) at 304:23-305:22.

**RESPONSE**:  Not disputed.  Giving the "Go Girl" to Ms. Malone was an "example of [DiZenzo's] sexual harassment." Ex. 2 (Malone Tr. Day 2) at 549:12–15.


**Alleged Loss of Overtime in March 2018**

27.     On March 7, 2018, there was a call-out for a snow emergency.  Ex. DD at TOWN002213 (3/7 Schedule); Ex. H (Connington Aff.) at ¶10.  On March 8 and 9, 2018, the Highway Department was involved in storm clean-up.  Ex. H at ¶11; Ex. DD at TOWN002197.

**RESPONSE**:  Not disputed.

- 13 -

**28.** On March 9, 2018, an MEO-II, George Russo, who was assigned to work on Foreman Strom's crew, did not show up for work. Ex. DD at TOWN002215; Ex. H (Connington Aff.) at ¶12. This left Strom's crew with only one Machine Equipment Operator, Chris Zampella, and laborers. Strom's crew needed a second MEO II, as it was assigned to use a claw truck and a roll-off. Ex. H at ¶12. Accordingly, that morning, Connington re-assigned Plaintiff to Strom's crew because the tree crew had more MEO-IIs than assigned machines that day (McDermott, Lillo, and Salvo were all MEO IIs). Ex. H at ¶12; Ex DD at TOWN002234 (Strom 3/9 Work Sheet).

**RESPONSE**: Not disputed.

**29.** In assigning Plaintiff to Strom's crew for the day, Connington considered which employees are capable of operating which trucks and relative seniority. Ex. H (Connington Aff.) at ¶12. Plaintiff had the least seniority on the tree crew, and was not as skilled at operating the bucket truck. Ex. H at ¶12; Ex. E (Malone Tr. Day 1) at 42:7-14; 33:18-23.

**RESPONSE**: Disputed. Ms. Malone had experience operating a bucket truck and had received training on it. Ex. 2 (Malone Tr. Day 2) at 272:8–21. Ms. Malone's supervisor Robert Klein also testified that there was no certification for going up in the bucket truck or cutting trees.

Q Was [Malone] certified?

   A    To go up in the bucket, I believe you don't have to certified.

Q To your knowledge, what do you have to be certified to do?

   A    Actually, to do it at the highway department, you don't have to be certified.

Ex. 11 (Klein Tr. at 226:24–227:6).

**30.** Later on the morning of March 9, 2018, Connington learned that a wood chipper was available for use from a neighboring town, which necessitated sending someone to retrieve it. Ex. H (Connington Aff.) at ¶13. Because the Highway Department was stretched thin with storm clean-up, employees from the Town Sewer department were available to assist. *Id*. Connington assigned John Fay, a former Highway employee who now worked for the sewer department to retrieve the wood chipper from Orangetown and assist the tree crew for the rest of the day. *Id*.

**RESPONSE**: Not disputed.

**31.** At some point on March 9, 2018, Orange & Rockland Utilities ("O&R['"]) contacted the Highway Department to request assistance removing downed trees from electrical wires. Ex. H (Connington Aff.) at ¶14. The tree crew may only remove trees from electrical wires when O&R is present. *Id*. The tree crew spent much of the day working with O&R to remove trees from electrical wires, including working into the night since O&R continued working. *Id*.

**RESPONSE**: Not disputed.

**32.** On March 9, 2018, the tree crew worked from 7:00am until 11:00pm. Ex. H (Connington Aff.) at ¶16; Ex. DD at TOWN002221 (Daily Work Sheet). Strom's crew worked from 7:00am until 5:00pm. Ex. DD at TOWN002234 (Daily Work Sheet). Each crew worked overtime that day, though the tree crew worked 6 hours more overtime. Ex. H at ¶16.

**RESPONSE**: Not disputed.

**33.** On the morning of Friday, March 9, 2018, when Connington assigned Plaintiff to Strom's crew for the day, Connington did not know what overtime the crews might be working that day, and did not know that the tree crew would work overtime with O&R. Ex. KK at TOWN002065 (Connington notes); Ex. H (Connington Aff.) at ¶¶12-14.

**RESPONSE**: Not disputed.

**34.** On Monday, March 12, 2018, Plaintiff was assigned to the tree crew. Ex. DD at TOWN002258 (3/12/18 schedule), TOWN002272 (3/12/18 Daily Work Sheet), Ex. H at ¶17.

**RESPONSE**: Not disputed.

**35.** On Tuesday, March 13, 2018, Plaintiff was assigned to the tree crew. Ex. DD at TOWN002282 (3/13/18 schedule); TOWN002293 (3/13/18 Daily Work Sheet). The tree crew worked from 7:00am to 3:30pm. *Id*. It did not work any overtime that day. Ex. H at ¶17.

**RESPONSE**: Not disputed.

**36.** On March 13, 2018, Salvo complained to Connington and Highway Deputy Dominic Santulli about safety issues concerning the way Plaintiff was flagging traffic. Ex. KK at TOWN002065 (notes); Ex. H at ¶18; Ex. P (Salvo Tr.) at 173:19-174:23, 179:22-180:3.

**RESPONSE**: Mr. Salvo apparently "made up a story about" Ms. Malone's flagging. Ex. 1 (Malone Tr. Day 1) at 95:18–20. Contemporaneously, Ms. Malone received a call from a co-worker who overheard Mr. Salvo and another co-worker trying to get their stories straight on the false flagging complaint. *Id.* at 95:21–96:19.

37.     Connington decided to separate Salvo and Plaintiff and to remove both of them from the tree crew while the complaint was investigated. Ex. H (Connington Aff.) at ¶19.

**RESPONSE**: Not disputed.

38.     The next day, March 14, 2018, Plaintiff was assigned to Strom's crew and Salvo was assigned to Bob Hayes' crew. Ex. DD at TOWN002306 (3/14/18 schedule), TOWN002312 (Hayes's Daily Work Sheet), TOWN002319 (tree crew Daily Work Sheet), TOWN002327 (Strom's Daily Work Sheet); Ex. H (Connington Aff.) at ¶19. The tree crew did not work overtime on March 14, 2018. Ex. H at ¶19; Ex. DD at TOWN002319.

**RESPONSE**: Not disputed.

39.     From March 15 through March 20, 2018, Plaintiff was on vacation. Ex. LL at (vacation requests filed on 3/5/18 and 3/14/18); Ex. DD at TOWN002331 (3/15/18 schedule), TOWN002360 (3/16 schedule), TOWN002380 (3/19 schedule); Ex. H (Connington Aff.) at ¶20.

**RESPONSE**: Not disputed.

40.     From March 15 through March 19, 2018, Salvo was assigned to Hayes's crew. Ex. DD at TOWN002331, TOWN002336, TOWN002362, TOWN002380,

TOWN002386. Neither Malone nor Salvo worked on the tree crew between March 14 and March 19, 2018. Ex. H (Connington Aff.) at ¶¶19-21; Ex. DD at TOWN002347, TOWN002367, TOWN002391.

**RESPONSE**: Not disputed.

41. On March 18, 2018, Salvo sent Malone a text while she was on vacation in Florida, asking if they could talk and straighten things out. Ex. S at MALONE_001994 (texts); Ex. E (Malone Tr. Day 1) at 105:12-106:17; Ex. P (Salvo Tr.) at 182:3-8. Malone texted back that Salvo could call her on the phone and they spoke. Ex. S at MALONE_001995.

**RESPONSE**: Not disputed.

42. On March 18, 2018, Plaintiff told Mr. Salvo, via text, "Go in tomorrow, tell them we are fine." Ex. E (Malone Tr. Day 1) at 107:19-23); Ex. S at MALONE_001995. The next morning, Salvo sent Plaintiff a text informing her that her vacation was approved for the next day. Ex. S at MALONE_001995. Plaintiff asked whether Salvo had spoken with Connington. Salvo informed Plaintiff that he sent Connington a text stating that he and Plaintiff had spoken and "everything is ok between us and we are ok with each other." *Id*. Salvo told Plaintiff that Connington still wanted to meet with them. Plaintiff responded "Oh good ok[.]" *Id*. at MALONE_001996; Ex. E (Malone Day 1) at 107:24-108:16.

**RESPONSE**: Not disputed.

**43.** On March 20, 2018, Salvo was assigned to the tree crew, Plaintiff was on vacation. Ex. DD at TOWN002405 (3/20 schedule), TOWN002415 (Klein Daily Work Sheet); Ex. H (Connington Aff.) at ¶22.

**RESPONSE**: Not disputed.

**44.** On the morning of March 21, 2018, the first day Plaintiff returned to work after her vacation, Connington held a meeting with Salvo, Plaintiff, and John Luther (a union representative). Ex. E (Malone Day 1) at 108:17-110:8; Ex. KK at TOWN002066 (notes); Ex. P (Salvo Tr.) at 186:6-16; Ex. H (Connington Aff.) at ¶23. In the meeting, Connington confirmed that Salvo and Plaintiff did not have any safety concerns and were both requesting to return to the tree crew. Ex. E at 108:17-110:8; Ex. KK at TOWN002066; Ex. H at ¶23; Ex. P at 186:17-20.

**RESPONSE**: Disputed as to the summary of the deposition testimony. As noted above, Mr. Salvo apparently "made up a story about" Ms. Malone's flagging. Ex. 1 (Malone Tr. Day 1) at 95:18–20. Contemporaneously, Ms. Malone received a call from a co-worker who overheard Mr. Salvo and another co-worker trying to get their stories straight on the false flagging complaint. *Id.* at 95:21–96:19.

