UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
VICTORIA MALONE,

                Plaintiff,         Case No.
                                     7:19-cv-05503(VB)
     -against-

TOWN OF CLARKSTOWN, WAYNE BALLARD, in his
personal and official capacity as Clarkstown
Highway Superintendent, FRANK DIZENZO, in
his personal and official capacity as
Clarkstown Highway Superintendent, ANDREW
LAWRENCE, in his personal and official
capacity, DAVID SALVO, in his personal and
official capacity, ROBERT KLEIN, in his
personal and official capacity, TUCKER
CONNINGTON, in his personal and official
capacity, and BRIAN LILLO, in his personal
and official capacity,

                Defendants.
-----------------------------------------x
                      1133 Westchester Avenue
                      White Plains, New York

                      September 25, 2020
                      10:02 a.m.

    CONTINUED EXAMINATION of VICTORIA MALONE, the

Plaintiff herein, held at the above time and place,

taken before Cheryl Thompson, a Shorthand Reporter

and Notary Public within and for the State of

New York, pursuant to Order.

               Magna Legal Services
                 866-624-6221
                 www.MagnaLS.com



```
                              266
 1
 2    A P P E A R A N C E S :
 3
 4    POLLOCK COHEN LLP
      Attorneys for Plaintiff
 5        60 Broad Street, 24th Floor
          New York, New York   10004
 6
      BY:  STEVE COHEN, ESQ.
 7
 8
 9    TOWN OF CLARKSTOWN
      10 Maple Avenue
      New City, New York   10956
10
      BY:  LESLIE KAHN, ESQ.
11        TOWN ATTORNEY
          (NOT PRESENT)
12
13
      WILSON ELSER MOSKOWITZ EDELMAN &
14      DICKER LLP
      Attorneys for Defendants
15    Town of Clarkstown, David Salvo and
      Tucker Connington
16        1133 Westchester Avenue
          White Plains, New York   10604
17
      BY:  ELIZA M. SCHEIBEL, ESQ.
18
19
      LAWRENCE A. GARVEY & ASSOCIATES, P.C.
20    Attorneys for Defendant
      Frank DiZenzo
21        Westchester Financial Center
          50 Main Street, Suite 390
22        White Plains, New York   10606
23    BY:  LAWRENCE A. GARVEY, ESQ.
24        BRITTANY C. CORDERO, ESQ.
          (VIA ZOOM)
25
```

```
                              267
 1
 2    A P P E A R A N C E S :
 3    (cont.)
 4
 5    McDERMOTT & McDERMOTT LAW FIRM
      Attorneys for Defendant
 6    Robert Klein
          293 Route 100, Suite 210
 7        Somers, New York   10589
 8    BY:  MICHAEL J. McDERMOTT, ESQ.
 9
10
      LYONS McGOVERN LLP
11    Attorneys for Defendant
      Brian Lillo
12        399 Knollwood Road, Suite 216
          White Plains, New York   10603
13
      BY:  KYLE C. McGOVERN, ESQ.
14        LISA FANTINO, ESQ. (VIA ZOOM)
15
16
17
18
19
20
21
22    ALSO PRESENT:
23    DAVID SALVO
      CHARLES CONNINGTON
24    ROBERT KLEIN
      BRIAN LILLO
25    FRANK DIZENZO (VIA ZOOM)
```

```
 1         S T I P U L A T I O N S      268
 2
 3      IT IS HEREBY STIPULATED AND AGREED by and between
 4    the counsel for the respective parties hereto, that
 5    the filing, sealing, and certification of the within
 6    deposition shall be waived.
 7
 8      IT IS FURTHER STIPULATED AND AGREED that all
 9    objections, except as to the form of the question,
10    shall be reserved to the time of the trial.
11
12      IT IS FURTHER STIPULATED AND AGREED that the
13    within deposition may be signed before any Notary
14    Public with the same force and effect as if signed and
15    sworn to before the Court.
16
17
18
19
20
21
22
23
24
25
```

```
 1         Victoria Malone      269
 2    VICTORIA MALONE,
 3         the Plaintiff herein, having been
 4         previously duly sworn by a Notary
 5         Public of the State of New York,
 6         upon being examined, continued to
 7         testify as follows:
 8    EXAMINATION BY
 9    MR. McGOVERN:
10         Q    Good morning, Miss Malone. My name is
11    Kyle McGovern.
12         A    Good morning.
13         Q    I am with the law firm of Lyons
14    McGovern.  I represent Defendant Brian Lillo in
15    this case.
16         A    Okay.
17         Q    We talked about you're still under
18    oath.  You were sworn in yesterday.
19         A    Yes.
20         Q    And just a couple -- I know Miss
21    Scheibel gave you some instructions, but just a
22    couple of reminder instructions.
23              Everything has to be a verbal response
24    so the reporter can take down everything that's
25    said, correct?
```



```
1            Victoria Malone        270
2       A   Yes.
3       Q   If you have any questions during, if
4  you want to confer with your attorney, you have a
5  right to do that.  Let me know and I will let you
6  step back and confer with your attorney.
7            If there is a question pending,
8  however, and your attorney doesn't direct you not
9  to answer, then I'm going to ask you to answer
10 the question before you confer.  Okay?
11      A   Yes.
12      Q   Do you understand that?
13      A   Yes.
14      Q   In addition, I am going to ask you to
15 listen to the questions that I pose.  Yesterday
16 during your testimony there was a few questions
17 that required a yes or no answer and you went
18 beyond those responses.
19           So I will just ask you to listen to
20 the question I ask.  If it requires a yes or no
21 to answer, I ask you to put that verbally on the
22 record.  And if there is a need to elaborate on
23 that, you can let me know and I will see if I can
24 ask followup questions.
25           Do you understand that instruction?
```

```
1            Victoria Malone        271
2       A   Yes.
3       Q   All right.  So you testified yesterday
4  that your position is an MEO II, and in that
5  position you're able to operate heavy equipment;
6  is that correct?
7       A   Correct.
8       Q   And you testified also yesterday about
9  typically when you're working with -- and by the
10 way, what I'm addressing is when you're with the
