1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------------)

5    VICTORIA MALONE,

6                    Plaintiff,

7            vs.

8    TOWN OF CLARKSTOWN, WAYNE BALLARD in his
     personal and official capacity as
9    Clarkstown Highway Superintendent; FRANK
     DIZENZO, in his personal and official
10   capacity as Clarkstown Highway
     Superintendent; ANDREW LAWRENCE, in his
11   personal and official capacity; DAVID
     SALVO, in his personal and official
12   capacity; ROBERT KLEIN, in his personal
     and official capacity; TUCKER CONNINGTON,
13   in his personal and official capacity; and
     BRIAN LILLO, in his personal and official
14   capacity,

15                   Defendants.

16   ----------------------------------------)

17        REMOTE DEPOSITION OF DENNY FRISCOE

18                New York, New York

19                November 17, 2020

20

21

22

23

24   Reported by:
     Linda Salzman
25   JOB NO. 185879

1
2                 November 17, 2020
3                 11:46 a.m.
4
5     Remote deposition of DENNY
6 FRISCOE, the witness herein, held
7 remotely from New York, New York,
8 pursuant to Notice, before Linda
9 Salzman, a Notary Public of the
10 State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2 A P P E A R A N C E S:
3
4    POLLOCK COHEN
5    Attorneys for Plaintiff Victoria Malone
6       60 Broad Street
7       New York, New York 10004
8    BY:   STEVE COHEN, ESQ.
9
10   WILSON ELSER MOSKOWITZ EDELMAN & DICKER
11   Attorneys for Defendants Town of
12   Clarkstown, Tucker Connington, and
13   David Salvo
14      1133 Westchester Avenue
15      White Plains, New York 10604
16   BY:  ELIZA SCHEIBEL, ESQ.
17
18   LAWRENCE A. GARVEY & ASSOCIATES
19   Attorneys for the Defendant Frank DiZenzo
20      235 Main Street
21      White Plains, New York 10601
22   BY:  BRITTANY CORDERO, ESQ.
23      LAWRENCE GARVEY, ESQ.
24
25

1
2 A P P E A R A N C E S (continued):
3
4    McDERMOTT & McDERMOTT ATTORNEYS AT LAW
5    Attorneys for Defendant Robert Klein
6      293 Route 100
7      Somers, New York 10589
8    BY:  MICHAEL McDERMOTT, ESQ.
9
10
11   LYONS McGOVERN
12   Attorneys for Defendant Brian Lillo
13      399 Knollwood Road
14      White Plains, New York 10603
15   BY:  LISA FANTINO, ESQ.
16
17
18   DARREN JAY EPSTEIN ATTORNEY AT LAW
19   Attorney for Witnesses Dominic Santulli,
20   John Luther, and Denny Friscoe
21      254 South Main Street
22      New City, New York 10956
23   BY:  DARREN EPSTEIN, ESQ
24
25

1
2 A P P E A R A N C E S (continued):
3
4 ALSO PRESENT:
5 Helen He, Intern for Pollock Cohen
6 Leslie Kahn, Town Attorney, Town of Clarkstown
7 Charles Connington, Town of Clarkstown
8 Highway Department
9 Frank DiZenzo, Clarkstown Highway
10 Superintendent
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

D. Friscoe

1               D. Friscoe
2 in paper?
3     A.    Yes.
4     MR. COHEN:  Okay.  So Helen, can
5   you take it off the screen, please?
6     I may have jumped too soon.
7 Does anybody else need it up on the
8 screen before we go through it?
9     MS. FANTINO:  I'm looking at it
10 in Dropbox.
11    Q.   Mr. Friscoe, do me a favor.
12    A.   Yeah.
13    Q.   Please read paragraph 22 to
14 yourself, and then we're going to go
15 through it.  But just get a sense of what
16 it is.
17     Okay?
18    A.   Okay.
19    Q.   So let's start right at the
20 first sentence.
21     Would you agree from what you
22 saw and knew about the Highway Department,
23 that, "Throughout her employment with the
24 Department, Ms. Malone was regularly
25 subjected to sexual and gender-based