Thereafter, Ms. Malone was removed from the tree crew. (Def. 56.1 Stmt. ¶ 37, *supra*.) Later, after Mr. Salvo reached out to Ms. Malone while she was on vacation, he agreed to tell Connington that he was ok with working with Ms. Malone — effectively, to withdraw his false complaint. When Ms. Malone returned from vacation, Connington held a meeting. He said, "I just want to make sure that it's a safe situation." Ex. 1 (Malone Tr. Day 1) at 108:23–25. Ms. Malone hadn't actually flagged unsafely in the

first place, so she didn't have any response: "I said, I didn't do anything that was unsafe to begin with so I don't know what that means." Ex. 1 (Malone Tr. Day 1) at 109:2–4.

Thus, it's not that Ms. Malone didn't have her own safety concerns; it's just that, in this instance, she didn't share Mr. Salvo's artificial "concern" about her flagging.

45. On March 21, 2018, Salvo and Plaintiff were both assigned to the tree crew. Ex. DD at TOWN002430, TOWN002438; Ex. H (Connington Aff.) at ¶23. No further action was taken regarding the flagging complaint and Plaintiff was not penalized or reprimanded in any way. Ex. H at ¶24. Plaintiff was primarily assigned to the tree crew until late June 2018. *Id*. at ¶9.

**RESPONSE**: Not disputed.

46. During the March 21 meeting with Connington, Plaintiff did not tell Connington that she did not want to go back to the tree crew. Ex. E (Malone Tr. Day 1) at 109:24-110:2; Ex. H (Connington Aff.) at ¶23.

**RESPONSE**: Not disputed.

47. Connington did not separately interview Plaintiff about Salvo's complaint because she went on vacation, and the day she returned from vacation, she and Salvo came to see Connington to effectively withdraw the complaint and inform him that they wanted to return to the tree crew. Ex. G (Connington Tr.) at 168:23-170:14; Ex. H (Connington Aff.) at ¶20.

**RESPONSE**: Not disputed.

48. On April 5, 2018, Plaintiff filed a grievance, asserting that she lost out on overtime when she was removed from her crew on March 13, 2018 (the "OT Grievance"). Ex. HH at TOWN001752-1753. Plaintiff alleged that on March 13, 2018, she was removed from her crew because "another member of the Tree Crew had requested to be removed from the crew and in turn I was removed." *Id.* She further asserted in the grievance that on March 13, the tree crew worked a total of 16 hours, 6 of which was "double time pay" and "four (4) hours of comp. time." *Id.*

**RESPONSE**: Not disputed.

49. On April 12, 2018, Superintendent DiZenzo denied Plaintiff's April 5, 2018 Overtime Grievance. Ex. HH (OT Grievance) at TOWN001754.

**RESPONSE**: Not disputed.

50. Plaintiff's Overtime Grievance is incorrect in stating that she missed out on overtime on the tree crew on March 13, 2018. Plaintiff worked on the tree crew on March 13, 2018, and the tree crew did not work any overtime on March 13, 2018. 56.1 Stmt. ¶35.

**RESPONSE**: Disputed. Defendants should cite to individual Time Card Reports to show whether members of the tree crew received overtime on that day.

## Allegations Regarding Roll-Off Truck #333

51. On May 24, 2018, Plaintiff told Deputy Dominic Santulli and mechanic Al Camadeco that truck #333 required maintenance. Ex. II at TOWN001606. Plaintiff

was told that she could continue using roll-off truck #333 as long as she felt it was safe to drive. *Id.*

**RESPONSE**: Not disputed.


52.    On Friday, June 1, 2018, Plaintiff was working on the tree crew with Chris McDermott, Denny Friscoe, Brian Lillo, and Brian Westervelt. Ex. H (Connington Affidavit) at ¶25; Ex. EE at TOWN002619 (6/1/18 schedule). Chris McDermott was the acting foreman for the day since Robert Klein was out. Ex. H at ¶25; Ex. EE at TOWN002619. Truck #333 was not on the out-of-service ("OOS") list and was assigned to the tree crew. Ex. H at ¶26; Ex. EE at TOWN002619.

**RESPONSE**: Not disputed.


53.    As acting foreman, it was McDermott's decision who on the crew would operate which trucks. Ex. H (Connington Aff.) at ¶25. Plaintiff refused to drive roll-off truck #333 because she claimed that she had previously written it up for service. Ex. MM at TOWN001605-1606; Ex. E (Malone Day 1) at 180-181. Connington was not aware that Plaintiff had previously identified truck #333 as needing service. Ex. H (Connington Aff.) at ¶26.

**RESPONSE**: Not disputed that Ms. Malone had previously written up Truck #333 for service. Per 56.1 Stmt. ¶ 51, above, on May 24, 2018, Ms. Malone had written Truck #333 for service. "I[t] had an air leak, bald tires, no AC, [and] the inspection was very overdue." Town Ex. MM at TOWN001605. It was not serviced. Then, a week later, on May 31, 2018, Ms. Malone was driving the truck "in the rain with a full load on the back and had a very hard time stopping. I decided that it was not safe to drive

[the truck] at that point. On 6-1-2018 first thing in the morning I told my superior (Chris McDermott) that the truck was not safe to drive. He then told HMS3 Tucker Connington." *Id.* Accordingly, disputed that Connington was not aware that the truck needed service.

54.     Connington asked Plaintiff what was wrong or unsafe about the vehicle and instructed Plaintiff and her crew that if they were not comfortable using truck #333, they could use open trucks, meaning trucks that were not assigned to another crew that day.  Ex. H (Connington Aff.) at ¶27;  Ex. O (Friscoe Tr.) at 132:3-18; Ex. II at TOWN001610-1611(McDermott and Friscoe Statements); Ex. G (Connington Tr.) at 216:24-218:25.  There were open dump trucks that the crew could have used.  Ex. H (Connington Aff.) at ¶¶27-29; Ex. O at 132:3-18.

**RESPONSE**:  Disputed.  On June 1, 2018, Connington did not merely ask "what was wrong or unsafe."  Upon hearing that the truck needed maintenance,

> [Connington] came out of the canopy furious and yelled, "Nobody knows what you['re] talking about Tori! You never wrote anything up!" … [Connington] was extremely aggressive with me. I felt as if he was trying to bully me into driving an unsafe truck. I was embarrassed.  It is my responsibility as a CDL driver to determine weather [sic] or not a truck is safe to drive. I should not be bullied or intimidated into driving an unsafe vehicle. It is one instance out of many.

Town Ex. MM at TOWN001605. *See also* Ex. 1 (Malone Tr. Day 1) at 180:20–181:7:

> Q   What about your interaction with Mr. Connington upset you?
>
> A     Because he screamed at me for no reason.  And he embarrassed me.  I'm not saying anything wrong.  I'm telling you that I don't feel safe driving a truck that had bald tires and bad brakes.  That's what I'm saying to you.  I don't want to be responsible for me getting hurt, the truck something, me killing somebody.  That's my job as an operator.  I'm supposed to deem

whether something is safe or unsafe to drive. But bald tires, it's never safe to drive.

Denny Friscoe, who was assigned to the same crew as Ms. Malone on the day of the roll-off unsafe truck incident testified that he heard Mr. Connington be "verbally abusive to Ms. Malone:":

> Q Did you ever witness Mr. Connington become verbally abusive to Ms. Malone?
>
> MS. SCHEIBEL. Objection.
>
> A The incident in question, I was -- Tori and I were actually assigned to the same crew that day, and she was told to drive a roll-off that she had apparently written up the day before.

Ex. 9 (Friscoe Tr. at 55:4–16).

Notably, Deputy Dominic Santulli later observed: "We received an updated workplace violence policy…. Tucker [Connington] violates it on a daily basis." Ex. 3 (TOWN004949–4957) at TOWN004957 (emphasis added).

**55.** Plaintiff's crew declined to use open trucks. Ex. H (Connington Aff.) at ¶¶28-29. Instead, Friscoe stated that he would drive roll-off truck #333. Ex. O (Friscoe Tr.) at 58:24-59:5; Ex. H at ¶28. Friscoe did not believe truck #333 was unsafe to drive. Ex. O at 59:6-13; Ex. II at TOWN001611. Plaintiff rode in roll-off truck #333 that day as a passenger, with Friscoe driving. Ex. E (Malone Tr. Day 1) at 179:10-17; 180:4-12; Ex. H at ¶29.

**RESPONSE**: Not disputed.

**56.** McDermott was acting as the foreman that day and was driving the pick-up truck assigned to the crew. Ex. II (McDermott and Friscoe Statements

TOWN001610-01611).  Plaintiff could have taken her own truck, or ridden in the pick-up truck as a passenger, but she preferred to ride in roll-off #333 with Friscoe.  Ex. E (Malone Tr. Day 1) at 180:4-12, 16:9-13, 17:7-19.

**RESPONSE**:  Not disputed.

57.    On June 4 and June 5, 2018, roll-off truck #333 was assigned to foreman Steve Peters' crew.  Ex. H (Connington Aff.) at ¶30; Ex. II at TOWN001606; Ex. EE at TOWN002676 (6/4/18 schedule), TOWN002736 (6/5/18 schedule).  On June 5, 2018, truck #333 was used by Chris Frank, on Peters' crew, who completed a daily vehicle inspection report and did not identify any issues with the truck.  Ex. H at ¶30; Ex. EE at TOWN002769.

**RESPONSE**:  Not disputed.

58.    On June 7, 2018 roll-off truck #333 was taken off-line for service, and was serviced on June 12, 2018.  Ex. H at ¶31; Ex. EE at TOWN002865 (6/7/18 schedule).

**RESPONSE**:  Not disputed.

59.    Weeks later, Plaintiff submitted a written complaint to Deputy Santulli regarding the June 1, 2018 truck incident, alleging that Connington was "extremely aggressive" during the encounter.  Ex. MM; Ex. E (Malone Tr. Day 1) at 184:4-20.