11 tree crew, when you're working with Brian Lillo,
12 I believe Mr. Salvo was also on the tree crew, and
13 my question is, you testified that you typically
14 handled work on the ground, meaning you raked, you
15 did a lot of raking, you did a lot of stick
16 pickup.
17           Was that the primary role with the
18 tree-cutting crew for that, was that your main
19 role?
20      A   I also did other things.
21      Q   Okay.  But you said, you testified
22 yesterday you did a lot of ground work, a lot of
23 raking?
24      A   I did a lot of ground work but I also
25 did other things.
```

```
1            Victoria Malone        272
2       Q   You also mentioned you worked the
3  chainsaw a little bit?
4       A   Correct.
5       Q   A couple of times I believe you said
6  one or two times?
7       A   A couple of times.
8       Q   I believe you also testified you
9  worked a claw bucket?
10      A   Correct.
11      Q   Did you receive any training in order
12 to operate, for example, the chainsaw?
13      A   I went to a class that was given by
14 the highway department on chainsaws, yes.
15      Q   So it was an instruction on how to
16 use it, was there safety issues involved, did they
17 discuss how to use it safely?
18      A   Yes.
19      Q   Did you also receive training
20 regarding using the claw bucket?
21      A   Yes.
22      Q   Now, in terms of doing the ground
23 work, the rake work, and picking up the sticks and
24 working around the trees, were you given training
25 in that as well?
```

```
1            Victoria Malone        273
2       A   I'm sorry.  Can you repeat that
3  question.
4       Q   Were you given training in terms of
5  how to handle raking duties and ground duties?  I
6  think you described it yesterday --
7       A   I --
8       Q   Our reporter has got to take every-
9  thing you say down and everything I say down so
10 we can't talk at the same time.
11           Do you understand that instruction?
12      A   Yes.
13      Q   So again, you testified yesterday you
14 did a lot of ground work, and I'm asking you do
15 you receive training on how to properly handle the
16 rake, how to do ground work when you're cutting a
17 tree?
18      A   I don't recall.
19           MR. COHEN:  Compound question.
20      One or the other.  Cutting a tree and
21      ground work are two very different
22      things.
23           MR. McGOVERN:  Mr. Cohen, you can
24      put your objection on the record.
25      This is a federal deposition.  You
```



```
1              Victoria Malone         434
2         He was very aggressive and he was
3    almost, like it wasn't a joke, it was not a joke.
4    He used force and it scared me, and it broke my
5    heart because I didn't think he would have hurt
6    me.
7         Q    Did you suffer any physical injury as
8    a result of this exchange?
9         A    No.
10        Q    Did Mr. Klein hurt you in some way in
11   connection with this incident?
12        A    He scared me.
13        Q    But did you suffer any physical injury
14   as a result of this exchange.
15        A    No.
16        Q    And did you continue working the rest
17   of the day?
18        A    I believe so.
19        Q    Okay.  Continuing on paragraph 35.
20            Is there anything else that you want
21   to add in connection about that sentence that was
22   addressed?
23        A    Which one?
24        Q    The one we talked about it says on
25   one occasion -- I will ask the question again.
```

```
1              Victoria Malone         435
2            In connection with that second
3    sentence of paragraph 35 which ends with into the
4    ground, is there anything more that you want to
5    tell me?
6         A    I don't want to add anything.
7         Q    No?  Okay.
8            Continuing, this would be the third
9    sentence, on at least two occasions, you see that
10   sentence?
11        A    Yes.
12        Q    It ends with into the seat of a truck,
13   closed paren.
14            Do you see that sentence?
15        A    Yes.
16        Q    Can you tell me what would happen?
17        A    Yes.  I was sitting in the passenger
18   seat and he was in the driver seat.  And he
19   took --
20        Q    Of what kind of vehicle?
21        A    The pickup truck.
22        Q    This would be the town truck, right?
23        A    Correct.
24        Q    In the passenger seat, and he was
25   driving you said?
```

```
1              Victoria Malone         436
2         A    He wasn't driving, he was sitting in
3    the driver seat.
4         Q    He was sitting in the driver seat.
5         A    Yes.
6         Q    The car was not operational.
7         A    No.
8         Q    And you were sitting right in the
9    passenger seat.
10        A    Yes.
11        Q    Then what happened?
12        A    He took me by the back of my neck and
13   pushed my head into the middle of the seat, and
14   then grabbed the back of my shirt and ripped it
15   over my head, so it was just I had my shirt over
16   my head, and it felt like he was going to snap my
17   neck.
18        Q    Okay.  You claim that he grabbed the
19   back of your neck and pressed it forward into the
20   middle of the seat?
21        A    Yes.
22        Q    Would that be between your legs?
23        A    To the middle of the seat.  Like
24   meaning it's a bench seat.
25        Q    Closer to him.
```

```
1              Victoria Malone         437
2         A    Yes.
3         Q    And why do you believe that he was
4    going to snap your neck?
5         A    Because he was using a lot of force.
6         Q    What precipitated this?  Just
7    spontaneously he did it, or was there an exchange
8    between you two or --
9         A    Nothing, nothing that could have, that
10   should have led to that.  I don't even remember
11   what the conversation was.
12        Q    Was there anyone else in proximity to
13   the vehicle?
14        A    I don't remember.  I was so concerned
15   just about getting my shirt to cover my body