D. Friscoe

1               D. Friscoe
2 harassment by her peers and supervisors"?
3     MR. McDERMOTT:  Objection.
4     MS. SCHEIBEL:  Objection.
5    Q.   You may answer.
6    A.   Yes.
7    Q.   So do you say that?  By whom --
8 I'm sorry.  Go ahead.
9    A.   No, go ahead.  Finish the
10 question.
11    Q.   By whom was she subjected to
12 sexual and gender-based harassment?
13     MR. McDERMOTT:  Objection.
14     MS. SCHEIBEL:  Objection.
15    A.   It's just, you put -- it's kind
16 of -- when you're the only female in a
17 room full of -- in an environment full of
18 men, you know, people -- guys tend to
19 forget themselves a little bit.
20    Q.   In what way?
21    A.   Like I said, you start
22 forgetting that she's a woman, you know.
23    Q.   Okay.  When did you see these
24 things happening?  Was it one time?  Five
25 times?  A hundred times?

D. Friscoe

1               D. Friscoe
2     MS. SCHEIBEL:  Objection.
3    A.   I can't put a number on it,
4 really.  It was just -- you know, it would
5 happen occasionally, we'll call it.
6    Q.   Okay.  And in terms of time, did
7 it happen 16 years ago, 10 years ago, 5
8 years ago, all the above?
9    A.   No, it was consistent, I guess.
10    Q.   Okay.  Second sentence here,
11 would you agree from what you saw and knew
12 about the Highway Department that, "The
13 Department tolerated and encouraged a
14 toxic atmosphere in which male employees
15 constantly made disgusting and degrading
16 sexual comments in front of Ms. Malone and
17 within earshot of supervisory employees"?
18     MS. SCHEIBEL:  Objection.
19     MR. McDERMOTT:  Objection.
20    A.   Yeah, comments were made.  I
21 can't tell if they were made it front of
22 supervisory employees, though.
23    Q.   Okay.
24    A.   I can't say that for sure.
25 Comments were made, yes.

D. Friscoe

1               D. Friscoe
2    Q.   Comments were made, but you
3 don't know if any supervisory employees --
4    A.   I can't tell you for sure if
5 that's the case.
6    Q.   Do you know who encouraged a
7 toxic environment atmosphere?
8     MS. SCHEIBEL:  Objection.
9     MR. McDERMOTT:  Objection.
10    A.   You know, I guess we all did in
11 a way, you know, by not stopping it.
12    Q.   Interesting.  Okay.  When did
13 this occur, I mean this toxic atmosphere?
14     Does it go back 16 years, 10
15 years, 5 years, to the present?
16     MS. SCHEIBEL:  Objection.
17    A.   I would say it would go in
18 waives where it would be, you know,
19 sometimes everything would be fine, but
20 then, you know, it would change.
21    Q.   Okay.  Third line is, would you
22 agree what you saw and knew about the
23 Highway Department that, "Many of these
24 comments were made or condoned by
25 supervisors and/or intentionally made it

1                D. Friscoe
2  Ms. Malone's presence"?
3            MS. SCHEIBEL:  Objection.
4            MS. CORDERO:  Objection.
5            MR. McDERMOTT:  Objection.
6            You're muted.  No one can hear
7     you.
8            MR. COHEN:  Darren is muted.
9        A.   He was just telling me the rules
10 about that after he asks a question,
11 everyone objects, then I answer.  That was
12 it.
13       Q.   So let me break the question
14 into two parts.  Okay?
15            So the first part is, did you
16 see comments made in Ms. Malone's
17 presence, sexual comments?
18       A.   Yeah.
19       Q.   Didn't hear you, though.
20       A.   Yes.
21       Q.   Who made such comments?
22       A.   I don't want to -- I mean, there
23 was the -- it was a climate of it.  It
24 was, you know, whoever was -- you know, I
25 can't say who did it on certain days, but