**RESPONSE**:  Not disputed.

60.    When questioned at her deposition, Plaintiff could not recall what Connington said to her during the encounter over truck #333.  Ex. E (Malone Tr. Day 1) at 179:5-9.

**RESPONSE**: Disputed. It's not that Ms. Malone didn't remember, it's just that she didn't remember "exactly" what Connington said. Ms. Malone testified:

> I told him that I wasn't going to drive a roll-off truck that he assigned to me that day. And he yelled at me and embarrassed me in front of people, and made me feel like I was a piece of shit, and I complained about it.
>
> …
>
> Because he screamed at me for no reason. And he embarrassed me. I'm not saying anything wrong. I'm telling you that I don't feel safe driving a truck that had bald tires and bad brakes. That's what I'm saying to you. I don't want to be responsible for me getting hurt, the truck something, me killing somebody. That's my job as an operator. I'm supposed to deem whether something is safe or unsafe to drive. But bald tires, it's never safe to drive.

Ex. 1 (Malone Tr. Day 1) at 177:13–17, 180:20–181:7.

**61.** Santulli forwarded the complaint to Superintendent DiZenzo. Ex. MM; Ex. N (Santulli Tr.) at 41:17-22, 71:4-23, 72:15-22. The complaint was investigated and witness statements were collected from McDermott and Friscoe. Ex. E (Malone Tr. Day 1) at 184:23185:6; Ex. G (Connington Tr.) at 237; Ex. II (statements) at TOWN001610-1611.

**RESPONSE**: Not disputed.

**62.** Plaintiff does not allege any other instances in which Connington purportedly assigned Plaintiff to a truck she felt was unsafe. Ex. E (Malone Tr. Day 1) at 185:7-11.

**RESPONSE**: Not disputed.

**63.** Plaintiff could not recall any other instances in which she thought Mr. Connington was verbally abusive to her. Ex. E (Malone Tr. Day 1) at 185:12-15.

**RESPONSE**: Disputed. Although Ms. Malone couldn't recall any specific instances when she sat for her deposition, she testified:

> [Connington] is aggressive, he is arrogant, he is verbally abusive, and he doesn't deserve the job that he has.
>
> ...
>
> Q  Why don't you think he deserves it?
>
> A    Because he's mean, he's unapproachable, he verbally assaults people....

Ex. 1 (Malone Tr. Day 1) at 159:15–17, 23–25.

Notably, Deputy Dominic Santulli later observed: "We received an updated workplace violence policy.... <u>Tucker [Connington] violates it on a daily basis</u>." Ex. 3 (TOWN004949–4957) at TOWN004957 (emphasis added).

## June 28, 2018 "Chain Saw Incident"

**64.** In 2018, Brian Lillo was an MEO II at the Highway Department. Ex. H (Connington Aff.) at ¶12.

**RESPONSE**: Not disputed. But Plaintiff notes that Mr. Lillo had a ███████

████████████████████████████████████████████████████████

██████████████████████████████

   ██ █████████████████████████████████████████

      ███████████████████████████

      ██ ███████████████

   ██

   ██ ██████████████████

      ██ █████████████████████



Ex. 5 (Lillo Tr.) at 145:7–10, 145:14–146:4, 149:2–6, 149:13–150:7 (emphasis added).

**65.**    Plaintiff alleges that on June 28, 2018 Mr. Lillo "kicked a chair at her and swung a chainsaw at her head." Ex. A (Compl.) at ¶43.

**RESPONSE**: Not disputed.

**66.**    After Plaintiff informed the Highway Department of these allegations, she and Mr. Lillo were placed on separate crews. Ex. G (Connington Tr.) at 263:16-264:15; Ex. N (Santulli Tr.) at 67:6-20; Ex. H (Connington Aff.) at ¶9. After June 28, 2018, Plaintiff did not work on a crew with Mr. Lillo again. Ex. E (Malone Tr. Day 1) at 203:21-24; Ex. GG (July 2018 Highway Schedules) at TOWN004843-4897; Ex. H at ¶9.

**RESPONSE**: Not disputed.

**67.**    On June 28, 2018, after the incident, Plaintiff verbally told Deputy Dominic Santulli that Lillo swung a chainsaw at her head and Santulli asked her to write down the complaint. Ex. E (Malone Tr. Day 1) at 202:12-11; Ex. NN (Memo and Notes); Ex. N (Santulli Tr.) at 66:515. Plaintiff later provided Santulli with written notes alleging that Mr. Lillo, inter alia, "took the chainsaw out of the bed of the truck and swung it at my [sic] the side of my head." Ex. NN at MALONE_000175-176; Ex. E (Malone Tr. Day 1) at 203:5-14; Ex. F (Malone Tr. Day 2) at 284:24-297:19. Plaintiff did not contact the police about the incident, nor did she request that the police be contacted. Ex. E at 203:25-204:7; Ex. B. at TOWN000724:11-727:25.

**RESPONSE**: Not disputed.

68.     As soon as the Highway Superintendent and Town Attorney's office were informed of Plaintiff's allegations, on July 10, 2018, the Clarkstown Police Department ("CPD") was notified.  Ex. I (DiZenzo Tr.) at 42:21-43:8; Ex. B. at TOWN000724:11-727:25. The CPD immediately responded to the Highway Department to investigate; Ex. AA (police report); Ex. I at 42:21-43:10.

**RESPONSE**:  Not disputed.

69.     The CPD and the Town Attorney's Office each conducted an investigation into Plaintiff's allegations regarding the June 28, 2018 incident, including a review of Highway Department surveillance video of the incident.  Ex. AA (police report); Ex. OO (Toomey Memo); Ex. I (DiZenzo Tr.) at 42:6-9; 42:2-43:10; 43:23-44:17.  The Town Attorney's Office and the DA's Office concluded that Plaintiff's allegations regarding Lillo's action on June 28, 2018 were unfounded.  Ex. OO (Toomey Report); Ex. CC (dismissal of Lillo charges).

<u>**RESPONSE**</u>:  Disputed.  As part of the Town's investigation, the Town intentionally sought to "<u>undermine [Ms. Malone's] credibility</u>." Ex. 4 (TOWN005570). Accordingly, Plaintiff disputes any finding of the Town or the Town's police. (Notably, the Town purposefully withheld this document from its productions and only produced after Court order.  ECF no. 147.[2])

---

[2] In mid-2020, the Town produced thousands of pages of discovery and then fact-witness depositions were completed. The Town's production had included hundreds of pages of attorney notes from the Town's internal investigations. But the Town deliberately withheld this one key page of notes, which was only produced following the Court's order.

70.     After her complaint about Lillo, Plaintiff and Mr. Klein were transferred, together, to another crew.  TOWN001615.  Superintendent DiZenzo made the decision to transfer Plaintiff and Klein to another crew upon the suggestion by police that Plaintiff and Lillo be separated during the investigation and because Lillo was qualified to operate the tree truck, whereas Plaintiff was not.  Ex. PP (7/11 Memo) at TOWN001615; Ex. I (DiZenzo Tr.) at 44:22-45:24; 46:21-47:24, 48:22-49:11; 49:21-4. Lillo is the most experienced operator of the tree truck at the Highway Department. Ex. I at 48:22-49:11; Ex. B at 71:4-82:20.

**RESPONSE**:  After Ms. Malone made her complaint, the Town retaliated against her in the conditions of her employment by removing her from the tree crew. The Town purportedly took the complaint seriously, but instead of suspending or moving the perpetrator pending the investigation, the Town removed Ms. Malone. Meanwhile, behind her back, Vincent Toomey, the Town's attorney, described the parties to incident – Mr. Lillo and Ms. Malone – as "combatants" and concluded by saying, "Ms. Malone has a history of grievances and harassment complaints." (Ex. 12, TOWN 005228.) But Ms. Malone was not a *combatant*; she was a victim. Then, in the so-called investigation of the chainsaw incident, the Town attorney's notes remark, "Undermine her credibility." (Ex. 4, TOWN 005570.) (As noted above, the Town purposefully withheld this document from its productions and only produced after Court order.  ECF no. 147.)

Further, Ms. Malone's supervisor Robert Klein, testified that Ms. Malone had worked in the bucket and that no certification for doing so was necessary. (See Response to ¶29 above.)

**71.** Plaintiff did not complain about being placed on a crew with Mr. Klein. Ex. B (7/23 Interview) at TOWN000743; Ex. I (DiZenzo Tr.) at 62:12-63:3; Ex. E (Malone Tr. Day 1) at 213:8-19. Joe Donovan, Dom Bosco, and Rob Gaglione were also assigned to the crew. Ex. B (7/23 Interview) at TOWN000743. On July 23, 2018, Plaintiff told the Town Attorney's Office that she no problems with anyone on this crew and did not ask to be moved to a different crew. Ex. B at TOWN000743, TOWN000745:6-23.

**RESPONSE**: Not disputed.

**72.** During her July 23, 2018 interview, Plaintiff made allegations of harassment against a foreman, but when the Town Attorneys asked her, she refused to name the individual she was referring to. Ex. B (7/23 Interview) at TOWN00737:14-TOWN00738:1; Ex. E (Malone Tr. Day 1) at 212:7-10.

**RESPONSE**: Not disputed. Ms. Malone was already so upset at the time that she didn't want to also get into more details of Mr. Klein sexually assaulting her. Ex. 1 (Malone Tr. Day 1) at 212:2–16.

**73.** Prior to July 23, 2018, Plaintiff never complained to any supervisor at the Highway Department regarding Robert Klein. Ex. I (DiZenzo Tr.) at 62:12-63:3; Ex. E (Malone Tr. Day 1) at 202:9-11, 213:8-15.