16   because I was mortified.
17        Q    So you claim that he grabbed your
18   neck and pushed it into the seat and pulled your
19   shirt over your head?
20        A    Yeah.  He said it was a hockey move.
21        Q    Do you recall what you were wearing?
22            You were wearing jeans obviously,
23   correct?
24        A    I was in jeans, yes.
25        Q    What was on your upper torso?
```

```
1              Victoria Malone          474
2        Q    Have you read it?
3        A    Yes.
4        Q    Did you read it before it was filed
5   with the Court?
6        A    Yes.
7        Q    Did you participate in its making?
8        A    Yes.
9        Q    Paragraph 28 of this complaint, which
10  is Page 7 of 22, can you read that paragraph for
11  us.
12       A    Out loud?
13       Q    No, to yourself.  Just refresh your
14  recollection.
15       A    (Reviewing)
16         I read it.
17       Q    Thank you.
18         That paragraph states in part:  When
19  DiZenzo saw Malone, he would ask her if she
20  needed a place to sit, wipe his mouth, tilt his
21  head back, and stick out his tongue inviting
22  Malone to sit on his face.
23         Do you remember that?
24       A    Correct.
25       Q    Can you tell me when that happened?
```

```
1              Victoria Malone          475
2        A    I can't give exactly.  It happened so
3   many times I can't.
4        Q    How many times?
5        A    A lot.  Over the course, so many times
6   I can't even put a number on it.
7        Q    More than ten?
8        A    I can't put a number on it.
9        Q    Less than ten?
10       A    I can't put a number on it.  It
11  happened often.
12       Q    When is the last time it happened?
13       A    Don't know exactly.
14       Q    Did you ever report it to anybody?
15       A    No.
16       Q    Also in that paragraph 28, when
17  DiZenzo heard Miss Malone state that she was going
18  to take a bathroom break, he would cup his hands
19  and say do you need help, suggesting that Malone
20  urinate into his hands.
21         Can you tell me when that happened?
22       A    That happens all the time.
23       Q    Can you give me any specific dates?
24       A    No.
25       Q    Can you give me any specific years?
```

```
1              Victoria Malone          476
2        A    Throughout.
3        Q    When is the last time it happened?
4        A    I don't remember the last time it
5   happened.
6        Q    Is it possible that you can't remember
7   because it never happened?
8        A    No.
9        Q    Also in paragraph 28 states:  When
10  they were raking leaves, DiZenzo said he would
11  love to throw Malone down on top of a pile of
12  leaves and make love to her.
13         Do you recall that?
14       A    Yes.
15       Q    When did that happen?
16       A    That happened before he was
17  superintendent.  That happened probably -- let's
18  see.  I was working in TJ Rickli's crew at that
19  time.
20       Q    Forgive me.  That doesn't help me
21  identify dates.
22       A    Well, that helps me.  That gives me a
23  time frame.
24       Q    So when did you work for --
25       A    I don't recall exactly the date I
```

```
1              Victoria Malone          477
2   worked in TJ Rickli's crew, but that's the crew I
3   worked in.
4            MR. GARVEY:  Counsel, can you ask
5        your client to let me finish my
6        question.
7        Q    So you don't know when you worked for
8   him, that crew?
9        A    I don't remember exact dates.
10       Q    How about unexact dates?
11       A    Between 2003 and I don't know.
12       Q    Is there anything that would help
13  refresh your recollection as to the dates?
14       A    I can ask somebody.
15       Q    Who would you ask?
16       A    Denny Frisco.
17       Q    And why do you think Denny Frisco
18  would know?
19       A    Because he was there.
20       Q    Also in paragraph 28 of that
21  complaint, you wrote that Mr. DiZenzo referenced
22  shifting gears and grasping the shift.
23         Can you tell me what that means?
24       A    He had me grab the shift.
25       Q    Okay.
```



```
1              Victoria Malone          514
2   now though.
3         Q    So it's possible that he did make
4   those complaints?
5         A    It's possible but I don't know.
6         Q    As we sit here today, are you aware
7   of any complaints that Dominick Santulli has
8   generally about his position with the highway
9   department?
10        A    I don't know.
11        Q    Isn't it true that Mr. Santulli --
12  strike that.
13             Isn't it true that Mr. Santulli does
14  not have a good relationship with the highway
15  department?
16             MR. COHEN:  If you know.
17             Objection.  If you know.
18        A    I don't know.
19        Q    Are you aware -- has there ever been
20  a time that you're aware that Mr. Santulli did
21  not have a good relationship with the highway
22  department?
23        A    I don't know.
24        Q    Can you look at the document the
25  court reporter just provided to you that's been
```

```
1              Victoria Malone          515
2   marked as Defendant's Exhibit Z, Stipulation of
3   Settlement and General Release concerning
4   Grievance of April 29, 2016.
5             Miss Malone, have you seen that
6   document before?
7         A    I don't remember it.
8         Q    Can you turn to the last page of this
9   three-page document labeled Malone 304.
10        A    Yes.
11        Q    Lower left-hand portion of that
12  document, is that your signature?
13        A    It is.
14        Q    By signing this, would it be safe to
15  assume that you read it?
16        A    I don't honestly, I don't remember
17  reading it.
18        Q    Can you tell me what the document is?
19        A    This is a Stipulation of Settlement
20  and General Release.
21        Q    Is it your testimony that you have no