1                D. Friscoe
2  it was prevalent.
3        Q.   Prevalent.  Okay.
4            Did you hear comments made in
5  front of -- were any of these comments
6  made it front of supervisors?
7        A.   I can't say for sure if they
8  were or not.
9        Q.   Okay.  Let's go to the next
10 page.  I want to go to the second bullet
11 point.
12            Did you ever see or hear about,
13 "Male employees call David Salvo, an
14 employee who was teased for kissing up to
15 supervisors, David swallow" --
16            MS. SCHEIBEL:  Objection.
17       Q.   -- "suggesting that he gave oral
18 sex to supervisors"?
19            Did you ever hear of that?
20       A.   Yes.
21       Q.   When did this happen, any idea?
22       A.   No, that was just a nickname
23 that people gave him.
24       Q.   Okay.  You remember who was
25 involved at all?

1                D. Friscoe
2        A.   No, I can't.  I don't know.
3        Q.   By the way, would you consider
4  such comment appropriate workplace
5  behavior?
6        A.   No.
7        Q.   Why not?
8        A.   Well, it's disrespectful, but it
9  doesn't mean it doesn't happen.
10       Q.   Okay.  Next bullet.
11            Did you ever see or hear about,
12 "A male employee claimed to be getting
13 lots of blow jobs and engaging in anal sex
14 with his girlfriend when she had her
15 period.  Other male employees joked that
16 the girlfriend was transsexual and asked
17 whether the employee tried to
18 'reach-around'"?
19            Did you ever hear that?
20       A.   No.
21       Q.   Okay.  Let's go to paragraph 23.
22 Read that to yourself for a second.
23       A.   Okay.
24       Q.   Would you agree that the sexual
25 comments were unwelcome and made

1                D. Friscoe
2  Ms. Malone uncomfortable?
3            MR. McDERMOTT:  Objection.
4            MS. SCHEIBEL:  Objection.
5            MS. CORDERO:  Objection.
6        A.   Yes.
7        Q.   And why do you say that?
8        A.   Because why wouldn't they make
9  her uncomfortable.
10       Q.   Did you see her be
11 uncomfortable?
12            MR. McDERMOTT:  Objection.
13            MS. CORDERO:  Objection.
14       A.   I'm sorry.  What was the
15 question again?
16       Q.   Did you see these comments being
17 made in Ms. Malone's presence?
18       A.   Yeah.
19       Q.   And did you see her reaction?
20       A.   I don't remember her reaction,
21 to tell you the truth.
22       Q.   Did she ever tell you she was
23 uncomfortable?
24       A.   Yes.
25       Q.   How often?

D. Friscoe

1 her being hired?
2
3     A.     No.
4     Q.     Did you ever hear Mr. Ballard
5 berate Ms. Malone?
6     A.     No.
7     Q.     Did you ever see Mr. Ballard
8 assign Ms. Malone administrative tasks?
9     A.     No, I don't remember.
10    Q.     Did you ever see Mr. Ballard
11 assign Ms. Malone cleaning tasks?
12    A.     Yeah, I believe he did.  Yes, I
13 do remember that.
14    Q.     To your knowledge, was that an
15 appropriate assignment for Ms. Malone?
16    A.     I don't know.  To me, if they
17 asked me to do something, I'm a company
18 guy, I'll do it, so I don't know.
19    Q.     Did Ms. Malone's job include
20 cleaning the barn?
21    A.     No.
22    Q.     So if she were told to clean the
23 barn, would that have been inappropriate,
24 given her job title?
25    MS. SCHEIBEL:  Objection.

D. Friscoe

1
2     A.     I wouldn't say it would be
3 inappropriate, but it's definitely -- it's
4 not a detail where you're normally
5 assigned.
6     Q.     Would it have been a form of
7 harassment?
8     MS. SCHEIBEL:  Objection.
9     A.     I don't know.  That's not for me
10 to decide.
11    Q.     Punishment?
12    A.     Yeah, possibly.
13    Q.     Petty?
14    A.     Sure.
15    Q.     Any other words you might
16 describe it?
17    A.     No.
18    Q.     Okay.  Did you ever see Mr.
19 Ballard stalk Ms. Malone?
20    A.     No.
21    Q.     Okay.  Did you ever see or hear
22 Ms. Malone being harassed by any other
23 co-workers?
24    MR. McDERMOTT:  Objection.
25    MS. SCHEIBEL:  Objection.