**RESPONSE**: Not disputed.

**74.** Upon learning of Plaintiff's allegations against a foreman or "Blue," the Town Attorney's office determined that this individual may be Robert Klein. Ex. K

(Kahn Tr.) at 98:23-99:18.  Upon determining this, the Town Attorney's Office immediately requested that Plaintiff be separated from Mr. Klein.  Ex. E (Malone Tr. Day 1) at 212:17-213:4.  Believing that Plaintiff's allegations regarding the "foreman" could describe criminal conduct, on the morning of July 24, 2018, the Town Attorney's Office referred the allegations concerning Klein/"Blue" to the CPD for investigation. Ex. K (Kahn 30(b)(6)) at 95:6-11, 96:15-99:18.  Deputy Town Attorney Kahn informed Plaintiff that she had referred the allegations to the Police Department.  Ex. K (Kahn 30(b)(6)) at 96:15-97:18.

**RESPONSE**:  Not disputed but, as noted above, as part of the Town's investigation, the Town intentionally sought to "<u>undermine [Ms. Malone's] credibility</u>." Ex. 4 (TOWN005570). Accordingly, Plaintiff disputes any finding of the Town or the Town's police.

**75.**     Accordingly, Plaintiff was assigned to a new crew.  Ray Salveggi was the foreman of this crew.  Ex. C (50-h) at 111:22-112:14; Ex. E (Malone Tr. Day 1) at 212:17-213:4.  Plaintiff was on Mr. Salveggi's crew until March 2019. Ex. C (50-h) at 111:22-112:14   From July 2018 to March 2019, Plaintiff got along well with her crews. No one on Mr. Salveggi's crew harassed Plaintiff or otherwise subjected her to a hostile work environment.  Ex. E (Malone Tr. Day 1) at 27:9-11, 28:10-12, 29:16-19.  Plaintiff did not lose any overtime as a result of being transferred off the tree crew in July 2018 to the brush crew, and then Mr. Salveggi's crew.  Ex. I (DiZenzo Tr.) at 50:25-51:6.

**RESPONSE**:  Not disputed.

**Alleged December 2018 Retaliation by Lillo**

**76.**     On January 9, 2019, Plaintiff provided a written list of complaints about Brian Lillo to the CSEA union president, Beth McDonald, regarding alleged conduct by Lillo in December 2018.  Ex V; Ex. W at TOWN002034; Ex. F (Malone Tr. Day 2) at 379:16-381:16.  On January 10, 2019, the union president provided the Town Attorney's office with a copy of the written complaint she received from Plaintiff.  Ex. W at TOWN002035.

**RESPONSE**:  Not disputed.


**77.**     In the written notes, Plaintiff alleged that on December 13, 2018, she walked into the vestibule to clock in and Lillo, lingered at the keybox, "and then when I reached over to clock in he aggressively opened the keybox door again for no reason." Ex. V  at MALONE_000293; Ex. F (Malone Day 2) at 386:9-22.

**RESPONSE**:  Not disputed.


**78.**     Plaintiff further alleges that on December 14, 2018, Lillo stood close to her in the vestibule and "gave [her] a look of disgust, slammed the door to the key box and stormed out."  Ex. W at TOWN002034.

**RESPONSE**:  Not disputed.


**79.**     Finally, Plaintiff alleged that on December 27, 2018, Lillo "whipped [an] airhose in the air" when he saw her approaching, Ex. V; the air hose did not touch her. Ex. F (Malone Tr. Day 2) at 383:4-9.  She also alleged that Lillo threw a coffee cup in

the trash "aggressively," bumped her bookbag, and stared at her when she was walking by.  Ex. V.

**RESPONSE**:  Not disputed.

**80.**     Upon receiving the January 10, 2019 complaint, the Town Attorney's Office began investigating, including by gathering the surveillance video from the Highway Department vestibule for the relevant time periods on December 13 and 14, 2018.  Ex. T (Affidavit of Robert Paul).  The surveillance videos did not show any aggressive conduct by Lillo towards Plaintiff.  Ex. T (Paul Affidavit) at Exhibit 1 (videos); Ex. F (Malone Day 2) at 389.

**RESPONSE**:  In order to streamline her case, Ms. Malone has decided to forgo presenting evidence on the keybox incidents. We note, however, that Ms. Malone's co-worker John Luther testified that these incidents were "threatening." (Luther Tr., Ex. 8, at 88:3–18.)

**81.**     In January and February, 2019, the Town Attorney's Office interviewed Plaintiff, Lillo, and other witnesses identified by Plaintiff (John Luther, Chris Frank, Ray Selvaggi, Brian Westervelt, and Frank Golden) regarding the allegations. Flannery Decl. at ¶51.  Lillo denied the allegations.  Ex. OO (Toomey Memo) at TOWN004358.

**RESPONSE**:  As part of the Town's earlier investigation, the Town intentionally sought to "undermine [Ms. Malone's] credibility." Ex. 4 (TOWN005570). Accordingly, Plaintiff disputes any finding of the Town or the Town's police, which was already actively working on undermining her credibility.  (Notably, the Town purposefully

withheld this document from its productions and only produced after Court order. ECF no. 147.)

**82.** The surveillance video for December 13, 2018 depicts the keybox incident about which Plaintiff complained. Ex. F (Malone Tr. Day 2) at 389:3-396:15; Ex. T (Paul Aff.) at Exhibit 1 at 12132018-HWY-TC.ave (video). The video shows that Mr. Lillo entered the vestibule ahead of Plaintiff at approximately 7:06:55am and goes straight to the key box. Mr. Lillo was wearing a fluorescent yellow hooded sweatshirt, and a gray hat with sunglasses resting on his hat. Plaintiff entered immediately behind him. Plaintiff chose to use the time-clock next to Lillo instead of using the clock on the opposite wall. Ex. T (Paul Aff.) at Exhibit 1 at 12132018-HWY-TC.ave (video); Ex. F (Malone Tr. Day 2) at 393:3-396:15.

**RESPONSE**: As noted above, in order to streamline her case, Ms. Malone has decided to forgo presenting evidence on the keybox incidents. We note, however, that Ms. Malone's co-worker John Luther testified that these incidents were "threatening." (Luther Tr., Ex. 8, at 88:3–18.)

**83.** Lillo is at the keybox for approximately eleven seconds, during which time he opens the key box, obtains a key, looks in the box, closes the box, and exits the vestibule. Ex. T (Paul Aff.) at Exhibit 1 at 12132018-HWY-TC.ave at 7:06:58-7:07:09. During that time, Lillo did not behave aggressively. *Id*; Ex. F (Malone Tr. Day 2) at 393:3-396:15. Lillo is in the vestibule for only 13 seconds total. Ex. T (Paul Aff.) at Exhibit 1 at 12132018-HWY-TC.ave at 7:06:587:07:11. The video does not show Plaintiff reacting in any way to Lillo's conduct. While the keybox is located very close

to the time clock on the right hand side of the video, Plaintiff does not appear to flinch or move back when Lillo looks in the keybox. *Id*.; Ex. F (Malone Tr. Day 2) at 393:3-396:15.  Plaintiff remains at the timeclock for another 24 seconds after Lillo exits, then she exits.  Ex. T (Paul Aff.) at Exhibit 1 at 12132018-HWY-TC.ave at 7:07:11-7:07:35; Ex. F (Malone Tr. Day 2) at 393:3-396:15.  Lillo and Plaintiff did not speak to each other during the 13 seconds that they were in the vestibule together.  Ex. F (Malone Tr. Day 2) at 393:3-396:15.

**RESPONSE**:  As noted above, in order to streamline her case, Ms. Malone has decided to forgo presenting evidence on the keybox incidents. We note, however, that Ms. Malone's co-worker John Luther testified that these incidents were "threatening." (Luther Tr., Ex. 8, at 88:3–18.)

**84.**     The Town Attorney's Office also reviewed the surveillance video of the vestibule from December 14, 2018.  Ex. OO (Toomey Memo) at TOWN004358; Ex. T (Paul Aff.) at ¶6.  The December 14th AM surveillance video shows Plaintiff in the vestibule, clocking into work at minutes 7:07:03am – 7:07:27am; Lillo is not in the vestibule during this time.  Ex. T (Paul Aff.) at Exhibit 1 at 12142018-HWY-TC-AM.ave (video).  The PM surveillance video shows Plaintiff enter the vestibule at 4:27:28 pm. Lillo is not in the room when Plaintiff enters.  Plaintiff stands directly next to the time clock and keybox while socializing with coworkers until she clocks out at 4:54 pm to 4:55 pm on the video and exits the vestibule.  Ex. T (Paul Aff.) at Exhibit 1 at 12142018HWY-TC-PM.ave (video).

**RESPONSE**:  As noted above, in order to streamline her case, Ms. Malone has decided to forgo presenting evidence on the keybox incidents. We note, however, that

Ms. Malone's co-worker John Luther testified that these incidents were "threatening." (Luther Tr., Ex. 8, at 88:3–18.)

85. At no point in the December 14, 2018 videos is Lillo seen giving Plaintiff "a look of disgust, slam[ing] the door to the key box and storm[ing] out[,]" as alleged in Plaintiff's written complaint. Ex. V.

RESPONSE: As noted above, in order to streamline her case, Ms. Malone has decided to forgo presenting evidence on the keybox incidents. We note, however, that Ms. Malone's co-worker John Luther testified that these incidents were "threatening." (Luther Tr., Ex. 8, at 88:3–18.)

86. The Town concluded that the December 2018 incidents alleged by Plaintiff were not substantiated. Ex. OO (Toomey Memo) at TOWN004358; Ex. L (Toomey Tr.) at 52:23-25.

**RESPONSE**: As part of the Town's earlier investigation, the Town intentionally sought to "undermine [Ms. Malone's] credibility." Ex. 4 (TOWN005570). Accordingly, Plaintiff disputes any finding of the Town or the Town's police, which was already actively working on undermining her credibility. (Notably, the Town purposefully withheld this document from its productions and only produced after Court order. ECF no. 147.)