22  recollection of this document?
23        A    I don't remember it.
24        Q    Okay.  Miss Malone, have you ever
25  filed a grievance with the Town of Clarkstown or
```

```
1              Victoria Malone          516
2   the highway department?
3         A    Yes.
4         Q    Can you tell me just so we have the
5   same understanding what your understanding of a
6   grievance is?
7         A    It's a complaint.
8         Q    Complaint concerning the Collective
9   Bargaining Agreement; is that correct?
10        A    What does that mean?
11        Q    Your union contract?
12        A    Yeah.  I guess so.  I don't know
13  that.
14        Q    When you filed a grievance -- strike
15  that.
16             When you filed your grievance, who
17  helped you file it, if anyone?
18        A    The union.
19        Q    The grievance that you filed, can you
20  tell us in sum and substance why you filed it?
21        A    Because I was being held back from
22  promotion.
23        Q    And did there come a time when there
24  was a resolution to that grievance?
25        A    Yes.
```

```
1              Victoria Malone          517
2         Q    And were you subsequently promoted?
3         A    Yes.
4         Q    You testified yesterday that when
5   that grievance was resolved, you had attorney
6   representation.
7             Is that true?
8         A    Yes.  Given to me by the town.
9         Q    The town or the union?
10        A    The union.  My apologies.
11        Q    The union attorney, you testified,
12  again I'm paraphrasing this, but you testified
13  yesterday you were not happy with the results of
14  the union attorney; is that correct?
15        A    Yes.
16        Q    Can you be more specific about what
17  you were unhappy with?
18        A    He wasn't good.
19        Q    Can you be more specific about not
20  being good.
21        A    He didn't properly explain to me that
22  what I was signing when I was going to get my
23  promotion.
24        Q    And when did you discover that he did
25  not properly explain to you what you were signing
```

```
1              Victoria Malone        526
2        Q    You knew where the Town Attorney's
3   office was; is that correct?
4        A    I don't know if I knew where that
5   was.
6        Q    You knew where town hall was, correct?
7        A    Correct.
8        Q    Your father had worked for the
9   highway department for a number of years; is that
10  correct?
11       A    No.
12       Q    For the town -- strike that.
13            Your father worked for the town for a
14  number of years; is that correct?
15       A    Yes.
16       Q    And you spoke to your father on a
17  regular basis; is that correct?
18       A    Yes.
19       Q    And despite knowing all of that,
20  knowing how to complain, knowing where to complain
21  to, knowing who to complain to, you never once
22  complained about any of the allegations in this
23  lawsuit to anyone at the town or the highway
24  department, with the exception of the chainsaw
25  incident; is that correct?
```

```
1              Victoria Malone        527
2        A    Yes.
3            No, I'm sorry, it's not.
4        Q    Please.
5        A    I complained about Rory.
6        Q    What -- to whom and what did you
7   complain about Rory?
8        A    I complained verbally.
9        Q    To who?
10       A    To Andy Lawrence, and to -- I think
11  Andy Lawrence was just it.  And I also --
12       Q    Let's start with Rory.
13       A    Okay.
14       Q    You complained to Andy Lawrence about
15  Rory specifically doing what?
16       A    Trying to run me over in the parking
17  lot, trying to close my fingers in the door,
18  pushing me, calling me, he cursed at me.  I
19  have -- they are all documented.
20       Q    In addition to Andy Lawrence,
21  complaining to Andy Lawrence about Rory, who else
22  did you report to about whom?
23       A    I think Rory was it.
24       Q    So what was the outcome of your
25  report to Andy Lawrence concerning Rory, what is
```

```
1              Victoria Malone        528
2   Rory's last name?
3        A    O'Connell.
4        Q    I'm sorry.
5            What was the outcome of your complaint
6   to Rory O'Connell?
7        A    There was no outcome.
8        Q    Was there an official report?
9        A    I wrote something up.
10       Q    And you gave it to Andy Lawrence?
11       A    Yes.
12       Q    What, if anything, if you know, did
13  Andy Lawrence do with that?
14       A    I don't know what he did with it.
15       Q    Did anyone ever question you about
16  it?
17       A    The notice?
18       Q    About your writing.
19       A    They brought me and Rory into Andy's
20  office with Steve Peters and I had a talk.
21       Q    What was the outcome of that talk, if
22  you know?
23       A    They didn't want me to write him up
24  or to put any paperwork in his file.
25            And I said no, absolutely not, this
```

```
1              Victoria Malone        529
2   needs to be documented just in case something
3   happens again.
4        Q    Was it in fact documented?
5        A    I believe so, yes.  I think.  I don't
6   know if they actually went through with it, but
7   as far as my knowledge, they did.
8        Q    And you were satisfied with that
9   outcome?
10       A    I was.
11       Q    So is it safe to say that you knew
12  how to complain, you did complain, and the
13  outcomes were favorable to you?
14       A    No, because he kept on bothering me.
15  He didn't stop.
16       Q    I just asked you if you were happy
17  with that outcome and you said yes.
18       A    I'm sorry.  Let me rephrase.
19            I was happy with the fact that they
20  agreed to put a paper in his file to at least show
21  that it was documented.
22       Q    And were you satisfied with the type
23  of the resolution of the grievance, with that
24  outcome?
25            MR. COHEN:  Objection.  If you
```