D. Friscoe

1
2     A.     I don't know.  I don't know.
3 You'd have to -- yeah, I don't know.
4     Q.     Okay.  We'll come back to some
5 specifics later on.
6     Did Tori ever complain to you of
7 being harassed by anyone?
8     MR. McDERMOTT:  Objection.
9     MS. FANTINO:  Objection.
10    A.     I don't remember.
11    Q.     Did she ever complain to you
12 about Mr. Ballard stalking her?
13    A.     Yes, I remember her bringing
14 that up.
15    Q.     What do you remember her saying
16 to you?
17    A.     I don't remember much about it.
18 I just remember her saying -- I guess it
19 was around the election time.  I honestly
20 forget the details about it, but I do
21 remember her mentioning it.
22    Q.     Okay.  Did you ever see
23 Ms. Malone subjected to comments about
24 sex, comments in her presence about sex?
25    MR. McDERMOTT:  Objection.

D. Friscoe

1
2     MS. SCHEIBEL:  Objection.
3     A.     Yes.
4     Q.     Who made such comments?
5     MR. McDERMOTT:  Objection.
6     A.     It was pretty common, so...
7     Q.     How often?
8     A.     I don't know.  I don't know
9 specifics.
10    Q.     You don't remember any details
11 at all?
12    A.     Not off the top of my head, no.
13    Q.     Okay.  Were any of the
14 supervisors aware of the sexual comments
15 or gestures that were being made to
16 Ms. Malone?
17    MR. McDERMOTT:  Objection.
18    MS. SCHEIBEL:  Objection.
19    A.     I don't know.
20    Q.     Let's move on to paragraph 26.
21 Why don't you read that to yourself.
22    A.     Okay.
23    Q.     By the way, to your knowledge,
24 does the Town have a sexual harassment
25 policy?

D. Friscoe

```
 1
 2   Q.    Did you know Frank DiZenzo?
 3   A.    I did, yes.
 4   Q.    In what capacity?
 5   A.    He was -- we were in the crew
 6   together, as well as friends outside of
 7   work, and then he later became the
 8   superintendent.
 9   Q.    Did you ever see or hear
10   Mr. DiZenzo ask Ms. Malone if she needed a
11   place to sit?
12         MS. CORDERO:  Objection.
13   A.    No.
14   Q.    Did you ever see or hear Mr.
15   DiZenzo wipe his mouth tilt his head back
16   and stick out his tongue?
17         MS. CORDERO:  Objection.
18   A.    No.
19   Q.    Did you ever see or hear Mr.
20   DiZenzo invite Ms. Malone to urinate in
21   his hands?
22         MS. CORDERO:  Objection.
23   A.    No.
24   Q.    Okay.  Did you ever see or hear
25   Mr. DiZenzo say anything to Ms. Malone of
```

D. Friscoe

```
 1
 2   a sexual nature?
 3         MS. CORDERO:  Objection.
 4         MS. SCHEIBEL:  Objection.
 5   A.    Yes.
 6   Q.    What did you hear?
 7   A.    I don't remember.  We were in
 8   the same crew for almost a year, so...
 9   Q.    Did it happen once?
10   A.    Yes.
11   Q.    Did it happen more than once?
12   A.    I don't know.
13   Q.    Okay.  Did you ever see him make
14   any sexual gestures in her presence?
15         MS. CORDERO:  Objection.
16         MS. SCHEIBEL:  Objection.
17   A.    I will say that's the only -- as
18   far as that paragraph goes, the only thing
19   that I can say that I absolutely remember
20   is the pulling the pants aside to see her
21   underwear.
22   Q.    Tell me about that.
23   A.    I can't remember where we were,
24   but we were -- I believe she was loading
25   block into the back of the truck, the dump
```