87. Plaintiff does not allege that Lillo retaliated against her after she complained to the Town on January 10, 2019. Ex. A (Compl.) at ¶46.

**RESPONSE**:  Ms. Malone does not make any complaints about Lillo between January 2019 and March 2019, when she was moved to the Town garage. She stayed away from him during this time.

## Alleged Sabotage and Transfer to the Town Garage

88.    Between July 2018 and March 2019, the Town Attorney's Office had discussions with Plaintiff's then-counsel, Catherine Foti, about the possibility of Plaintiff transferring out of the Highway Department to another MEO II position within the Town.  Ex. L Toomey Tr. at 29:4-6; Ex. E (Malone Tr. Day 1) at 232:24-233:6, 235:9-17.  Plaintiff was offered a transfer to the Town Sanitation Department.  Ex. L (Toomey Tr.) at 29:10-13; Ex. E at 232:24-233:6; Ex. YY at ¶51.  Plaintiff declined the transfer, stating she would be uncomfortable working there because of an encounter she had with another Sanitation employee while they were off-duty at a bar.  Ex. E at 233:4-234:14; Ex. L at 29:4-30:9; Ex. YY at ¶52.

**RESPONSE**:  Not disputed.  Instead of cleaning up the Highway Department, the Town tried to move Ms. Malone away, giving her the option of transferring to the Sewer Department. She declined. A "right hand man" of the head of the Sewer Department was John Fay, whom Ms. Malone testified "tried to make out with me at a bar and I pushed his face." (Malone Tr. Day 1, Ex. 1, at 234:5–7.) More recently, according to Ms. Malone's understanding, the head of the department received a 10-day suspension for "intimidation" after bringing a gun to work.

89.     Plaintiff was also offered a transfer to the Recreation and Parks Department, but she declined this transfer as well.  Ex. E (Malone Tr. Day 1) at 235:9-21; Ex. YY at ¶¶53-54.

**RESPONSE**:  Not disputed. Park is run by Elaine Apfelbaum, who was the head of the union during the relevant time periods, when Ms. Apfelbaum laughed at Ms. Malone and lost her file. Moreover, Ms. Malone understands that one of the bosses at Parks has faced multiple sexual harassment claims.

90.     At 5:05 pm on February 28, 2019, Plaintiff's counsel sent a letter to the Town's Labor Counsel, Vincent Toomey, alleging that Plaintiff had been the victim of two incidents of sabotage and requesting a plan to protect Plaintiff from "potentially deadly conduct."  Ex. M (Toomey Aff.) at Exhibit 1 at TOWN005192-5193 (2/28 Letter). Specifically, the letter alleged that on January 17, 2019, the cable connecting the roll-off truck to a dumpster snapped while Plaintiff was driving it, and that on February 12, 2019, the back tire on the right side of Plaintiff's snowplow slid off.  *Id.*  Plaintiff alleged that these were acts of sabotage and retaliation, but did not name any particular suspect.  *Id.*; Ex. M (Toomey Aff.) at ¶4.

**RESPONSE**:  Not disputed.

91.     Immediately after receiving the letter, Mr. Toomey contacted the CPD. Ex. M (Toomey Aff.) at Exhibit 1 at TOWN005191 (email forwarding letter to CPD); Ex. L (Toomey Tr.) at 42:2-15; Ex. RR (email to CPD); Ex. M (Toomey Aff.) at ¶5. Toomey also immediately contacted Plaintiff's then-counsel, Ms. Foti.  Ms. Foti requested that the Town take immediate action to keep Plaintiff safe.  Ex. L (Toomey

Tr.) at 21:21-22:16, 23:19-24:12; Ex. RR (TOWN005195-5196); Ex. M (Toomey Aff.) at

¶¶4-5.   In consultation with Ms. Foti, Mr. Toomey recommended that Plaintiff be

transferred to the Town Garage where her brother-in-law was the supervisor, while the

police investigated Plaintiff's allegations of sabotage.   Ex. L (Toomey Tr.) at 25:5-18;

Ex. I (DiZenzo Tr.) at 55:20-56:13; Ex. M (Toomey Aff.) at ¶¶5, 7.

>    **RESPONSE**:  Not disputed.


**92.**    Plaintiff's counsel did not object to the transfer to the Town Garage.

Ex. M (Toomey Affidavit) at ¶5; Ex. YY at ¶¶55-56.

>    **RESPONSE**:  Not disputed.


**93.**    Frank DiZenzo wrote the letter notifying Plaintiff of her transfer to the

Town Garage upon counsel's recommendation; he was not happy about the transfer

because it meant he would lose a worker.   Ex. I (DiZenzo Tr.) at 56:3-9, 56:24-57:5;

Ex. SS (transfer memo).   Connington was not involved in the decision to transfer

Plaintiff to the Town Garage.   *See* Ex. G (Connington Tr.) at 257:22-258:6, 268:2-5,

268:8-269:3.

>    **RESPONSE**:  Not disputed.


**94.**    The Town Garage is not part of the Highway Department.   Ex. G

(Connington Tr.) at 265:4-14.  At the Town Garage, Plaintiff was supervised by the

Department of Engineering and Facilities Management.   Ex. L (Toomey Tr.) at 21:9-20.

>    **RESPONSE**:  Not disputed.

**95.**     On Friday March 1, 2019, a memorandum from Frank DiZenzo to Plaintiff was hand delivered, confirming the transfer to the Garage, effective, Monday March 4, 2019.  Ex. SS TOWN001662; Ex. I (DiZenzo Tr.) at 55:20-56:2, 58:2-5.  The transfer was to be temporary during the course of the investigation of Plaintiff's allegations of truck sabotage.  Ex. SS.

**RESPONSE**:  Not disputed.

**96.**     Plaintiff did not object to the transfer to the Town Garage.   Ex. M (Toomey Affidavit) at ¶5; Ex. E (Malone Tr. Day 1) at 231:23-232:3; Ex. YY (Answer to Requests for Admission) at ¶¶55-56.  Plaintiffs has never requested to return to her position at the Highway Department.  Ex. E (Malone Tr. Day 1) at 237:20-238:11; Ex. M (Toomey Aff.) at ¶¶10, 12.

**RESPONSE**:  Not disputed.

**97.**     Plaintiff's March 2019 transfer to the Town Garage resulted from Ms. Foti's February 28, 2019 letter expressing concerns for Plaintiff's safety and her request for immediate action to protect Ms. Malone.  Ex. L (Toomey Tr.) at 40:23-41:11; Ex. M (Toomey Aff.) at ¶7.

**RESPONSE**:  In response to Ms. Malone's repeated complaints of sexual harassment and sexual assault, the Town did *not* take action to clean up the highway department. (Ex. 1 (Malone Tr. Day 1) at 229:15–230:12.) Thus, it was understandable that Ms. Malone was concerned about her safety, especially following the two truck incidents, the biased investigation of the Lillo chainsaw incident, and the on-going harassment and sexual assaults. (Regarding assaults, see Klein Tr., Ex. 11, at 118,

where Mr. Klein admits to pulling Ms. Malone's ripping her shirt off, over her head, in what he calls a "[h]ockey fight"; and at 125, where he admits to cutting her leg with a pole saw. See also Frisco Tr., Ex. 9, at 46–48, where Mr. Friscoe testified that he saw Mr. DiZenzo pull Ms. Malone's "pants aside to see her underwear." And Mr. Klein testified that he remembered Ms. Malone being upset after getting hit by woodchips from Mr. Lillo. Klein Tr., Ex. 11, at 198.)

Ms. Malone's prior attorney understandably "demanded that the Town take 'immediate' action to protect her client." (Aff. of Vincent Toomey, Def. Ex. M ¶ 5.) Then, on March 1, 2019, Mr. DiZenzo did transfer Ms. Malone to the Town Garage, allegedly for her safety. Mr. DiZenzo wrote: "This transfer is temporary while the Clarkstown Police Department investigates your allegations of two incidents in which you believe your physical safety has been placed at risk." (Ex. 13, MALONE_001675.) It is now nearly four years later, and Ms. Malone is still at the Town Garage.

**98.** The transfer to the Garage had no effect on Plaintiff's salary or benefits, though she alleges that she lost overtime due to the transfer. Ex. E (Malone Tr. Day 1) at 240:16-242:3.

**RESPONSE**: Disputed; Ms. Malone lost overtime as a result, Ex. 1 (Malone Tr. Day 1 at 240:19–241:14). Ms. Malone also testified that the transfer to the Town Garage was "a punishment." Ex. 1 (Malone Tr. Day 1 at 232:11-13). When asked to explain why it was a punishment, Ms. Malone testified:

> Q. Why is it a punishment to have been moved?
>
> A    Because I'm the only one that was moved. I'm the only one that's going through what I'm going through. I'm a machine operator. I'm a truck driver. I'm not a bus cleaner. I don't sweep

floors. That's not my job title. Answer phones. I'm literally doing anything I could possibly do to make the day go by. That is not what my title is.

Ex. 1 (Malone Tr. Day 1 at 232:14–23).

**99.** After being contacted by the Town Attorney's Office, the police began investigating the allegations in the February 28, 2019 letter. Ex. U (police report) at TOWN001619-1620.

**RESPONSE**: Not disputed.

**100.** On March 5, 2019, the police reached out to Plaintiff to ask whether she wished to file a police report. She deferred to her lawyer, and police spoke to Ms. Foti the following day. Ex. U (police report) at TOWN001619-1620.

**RESPONSE**: Not disputed.

**101.** On March 6, 2019, the Town received a letter from American Hose & Hydraulics, the company which had serviced and replaced the cable. Ex. TT at TOWN005420. The letter stated, "The broken end of the cable looked like normal wear and tear." Ex. TT.