1          Victoria Malone          542
2 tell me the last date?
3     A   3/8/18.
4     Q   Would there be additional text
5 messages before 10/2 of 2016?
6     A   Excuse me?
7     Q   Would there be additional text
8 messages between you and Frank DiZenzo before
9 October 2nd of 2016?
10    A   I don't know.  I don't think so.
11    Q   Did you have a phone, did you have an
12 iPhone before October 2nd of 2016?
13    A   I did.
14    Q   Did you text at that time?
15    A   I texted at that time.
16    Q   Do you think that you also texted
17 Frank DiZenzo at that time?
18    A   I don't know.
19    Q   But it's possible.
20    A   I don't know.
21    Q   It's possible, correct?
22    A   I don't know.
23    Q   Miss Malone, you made some very, very
24 serious allegations against Mr. DiZenzo in this
25 lawsuit.

1          Victoria Malone          543
2          Do you realize that?
3     A   Yes.
4     Q   And you made allegations that on a
5 regular and repeated basis, Mr. DiZenzo sexually
6 harassed you, right?
7     A   Yes.
8     Q   And he made comments to you that were
9 wholly inappropriate when he was working during
10 the highway department; is that correct?
11    A   Yes.
12    Q   And that behavior only increased as
13 he was elected as highway superintendent; is that
14 correct?
15    A   Yes.
16    Q   Can you look through these text
17 messages and tell us if there is anything in here
18 that references the egregious conduct that you
19 accuse Mr. DiZenzo of.
20    A   (Reviewing)
21    Q   Miss Malone, do you see anything here
22 that --
23    A   I'm still reading.
24        MR. COHEN:  She's still reading.
25    Q   You're not familiar with these,