D. Friscoe

```
 1
 2   truck, and that's when did he it.
 3   Q.    What did he do?
 4   A.    He pulled her pants aside to see
 5   her underwear.
 6   Q.    Did he say anything?
 7   A.    I don't remember.
 8         MS. CORDERO:  Objection.
 9   Q.    Did she say anything?
10         MS. CORDERO:  Objection.
11   A.    I don't remember.
12   Q.    Did anybody else see it?
13         MS. CORDERO:  Objection.
14   A.    I don't know.
15   Q.    Did anybody laugh when it
16   happened?
17         MS. CORDERO:  Objection.
18   A.    I don't remember.
19   Q.    Were you surprised by that
20   action?
21         MS. CORDERO:  Objection.
22         MS. SCHEIBEL:  Objection.
23   A.    Yes.
24   Q.    Why?
25   A.    Because it was inappropriate.
```

D. Friscoe

```
 1
 2   Q.    It wasn't workplace appropriate
 3   behavior?
 4         MS. CORDERO:  Objection.
 5   A.    No.
 6   Q.    Had it happened before?
 7         MS. CORDERO:  Objection.
 8   A.    Not that I know of.
 9   Q.    Had anything like it happened
10   before?
11         MS. SCHEIBEL:  Objection.
12         MS. CORDERO:  Objection.
13   A.    I don't know.
14   Q.    Let's jump down to paragraph 34,
15   if you would, and read that to yourself.
16         Okay?
17         MS. CORDERO:  I'm sorry, Steve.
18         Just while we're waiting, Linda
19   can you just clarify, because I've
20   been objecting a lot and my screen is
21   not lighting up, and I just want to
22   make sure that you have record of my
23   objections.
24   A.    Okay.
25   Q.    Did you ever see Highway
```

D. Friscoe

1  D. Friscoe
2  Department employees urinate in the
3  presence of Ms. Malone?
4      MR. McDERMOTT:  Objection.
5      MS. CORDERO:  Objection.
6      MS. SCHEIBEL:  Objection.
7  A.    Yes.
8  Q.    Who was that?  Who did that?
9  A.    It's common to, you know, be on
10 the road to do it.  I wouldn't say we were
11 doing it in front of her.  You know, you
12 would -- it wasn't like -- it was just --
13 you would just do it on the side of the
14 road.
15 Q.    In her vicinity?
16     MR. McDERMOTT:  Objection.
17 A.    I don't know.  Describe
18 vicinity.  I don't know, within 20 feet?
19 Sure.
20 Q.    I'm sorry.  I cut you off.  I
21 apologize.
22 A.    Within 20 feet, sure.
23 Q.    Within ten feet?
24 A.    Maybe.
25 Q.    Five feet?

D. Friscoe

1  D. Friscoe
2  A.    No.
3  Q.    Is a workplace appropriate
4  behavior to urinate front of a woman?
5      MR. McDERMOTT:  Objection.
6      MS. SCHEIBEL:  Objection.
7  A.    No.
8  Q.    People did it anyway?
9      MS. SCHEIBEL:  Objection.
10     MR. McDERMOTT:  Objection.
11 Q.    Yeah, Mr. Friscoe, I'll ask the
12 question again.
13     But people did it anyway?
14     MR. McDERMOTT:  Objection.
15     MS. SCHEIBEL:  Objection.
16 A.    Yes.
17 Q.    Mr. Friscoe, do you know what a
18 Go Girl is?
19 A.    Yes.
20 Q.    Have you ever seen one?
21 A.    Yes.
22 Q.    Where?
23 A.    I forget if she showed me the
24 actual one or a picture of it, but I
25 remember Tori showing me when Mr. DiZenzo

D. Friscoe

1  D. Friscoe
2  gave it to her.
3  Q.    How are you aware that
4  Mr. DiZenzo gave to her?
5      MS. CORDERO:  Objection.
6  A.    She told me.
7  Q.    Do you remember when it
8  happened?
9  A.    No.
10 Q.    Do you remember the context in
11 which it happened, where?
12     MS. CORDERO:  Objection.
13 A.    No.
14 Q.    What was your reaction when you
15 found out that Mr. DiZenzo had given
16 Ms. Malone a Go Girl?
17     MS. CORDERO:  Objection.
18 A.    I don't remember.
19 Q.    Did anyone at the Highway
20 Department talk about it?
21     MS. CORDERO:  Objection.
22 A.    I don't remember.
23 Q.    Did anybody joke about it?
24     MS. CORDERO:  Objection.
25 A.    I don't remember.