**RESPONSE**: The letter speaks for itself, but Ms. Malone notes that it was written, at the request of the Town, well after the repair was made. When asked whether it was unusual for a vendor to write a letter six weeks after doing a repair, Deputy Santulli "I've never seen it before." (Santulli Tr., Ex. 10, at 89.)

**102.** On March 6, 2019, the police advised Plaintiff's counsel that the police had received the letter from American Hose & Hydraulics. Plaintiff's counsel stated

that she also had a copy of the letter.  Ex. U at TOWN001620.  Toomey also provided Plaintiff's then-counsel with a copy of the American Hose & Hydraulics letter on March 8, 2019.  Ex. TT (TOWN0054175420).

**RESPONSE**:  Not disputed.

**103.**  The Clarkstown police independently investigated the allegations of the February 28, 2019 letter, including interviews of all the witnesses identified by Plaintiff, and review of the March 6th Letter from American Hose & Hydraulics.  Ex. J (Brigando 30(b)(6)) at 23:17-23, 38:16-21, 65:3-11; Ex. U (police report).  All of the individuals interviewed told the police that they did not think the incidents were caused by sabotage or tampering with the trucks.  Ex. U at TOWN001620-1622; Ex. Q (Smith Aff.) at ¶11. The police concluded that there was no evidence of tampering and issued a report on April 5, 2019.  Ex. U at TOWN001622-23; Ex. J at 38:10-21.

**RESPONSE**: As part of the Town's earlier investigation, the Town intentionally sought to "underline [Ms. Malone's] credibility." Ex. 4 (TOWN005570). Accordingly, Plaintiff disputes any finding of the Town or the Town's police, which was already actively working on undermining her credibility.  (Notably, the Town purposefully withheld this document from its productions and only produced after Court order.  ECF no. 147.)

At the time that the wheel fell of the truck in February 2019, shortly after the other truck's cable had snapped in January 2019, Deputy Dom Santulli indicated that the wheel had been "sabotaged" and "that somebody must have tampered with that wheel."  He said that "I can't believe it's come to this," and considered ordering some

kind of markers to check whether lug nuts were loose. Ex. 1 (Malone Tr. Day 1) at 194:24–195:25.

The wheel had apparently been replaced a few months earlier. Def. Ex. U at TOWN001622. If the wheels wasn't properly tightened, it would have fallen off then. It would not have fallen off a few months later unless it was intentionally loosened. Ex. 6 (MALONE_002572).

**104.** With respect to the cable snapping on January 17, 2019, police learned that truck #327 had been used on the night of January 16, 2019 to carry heavy Jersey barriers, placing significant stress on the cable. Ex. U (police report) at TOWN001621-1622. When the cable snapped on January 17, Plaintiff was operating the roll-off, thus she was in the cab of the truck; her foreman Ray Selvaggi was on the ground flagging, and crew member John Luther was on the street. Ex. U (police report) at TOWN001621-1622; Ex. E (Malone Tr. Day 1) at 190:22-191:3. When the cable snapped, the dumpster it was holding fell into the road. Ex. U (police report) at TOWN001621-1622. Plaintiff was not injured; neither were the other members of the crew. *Id*. Additionally, all members of Plaintiff's crew, and the foreman of the crew utilizing truck #327 the prior night informed the police that the cable appeared stretched and frayed. *Id*.

**RESPONSE**: Not disputed.

**105.** In order to tamper with the cable on truck #327, an individual would need a heavy duty cutter or a torch in order to cut into a cable of that size. Ex. U (police report) at TOWN001621; Ex. Q (Smith Aff.) at ¶10. It is not uncommon for a cable to

snap on a roll-off truck due to wear and tear.  Ex. I (DiZenzo Tr.) at 51:22-52:3 ("that happens all the time.  The cables fray[.]"); Ex. N (Santulli Tr.) at 86:20-22; Ex. Q (Smith Aff.) at ¶9.

**RESPONSE**:  Not disputed.

106.    The cable was replaced by outside vendor, American Hose & Hydraulics. Ex. I (DiZenzo Tr.) at 53:19-21).  American Hose & Hydraulics sent the Town a letter stating that the cable appeared to have broken due to normal wear and tear.  Ex. TT at TOWN005420.

**RESPONSE**:  The letter speaks for itself, but Ms. Malone notes that it was written, at the request of the Town, well after the repair was made. When asked whether it was unusual for a vendor to write a letter six weeks after doing a repair, Deputy Santulli "I've never seen it before." (Santulli Tr., Ex. 10, at 89.)

107.    On the night of February 12, 2019, there was a call-out for snow.  Ex. E (Malone Tr. Day 1) at 192:2-9.  Plaintiff inspected plow truck #91 before taking it out on the road.  Ex. E (Malone Tr. Day 1) at 192:15-24.

**RESPONSE**:  Not disputed.

108.    While plowing her route, the right rear wheel came off the truck, causing the truck to tilt.  Ex. E (Malone Tr. Day 1) at 192:25-194:6.  Plaintiff was not injured when the wheel came off the truck.  Ex. E (Malone Tr. Day 1) at 194:7-8.

**RESPONSE**:  Not disputed.

**109.** When the tire came off snowplow #91, it was examined and repaired by Highway Department mechanic Donald Smith. Ex. U (police report) at TOWN001621; Ex. Q (Smith Aff.) at ¶4. Mr. Smith had been a mechanic for 26 years at the time he examined the truck. Ex. Q at ¶1. Mr. Smith observed that the right side of the truck was down and the brake drum was cracked in half and all of the studs were either gone, bent, or broken. Ex. U at TOWN001621; Ex. Q (Smith Aff.) at ¶4. Lug nuts will loosen with a cracked drum or due to the weight of the salt carried by the truck. Ex. U at TOWN001621; Ex. Q (Smith Aff.) at ¶4. Lugs are tightened with an air wrench, using approximately 450-foot-poounds of torque; the lug nuts on the wheel could not be loosened by hand. Ex. U at TOWN001621; Ex. Q (Smith Aff.) at ¶6; Ex. I (DiZenzo Tr.) at 53:21-54:2. Mr. Smith did not think the truck had been tampered with. Ex. U at TOWN001621; Ex. Q (Smith Aff.) at ¶7.

**RESPONSE**: Not disputed

**110.** Plaintiff has never had any issues with Mr. Smith; she trusts him to have a key to her snow plow. Ex. B (7/23 interview) at 61:14-21.

**RESPONSE**: Not disputed

**111.** Mr. Santulli, the deputy supervising Plaintiff's plow route, also reported to the scene when the wheel came off truck #91. He did not find the incident suspicious or indicative of sabotage. Ex. N (Santulli Tr.) at 89:2-90:21.

**RESPONSE**: Disputed. As discussed above, 56.1 Stmt. ¶ 103, at the time that the wheel fell of the truck in February 2019, shortly after the other truck's cable had snapped in January 2019, Deputy Dom Santulli indicated that the wheel had been

"sabotaged" and "that somebody must have tampered with that wheel." He said that "I can't believe it's come to this," and considered ordering some kind of markers to check whether lug nuts were loose. Ex. 1 (Malone Tr. Day 1) at 194:24–195:25.

The wheel had apparently been replaced a few months earlier. Def. Ex. U at TOWN001622. If the wheels wasn't properly tightened, it would have fallen off then. It would not have fallen off a few months later unless it was intentionally loosened. Ex. 6 (MALONE_002572).

**112.** When the tire came off Plaintiff's snowplow, DiZenzo looked at the truck. He concluded that there was no evidence of sabotage and that the tire coming loose was not an uncommon incident. Ex. I (DiZenzo Tr.) at 52:4-22. During his 37 years at the Highway Department (approximately 20 as an MEO II), a wheel has come off of DiZenzo's truck approximately 10 times. Ex. I (DiZenzo Tr.) at 52:16-22. He explained that when plowing snow "the tires are spinning and, then all of a sudden, you'll hit a dry spot, and then everything just binds up, and they start – and then it sheared all the studs and the wheel fell off." Ex. I at 52:11-14.

**RESPONSE**: Not disputed that DiZenzo's opinion was that the truck wasn't tampered with. However, there is no evidence that DiZenzo has any particular expertise in evaluating mechanical issues. Moreover, as detailed throughout, DiZenzo has serious credibility issues.

**113.** Though infrequent, it is not unheard of for a wheel to fall off a truck through normal use. Ex. U at TOWN001621; Ex. Q (Smith Aff.) at ¶5; Ex. N (Santulli Tr.) at 89:13-15.

**RESPONSE**:  Not disputed.

**114.**    Each MEO II is responsible for inspecting their vehicle before leaving the Highway Department to start a day's assignment.  Ex. FF at TOWN003767; Ex. H (Connington Aff.) at ¶6.

**RESPONSE**:  Not disputed.

**115.**    In April 2019, the police report and its results were shared with Plaintiff's then-counsel.  Ex. M (Toomey Aff.) at ¶9.  Despite the report's finding that there was no evidence of tampering, Plaintiff was still concerned and did not return to the Highway Department.  *Id*.  At no point between April 2019 and January 2020 has Plaintiff indicated that she is willing to return to her position at the Highway Department.  *Id*. at ¶¶9-10.

**RESPONSE**:  Not disputed.  As described above, in response to Ms. Malone's repeated complaints of sexual harassment and sexual assault, the Town did *not* take action to clean up the highway department. (Ex. 1 (Malone Tr. Day 1) at 229:15–230:12.) Thus, it was understandable that Ms. Malone was concerned about her safety, especially following the two truck incidents, the biased investigation of the Lillo chainsaw incident, and the on-going harassment and sexual assaults. (Regarding assaults, see Klein Tr., Ex. 11, at 118, where Mr. Klein admits to pulling Ms. Malone's ripping her shirt off, over her head, in what he calls a "[h]ockey fight"; and at 125, where he admits to cutting her leg with a pole saw. See also Frisco Tr., Ex. 9, at 46–48, where Mr. Friscoe testified that he saw Mr. DiZenzo pull Ms. Malone's "pants aside to

see her underwear." And Mr. Klein testified that he remembered Ms. Malone being upset after getting hit by woodchips from Mr. Lillo. Klein Tr., Ex. 11, at 198.)