1          Victoria Malone          544
2 Miss Malone?
3     A   I'm reading through them.
4     Q   Okay.
5     A   (Reviewing)
6          Okay.
7     Q   Is there anything in here that
8 supports any of the allegations contained in your
9 complaints?
10    A   No.
11    Q   In fact, it's quite the opposite,
12 isn't it?
13    A   It's friendly talk.
14    Q   So for instance, on Page 1 of 10,
15 Bates stamp 1907, you tell Mr. DiZenzo in the
16 first text that you're sick; is that correct?
17    A   Yes.
18    Q   Then he said feel better; is that
19 correct?
20    A   Yes.
21    Q   Then he says to you you have to
22 change your profile.  You're an MEO II now.  LOL.
23        Is that a congratulatory text?
24    A   I don't know.  That just seems like
25 he's telling me I'm an MEO II now.

1          Victoria Malone          545
2     Q   Was that an exciting time for you?
3     A   When I was an MEO II?
4     Q   Well, apparently you had gotten
5 promoted, correct?
6     A   Yes.  I got my MEO II.
7     Q   Then the next one he says just seen
8 you.  Welcome back.
9          Do you see that?
10    A   Just seen you.  Welcome back.  Yes.
11    Q   Then he says later can you stop in.
12        You say am I in trouble?
13        He said never.  Had a question about
14 plexus.
15        Do you see that?
16    A   Yes.
17    Q   Turning to Page 3.
18    A   Three.
19    Q   Page 3, he texted you keep me posted
20 please.
21        I'm sorry.  You texted him keep me
22 posted please.
23        He says we are home.  All went good.
24        Do you know what you were referring
25 to or he was referring to?