D. Friscoe

1  D. Friscoe
2  Q.    Did you ever say anything to
3  Mr. DiZenzo about giving her a Go Girl?
4      MS. CORDERO:  Objection.
5  A.    No.
6  Q.    Did he ever say anything to you
7  about it?
8      MS. CORDERO:  Objection.
9  A.    No.
10 Q.    And you didn't hear any talk
11 about it in the Highway Department?
12     MS. CORDERO:  Objection.
13 A.    I don't remember.
14 Q.    Do you think it was appropriate
15 workplace behavior for Mr. DiZenzo to give
16 Tori a Go Girl?
17     MS. CORDERO:  Objection.
18     MS. SCHEIBEL:  Objection.
19 A.    No.
20 Q.    Why is that?
21 A.    Rude.
22 Q.    Take a look at paragraph 40, if
23 you would.  Okay.  Four-zero.  Read that
24 to yourself.
25 A.    Okay.

D. Friscoe

1  Q.  Do you know who Tucker
3  Connington is?
4  A.  Yes.
5  Q.  Is he your boss currently?
6  A.  Yes.
7  Q.  He is.  Okay.  And he knows
8  you're testifying here today because he's
9  actually on the call, correct?
10  A.  I guess.
11  Q.  Did you know he was on the call?
12  A.  No.
13  Q.  Has he ever said anything to you
14  about your testimony in this case?
15  A.  No.
16  Q.  Has he ever talked to you about
17  this case at all?
18  A.  No.
19  Q.  Did you ever see or hear
20  Mr. Connington say anything about
21  Ms. Malone filing a lawsuit?
22  MS. SCHEIBEL:  Objection.
23  A.  No.
24  Q.  Did you ever hear him saying
25  anything about her filing a grievance?

D. Friscoe

1
2  MS. SCHEIBEL:  Objection.
3  A.  No.
4  Q.  Did you ever hear Mr. Connington
5  say anything at all about Ms. Malone?
6  MS. SCHEIBEL:  Objection.
7  A.  I don't remember.
8  Q.  Did you ever witness Mr.
9  Connington become verbally abusive to
10  Ms. Malone?
11  MS. SCHEIBEL:  Objection.
12  A.  The incident in question, I
13  was -- Tori and I were actually assigned
14  to the same crew that day, and she was
15  told to drive a roll-off that she had
16  apparently written up the day before.
17  And so when she was assigned
18  that, she said I'm not taking that truck.
19  Tucker was like why.  And she said I wrote
20  it up.  He said I didn't know that.  And
21  then it was a big thing.  Well, I'm not
22  going to drive it.  And I said, I'll just
23  take the thing because I just wanted to
24  get out of there.
25  Q.  Okay.  So tell me what does it

D. Friscoe

1
2  mean to write a truck up?
3  A.  You write it up for -- every day
4  we have to do a truck sheet to write down
5  if there's anything wrong with the truck,
6  make sure you check the oil, the fluids,
7  and stuff, and if there's something wrong
8  with it, you would write it up.
9  Q.  It was potentially unsafe when
10  you write it up?
11  MS. SCHEIBEL:  Objection.
12  A.  Yes.
13  Q.  Okay.  Did you know Tori's
14  write-up included anything about the
15  potential safety of the truck?
16  A.  I believe it did.
17  Q.  Did she say anything to you
18  about not wanting to use that particular
19  truck that day?
20  MS. SCHEIBEL:  Objection.
21  A.  Yes.
22  Q.  What did she say, if you
23  remember?
24  A.  She said, I don't want to drive
25  that thing.  It's dangerous.