**116.** When asked, Plaintiff could not point to any evidence that either truck #327 or truck #91 had been tampered with.  Ex. E (Malone Dep Day 1) at 190:11-21, 191:11-18; 194:24-196:18.  When asked if she was alleging whether someone had tampered with her trucks, she stated "I don't know."  *Id.* at 190:18-21.  When asked who would have tampered with the truck, Plaintiff testified "I don't know."  Ex. E (Malone Tr. Day 1) at 191:19-21, 196:25-197:3.

**RESPONSE**:  Plaintiff was unable to develop evidence of tampering, as the accident was not properly documented as part of a post-accident investigation, Def. Ex. U at TOWN001623, and the underlying evidence was destroyed. Notably, when questioned about the first truck incident, Deputy Santulli testified that it was quite unusual for a vendor to write a letter six weeks after a repair, and that he had never seen such a thing before:

> Q  Is it unusual for a vendor to write a letter some six weeks
> later about a repair that they did?
>
> MR. FLANNERY: · Objection.
>
> A  THE WITNESS: · I've never seen it. before.

Santulli Tr., Ex. 10, at 88:10–14.

**117.** In January 2020, Frank DiZenzo was replaced by Bob Milone as the newly-elected Highway Superintendent.  Ex. E (Malone Tr. Day 1) at 237:15-17.  After taking office in January 2020, Bob Milone invited Plaintiff to return to the Highway Department.  Ex. E (Malone Tr. Day 1) at 237:20-238:3; Ex. M (Toomey Aff.) at ¶11;

Ex. YY at ¶55.  Plaintiff refused to return to the Highway Department.  Ex. E (Malone Tr. Day 1) at 237:20-238:5, 239:18-240:4; Ex. L (Toomey Tr.) at 50:14-21; Ex. M (Toomey Aff.) at ¶¶11-12; Ex. YY at ¶58.

**RESPONSE**:  Not disputed.  As described above, in response to Ms. Malone's repeated complaints of sexual harassment and sexual assault, the Town did *not* take action to clean up the highway department. (Ex. 1 (Malone Tr. Day 1) at 229:15–230:12.) Thus, it was understandable that Ms. Malone was concerned about her safety, especially following the two truck incidents, the biased investigation of the Lillo chainsaw incident, the on-going harassment, and the repeated physical and sexual assaults. (Regarding assaults, see Klein Tr., Ex. 11, at 118, where Mr. Klein admits to pulling Ms. Malone's ripping her shirt off, over her head, in what he calls a "[h]ockey fight"; and at 125, where he admits to cutting her leg with a pole saw. See also Frisco Tr., Ex. 9, at 46–48, where Mr. Friscoe testified that he saw Mr. DiZenzo pull Ms. Malone's "pants aside to see her underwear.")

**118.**    Plaintiff has not been harassed by anyone at the Town Garage.  Ex. E (Malone Tr. Day 1) at 237:9-14.

**RESPONSE**:  Not disputed.

**Procedural History**

**119.**    Plaintiff filed her initial complaint in this matter on June 12, 2019. DE #1

**RESPONSE**:  Not disputed.

**120.** Plaintiff filed an Amended Complaint in this matter on October 22, 2019 asserting claims against the Town of Clarkstown and individual defendants Wayne Ballard, Tucker Connington, Frank DiZenzo, Robert Klein, Andrew Lawrence, Brian Lillo, and David Salvo. Ex. A. In the Amended Complaint, Plaintiff asserts the following causes of action: (i) a Section 1983 claim against the Town for Gender Discrimination in violation of the Equal Protection Clause; (ii) a Section 1983 claim against the Individual Defendants for Gender Discrimination in violation of the Equal Protection Clause; (iii) Gender Discrimination in violation of the New York State Human Rights Law (NYSHRL) against all defendants; (iv) Retaliation in violation of the NYSHRL against all defendants; (v) Assault and Battery against defendants Klein, Salvo, and Lillo; (vi) Intentional Infliction of Emotional Distress against the Individual Defendants; (vii) Gender Discrimination in violation of Title VII against the Town; (viii) Retaliation in violation of Title VII against the Town; and (ix) Witness Intimidation in violation of 42 U.S.C. § 1985(2) against the Town and DiZenzo. Ex. A at ¶¶53-82.

**RESPONSE**: Not disputed. (The Amended Complaint was actually filed on October 15, 2019 (ECF no. 69), but was re-filed after the ECF clerk indicated Plaintiff's counsel's error in filing.)

**121.** On November 11, 2019, Plaintiff's claims against Wayne Ballard were voluntarily dismissed with prejudice. DE #83.

**RESPONSE**: Not disputed.

**122.** On November 19, 2019, this court entered an order in which Plaintiff stipulated that (1) Defendants are not liable for any acts arising on or before April 29,

2016; (2) all claims against Andrew Lawrence were dismissed with prejudice, and (3) the assault and battery claims against defendants Klein and Salvo were dismissed with prejudice. DE #87.

**RESPONSE**: Not disputed.

123. On August 6, 2021, this court so ordered a stipulation in which (1) Plaintiff dismissed with prejudice all claims against Defendant Lillo and Connington; (2) Plaintiff dismissed with prejudice her NYSHRL retaliation claim against defendants Salvo, Klein, and DiZenzo; (3) Plaintiff dismissed with prejudice her claims for intentional infliction of emotional distress (Count VI of the Amended Complaint) and her claim under 42 U.S.C. § 1985(2) (Count IX of the Amended Complaint). DE #169.

**RESPONSE**: Not disputed.

124. Following the August 6, 2021 order, the following claims remain in the case: Count One - Section 1983 claim against the Town for Gender Discrimination in violation of the Equal Protection Clause; Count Two - a Section 1983 claim against DiZenzo, Salvo, and Klein for Gender Discrimination in violation of the Equal Protection Clause; Count Three - Gender Discrimination in violation of the New York State Human Rights Law (NYSHRL) against all remaining defendants; Count Four - Retaliation in violation of the NYSHRL against the Town; Count Seven - Gender Discrimination in violation of Title VII against the Town; and Count Eight - Retaliation in violation of Title VII against the Town. DE #166.

**RESPONSE**: Not disputed.

## Statement of Additional Material Facts

**125.**     Ms. Malone repeatedly complained to management about hostile, sexually-based discriminatory conduct, and about unsafe working conditions. By way of examples, she filed a union grievance when improperly passed over for promotion (Ex. 17, MALONE_000182–184); she complained to Deputy Lawrence in March of 2015 about harassment, and again in December 2015 about a physical attack by Rory O'Connell (Malone 50-h, Ex. 7, at 273, 276–77); she repeatedly filed grievances about O'Connell's conduct (Ex. 16, MALONE_000168–170); she complained to Denny Friscoe about Highway Superintendent Wayne Ballard's sexually inappropriate behavior (Friscoe Tr., Ex. 9, at 36:11–21); she filed a grievance about David Salvo's sex-motivated made-up complaint about her road-flagging (Ex. 14, TOWN001752–1753); she complained to Deputy Dom Santulli about Lillo's dangerous behavior (Santulli Tr., Ex. 10, at 66–67) and about the behavior of HMS-III Tucker Connington (the number two person at the Highway Department) (*Id.* at 72); she filed a workplace violence incident with Deputy Santulli (Malone 50-h, Ex. 7, at 49–50); she complained to the Town Board and to union representative Elaine Apfelbaum about HMS-III Connington (*Id.* at 118–20); she repeatedly complained to union vice-president John Luther, both "officially" and "unofficially" (Luther Tr., Ex. 8, at 19:17–23); she complained about trucks which she wrote up as unsafe, as she believed them to be acts of deliberate, sex-motivated sabotage (Friscoe Tr., Ex. 9, at 56 and Santulli Tr., Ex. 10, at 42); and she complained to Deputy Lawrence about being the only person in the Department who had to clean the floors in the Highway Department building despite there being a cleaning crew, and being told by Lawrence that she had to "because women are good at

cleaning, that's what women should be doing is cleaning" (Malone 50-h, Ex. 7, at 170:10–23, 172:20–173:17).

126. The notes of Vincent Toomey – a Town attorney – state "undermine her credibility" in his purportedly unbiased investigation of Ms. Malone's report of the Brian Lillo chainsaw incident. (Ex. 4, TOWN005570).

127. Vincent Toomey noted that "Ms. Malone has a history of grievances and harassment complaints." (Ex. 12, TOWN005228.)

128. Adverse actions by the Town include the Town's escalation of the hostile work environment and sexually discriminatory conduct, which worsened every time Ms. Malone complained. Additional retaliatory incidents include: (i) DiZenzo, the most senior member of the Highway Department, giving Ms. Malone a "Go Girl"; (ii) physical and sexual assaults; (iii) prohibiting Ms. Malone from using the women's bathroom, a prohibition that continued throughout Ms. Malone's time at the Highway Department; (iv) transferring Ms. Malone to the Town Garage; (v) "unfair[ly]" transferring Ms. Malone to less desirable crews (Friscoe Tr., Ex. 9, at 107, 109); (vi) David Salvo's sex-motivated made-up complaint about Ms. Malone's road-flagging (Ex. 14, TOWN001752–1753); (vii) depriving Ms. Malone of overtime opportunities (Malone 50-h, Ex. 7, at 370–71; Malone Dep. Day 1, Ex. 1, at 97, 102, 130, 174, 241). And significantly, with her transfer to the Town Garage – which was supposedly "for her own safety" and supposedly was to be "temporary" – Ms. Malone has been deprived of

the opportunity to do meaningful work and the opportunity for advancement.[3] (*See* Malone Dep. Day 1, Ex. 1, at 232, 236.)