Victoria Malone          546

1
2       A    I just read the next one and I said
3   oh, thank God, Lisa.  Give Lisa hugs and kiss.
4           Lisa is his wife.  I don't remember
5   what happened but there must have been something
6   with Lisa.
7       Q    Was there a medical emergency do you
8   recall?
9       A    I want to say she had a biopsy.
10      Q    Thank you.  Moving on.
11          Turning to Page 5 of 10.
12      A    Five?
13      Q    Yes.
14      A    Okay.
15      Q    Halfway down the page you ask, hold
16  on.  Oh.
17          Frank said to you, you get the day
18  just for that.  Do me a favor.  Just call in sick
19  and I will change it.
20          And you reply, LMAO.  You got it.  And
21  I put in for Friday.  Please approve my ass.
22          Is that what you wrote?
23      A    Yes.
24      Q    Can you tell us what you're referring
25  to?

Victoria Malone          547

1
2       A    I think I put a day in.
3       Q    And he approved it?
4       A    I don't know.  It doesn't say that he
5   did.
6       Q    Is that the way you talk to your boss,
7   please approve my ass?
8       A    Apparently I texted it.
9       Q    Further down the page he says, Frank
10  says, don't forget to call in sick.
11          You say just did.  Thanks, Frank.
12  Thank God you're my boss.
13          Do you see that?
14      A    Yes.
15      Q    What does that mean?
16      A    That I was happy he was my boss.
17      Q    Okay.  Despite all the years of sexual
18  harassment and abuse --
19      A    I--
20      Q    -- despite all the years of sexual
21  harassment and abuse and horrible behavior and
22  disgusting things, you still say to him all right,
23  just did.  Thanks, Frank.  Thank God you're my
24  boss?
25      A    I would have supported Satan to get

Victoria Malone          548

1
2   Wayne out of office.
3       Q    Well, apparently that's what you're
4   saying.
5       A    Excuse me?
6       Q    Never mind.
7           MR. COHEN:  Objection.
8       Q    Then on 12/25 he texted you Merry
9   Christmas.
10          You say Merry Christmas to you and
11  your family, correct?
12      A    Yes.
13      Q    Did you volunteer on Frank DiZenzo's
14  campaign for highway superintendent?
15      A    Doing what?
16      Q    In any capacity at all.
17      A    I gave him signs.  My dad actually
18  gave him signs.
19      Q    Did you make phone calls for him?
20      A    I believe I did.  I don't know.  Did
21  I do that for my dad or did I do that for Frank?
22  I might have done that for Frank.  I'm not
23  positive.
24      Q    So is it -- strike that.
25          You also allege in your complaint

Victoria Malone          549

1
2   that Frank DiZenzo gave you a Go Pro; is that
3   correct?
4       A    Go Girl.
5       Q    I'm sorry.  Go Girl.
6           Can you tell us what a Go Girl is?
7       A    It's a device used to pee standing
8   up.
9       Q    That a woman uses to pee standing up,
10  correct?
11      A    Yes.
12      Q    And you felt the receipt of that gift
13  was another example of his sexual harassment; is
14  that correct?
15      A    Yes.  That was ridiculous.
16      Q    Who was there when he gave you that
17  device?
18      A    I was in the deputies' office.  I
19  don't remember exactly which deputies were there.
20      Q    Anybody else besides the deputies?
21      A    Could have been.
22      Q    Anyone that worked for the highway
23  department?
24      A    I don't know.
25      Q    Are you sure Frank gave it to you?

MAGNA
LEGAL SERVICES