D. Friscoe

1
2  Q.  It's dangerous.
3  A.  Yes.
4  Q.  Did anybody else hear her say
5  it's dangerous?
6  MS. SCHEIBEL:  Objection.
7  A.  I don't know.
8  Q.  Who was the supervisor that
9  day -- the foreman -- I apologize.
10  Withdrawn.
11  Who was the foreman that day; do
12  you remember?
13  A.  I believe it was Brian Lillo.
14  Q.  Okay.  Did Mr. Lillo say
15  anything?
16  A.  No.
17  Q.  Is it a supervisor's
18  responsibility to do something when
19  someone says they don't want to
20  write-up -- drive a truck?
21  MS. SCHEIBEL:  Objection.
22  A.  I believe so.
23  Q.  What are they supposed to do?
24  MS. SCHEIBEL:  Objection.
25  A.  Inform one of the deputies,

1              D. Friscoe
2       identification, as of this date.)
3       Q.    You say, "I figured you needed
4   someone to say nice things."
5             Do you remember what the context
6   of what you were saying to her at that
7   point in time?
8       A.    I had a conversation with a
9   friend of ours at the Highway Department
10  about her, and he was very complimentary
11  about Tori, so I just wanted to reiterate
12  that to her.
13      Q.    Okay.  Let's go to the next
14  page, which is Malone 02497.  Let's start
15  with -- tell me what's going on here.  I'm
16  sorry.  Go ahead, 26.
17      A.    Looks like she had gotten
18  switched out of her crew to be put on a
19  different detail; and that seems to be
20  what's happening.
21      Q.    And you say, "That's such
22  bullshit."
23      A.    Yes.
24      Q.    What do you mean by that?
25  What's such bullshit?

1              D. Friscoe
2       A.    That she was being moved out of
3   her crew.
4       Q.    Was that unfair?
5       A.    I believe at the time I thought
6   so, yes.
7       Q.    Why did you think it was unfair?
8             MR. McDERMOTT:  Bates, please?
9             MR. COHEN:  We're on Bates
10      Malone 2497.
11            MR. McDERMOTT:  Yeah, but can
12      you state the dates of these text
13      messages because, otherwise, they're
14      taken in a vacuum.
15            MR. COHEN:  Okay.  It looks like
16      on the page above it's 3/5/18.
17            MR. McDERMOTT:  These are his
18      text messages.
19      Q.    These are text messages between
20  you, Mr. Friscoe, and Tori?
21      A.    Yes.
22      Q.    And it seems to be on the 5th of
23  March of 2018, correct?
24      A.    Yes.
25      Q.    Okay.  So going down the text

1              D. Friscoe
2   message line, after you say, "That's such
3   bullshit."  She says to you, "I can't deal
4   with this today."
5             And then what do you say?
6       A.    I said, "I'm so sorry this
7   bullshit always falls on you."
8       Q.    What do you mean by that?
9       A.    I honestly don't remember.
10      Q.    Okay.  "Always falling on you"
11  doesn't ring a bell of what you meant?
12      A.    No.  No.
13      Q.    A little further down the page,
14  she says, "He's a fucking child."
15            Do we know who she's referring
16  to?  Did you know who she's referring to?
17      A.    No, I don't see where -- I don't
18  remember.
19      Q.    And your response to her,
20  though, is what?
21      A.    "Fuck this place.  You don't
22  deserve it."
23      Q.    Yes.  What were you referring
24  to?
25      A.    I think it was just she