129.    When Wayne Ballard first banned her from using the women's bathroom, Ms. Malone spoke with Deputy Andrew Lawrence about it. Lawrence told her not to complain, that if she did, her life "would get much worse":

> You complain about somebody, you got to complain about everybody. And you can't - - no one's going to stick up for you. Nobody is going to back you up. You say something, and everybody goes against you. They're not going to want to work with you, they're going to say bad things about you, it's going to be extremely uncomfortable to go to work. Don't complain. And I was warned not to complain. I was warned not to say anything by somebody who was higher in office, because things would get much worse for me.

(Malone 50-h, Ex. 7, at 248:9–249:8.)

130.    Deputy Santulli, a member of the senior leadership team at the Highway Department, testified that in his presence he saw "abusive comments" directed towards Ms. Malone; "sexually suggestive comments or behaviors in her presence"; and concluded that Ms. Malone was "discriminated against in any way because of her sex." (Santulli Tr., Ex. 10, at 212:7–213:16.) And Deputy Santulli testified that

---

[3] Instead of cleaning up the Highway Department, the Town moved Ms. Malone away. Then they gave her the option of transferring to the Sewer Department. She declined. The Sewer Department is run by John Fay, a "jerk" whom Ms. Malone testified "tried to make out with me at a bar and I pushed his face." (Malone Dep. Day 1, Ex. 1, at 234:5–7.) And, importantly, Ms. Malone drives trucks and operates heavy machinery, not a "bus cleaner" or someone to "sweep floors." (*Id.* at 232.) The Town should fix the Highway Department instead of changing the terms, conditions, and privileges of Ms. Malone's employment.

Superintendent DiZenzo "allow[ed] a hostile work environment to continue while he was Superintendent[.]" (*Id.* at 215.)

131.    Denny Friscoe recognized the "toxic environment" and that the sexual comments made to Ms. Malone were "prevalent." (Friscoe Tr., Ex. 9, at 25:6–11, 26:21–27:2.) He testified that Ms. Malone "had to endure offensive conduct"; that it was at times "severe", "pervasive", and "abusive". (*Id.* at 126–27.)

132.    Union vice-president John Luther testified that Ms. Malone had to endure "offensive conduct," conduct was of a "sexual nature," that some of the conduct was "severe," and some of it was "pervasive." (Luther Tr., Ex. 8, at 86–87.) Luther testified that some of that conduct was "somewhat" "abusive" and that the key box and chainsaw incidents involving Mr. Lillo and Ms. Malone were "threatening." (*Id.* at 88.) He testified that he believed Ms. Malone was "discriminated against because of her sex"; that Superintendent Ballard "allowed a hostile work environment to continue while he was Superintendent"; and that "the conduct never changed" under Superintendent DiZenzo. (*Id.* at 88–89.)

133.    Deputy Santulli testified he was present when DiZenzo gave the Go Girl to Ms. Malone. (Santulli Tr., Ex. 10, at 59:25–60:8.) Santulli placed the timing of the event sometime after DiZenzo became Superintendent in January 2016, but could not be more specific as to the date. (*Id.* at 60:15–16.)

134.    DiZenzo was even warned by Santulli in the Department that it "was not a good idea" (Santulli Tr., Ex. 10, at 61:19–24) – but he did it anyway.

**135.** Ms. Malone repeatedly rebuffed DiZenzo's unwanted "offers" to have Ms. Malone to "sit on his face" (Malone 50-h, Ex. 7, at 210). DiZenzo "would ask [Ms. Malone] if she needed a place to sit, wipe his mouth, tilt his head back, and stick out his tongue inviting Malone to sit on his face." (Malone Dep. Day 2, Ex. 2 at 474:18–475:6.) Ms. Malone also rebuffed DiZenzo's efforts to follow her into the bathroom. (Malone 50-h, Ex. 7, at 212.)

**136.** DiZenzo had long known about, participated in, and condoned the unconscionable behavior directed at Ms. Malone, and now that he was the top boss – the Superintendent – he was going to send his own message about keeping in her place. (*See* Santulli Tr., Ex. 10, at 66–68, 72, 146–47, 215; Friscoe Tr., Ex. 9, at 53, 128; Luther Tr., Ex. 8, at 89.)

**137.** The timing of this "Go Girl" also conveys its intent—it occurred shortly after Ms. Malone complained about O'Connell's repeated sexual harassment and assault. (Ex. 16, MALONE_000168–170).

**138.** Defendant Klein – Ms. Malone's supervisor on the tree crew – even admitted to sexual assault: ripping off Ms. Malone's shirt over her head in what he called a "[h]ockey fight" (Klein Tr., Ex. 11, at 118), and what Ms. Malone testified "mortified" her. (Malone Dep. Day 2, Ex. 2, at 437.) In testimony, Klein discounted it as "a joke" and "horseplaying," adding, "Who only wears a sports bra under a sweatshirt jacket?" (Klein Tr., Ex. 11, at 120:23–24, 121:9–17.)

**139.** Klein also admitted to cutting Ms. Malone's leg with a pole saw. (Klein Tr., Ex. 11, at 125.)

**140.** On another occasion, Klein threw her to the ground and smacked her buttocks:

> Q Sorry. What was the last one?
>
> A Get the fuck off of me.
>
> Q When did you say that to someone?
>
> A When I was thrown to the ground.
>
> Q When were you thrown to the ground?
>
> A I don't remember exactly a date.
>
> Q Who threw you to the ground?
>
> A This instance that I'm talking about, Blue [Robert Klein].
>
> Q When he threw you to the ground, you said get the fuck off of me?
>
> A Yes. Because he was sitting on top of me and smacking my ass.

Malone Dep. Day 1, Ex. 1, at 76:13–25.

**141.** And Ms. Malone testified that on yet another occasion her coworker Salvo tackled her:

> A Dave [Salvo] pushed me. He was also on top of me and my face was being pushed into the dirt, at a graveyard no less. Everybody laughed.
>
> Q Who is everybody?
>
> A Everybody that was there thought it was hysterical, except for Johnny Velez. And Johnny Velez came up to me at the

end of the day and said nobody under any circumstances has a
right to put their hands on you for any reason whatsoever.

…

Q  What part of him was on you?

    A  I don't know. My face was in the dirt.

Malone Dep. Day 1, Ex. 1, at 89:6–15, 90:10–12.

**142.** DiZenzo pulled Ms. Malone's "pants aside to see her underwear." (Friscoe

Tr., Ex. 9, at 46–48.)

**143.** Ms. Malone was forced to use the men's bathroom (also known as the

deputies' bathroom). (Malone Dep. Day 1, Ex. 1, at 166.) Occasionally, men would use

the bathroom and not lock the door. Ms. Malone would go into the bathroom, thinking it

was empty because the door was unlocked, and would find a man on the toilet. (Malone

50-h, Ex. 7, at 231.) And she had to use an electrical closet that was filthy with rat feces

to change her clothes. (Malone 50-h, Ex. 7, at 226.) Moreover, that room's lock did not

work properly and management knew it. (Santulli Tr., Ex. 10, at 53.)

**144.** Toomey described the parties to the chainsaw incident – Lillo and Ms.

Malone – as "combatants" and concluded by saying, "Ms. Malone has a history of

grievances and harassment complaints." (Ex. 12, TOWN005228.)

**145.** On March 1, 2019, Mr. DiZenzo transferred Ms. Malone to the Town

Garage, allegedly for her safety. Mr. DiZenzo wrote: "This transfer is temporary while

the Clarkstown Police Department investigates your allegations of two incidents in

which you believe your physical safety has been placed at risk." (Ex. 13,

MALONE_001675.)

146. Ms. Malone was sent to the Town Garage where she cleaned bird poop off car windows and occasionally moved police cars from one location to another. She has no opportunity for advancement, no chance to earn overtime, and no meaningful work. That is a material deprivation and adverse action:

> Q  Why is it a punishment to have been moved?
>
> A    Because I'm the only one that was moved. I'm the only one that's going through what I'm going through. I'm a machine operator. I'm a truck driver. I'm not a bus cleaner. I don't sweep floors. That's not my job title. Answer phones. I'm literally doing anything I could possibly do to make the day go by. That is not what my title is.

Malone Dep. Day 1, Ex. 1, at 232:14–23.

147. Deputy Santulli testified that "Connington allow[ed] the hostile work environment to continue while he was deputy," (Santulli Tr., Ex. 10, at 216) including "tolerat[ing] … a toxic atmosphere in which male employees constantly made disgusting and degrading sexual comments in front of Ms. Malone and within earshot of supervisory employees?" (*Id.* at 24:8–25:24.) And contemporaneous notes kept by Santulli noted that Connington "violat[ed] the [Town's workplace violence policy] on a daily basis." (Ex. 3, at TOWN004957.) Further, union vice-president Luther concurred that "Connington allow[ed] the hostile work environment to continue while he was deputy[.]" (Luther Tr., Ex. 8, at 90.)

**148.** Connington's conduct was driven, at least in part, by his animus towards women:

> Q   Did you think that he yelled at you because you were a woman?
>
> A   I think that definitely had something to do with it.
>
> Q  And why do you think that?
>
> A   There was no other reason to yell at me.

Ex. 1 (Malone Dep. Day 1) at 189:2–8.

Dated:      January 3, 2022

**POLLOCK COHEN LLP**

By:   _/s/ *Adam Pollock*_
        Adam Pollock
        Steve Cohen
60 Broad St., 24th Floor
New York, NY  10004
Adam@PollockCohen.com
(212) 337-5361

*Counsel for Plaintiff Victoria Malone*