1              D. Friscoe
2   should -- that it's not right that she
3   always gets the short end of the stick on
4   the job.
5       Q.    And did you agree she always
6   gets the short end of the stick on the
7   job?
8       A.    As far as crew went, yeah.
9       Q.    Which crew?
10      A.    The tree crew, I believe.
11      Q.    Which was run by Mr. Klein?
12      A.    Yes.
13      Q.    And what did you mean by she
14  always gets the short end of the stick?
15      A.    It was just it was easier to
16  move her than to move somebody else out of
17  the crew.
18      Q.    In what way?
19      A.    That was what I meant.  It was
20  just why -- why should she get moved
21  when -- you know, why does it fall on her
22  to be her problem, as opposed to other
23  people.
24      Q.    So someone was preferring others
25  in the crew, treating them differently?

```
1                  D. Friscoe
2      A.    Yes, sir.
3      Q.    Would you want her to work
4  there?
5      A.    No.
6            MS. SCHEIBEL:  Objection.
7            MR. McDERMOTT:  Objection.
8      Q.    But your answer was?
9      A.    No, I would not want my daughter
10 to work there.  No.
11     Q.    Why is that?
12     A.    I would not want my daughter
13 working around 85 men all day.
14     Q.    Did you think that Tori had to
15 endure offensive conduct?
16           MS. SCHEIBEL:  Objection.
17           MR. McDERMOTT:  Objection.
18     A.    Yes.
19     Q.    Of a sexual nature?
20           MR. McDERMOTT:  Objection.
21           MS. SCHEIBEL:  Objection.
22     A.    Sometimes.
23     Q.    Did you ever think that conduct
24 was severe?
25           MS. SCHEIBEL:  Objection.
```

```
1                  D. Friscoe
2            MR. McDERMOTT:  Objection.
3      A.    Yes.
4      Q.    Pervasive?
5            MS. SCHEIBEL:  Objection.
6      A.    Yes.
7      Q.    Intimidating?
8            MR. McDERMOTT:  Objection.
9            MS. SCHEIBEL:  Objection.
10     A.    I can't say that, no.
11     Q.    Abusive?
12           MS. SCHEIBEL:  Objection.
13     A.    Yes.
14     Q.    Threatening?
15           MS. SCHEIBEL:  Objection.
16           MR. McDERMOTT:  Objection.
17     A.    No.
18     Q.    Do you think Tori was
19 discriminated against because of her sex?
20           MR. McDERMOTT:  Objection.
21           MS. SCHEIBEL:  Objection.
22     A.    I can't say that.  I don't know.
23     Q.    Okay.  Do you think Wayne
24 Ballard allowed a hostile work environment
25 to continue when he was superintendent?
```

```
1                  D. Friscoe
2            MS. SCHEIBEL:  Objection.
3      A.    I don't know.
4      Q.    Did he encourage it?
5            MS. SCHEIBEL:  Objection.
6      A.    I don't think so.
7      Q.    Did he contribute to it?
8            MS. SCHEIBEL:  Objection.
9      A.    I don't know.
10     Q.    Did Frank DiZenzo allow a
11 hostile work environment to continue while
12 he was superintendent?
13           MS. SCHEIBEL:  Objection.
14     A.    He definitely didn't help it.
15     Q.    Did he encourage it?
16           MS. SCHEIBEL:  Objection.
17     A.    I don't know if he encouraged
18 it.
19     Q.    Did he contribute to it?
20           MS. SCHEIBEL:  Objection.
21     A.    Just the incidents that I
22 described, yeah.
23     Q.    Including the Go Girl?
24     A.    Yes, that's what I mean.
25     Q.    Did Tucker Connington allow the
```

```
1                  D. Friscoe
2  hostile work environment to continue while
3  he was deputy?
4            MS. SCHEIBEL:  Objection.
5      A.    I don't think so.
6      Q.    Did he encourage it?
7            MS. SCHEIBEL:  Objection.
8      A.    No.
9      Q.    Did he contribute to it?
10           MS. SCHEIBEL:  Objection.
11     A.    Not that I know of.
12     Q.    Okay.  Do you think
13 accumulatively over time that the
14 individual slights, slurs, comments,
15 gestures towards Tori added up to a
16 hostile work environment?
17           MR. McDERMOTT:  Objection.
18           MS. SCHEIBEL:  Objection.
19     A.    You could say that sure.
20     Q.    A serious situation?
21           MS. SCHEIBEL:  Objection.
22     A.    I'm sorry?
23     Q.    Did you think it was a serious
24 situation for Tori?
25           MR. McDERMOTT:  Objection.
```