UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

VICTORIA MALONE,

Plaintiff,

-against-

TOWN OF CLARKSTOWN, WAYNE BALLARD, in his personal and official capacity as Clarkstown Highway Superintendent, FRANK DIZENZO, in his personal and official capacity as Clarkstown Highway Superintendent, ANDREW LAWRENCE, in his personal and official capacity, DAVID SALVO, in his personal and official capacity, ROBERT KLEIN, in his personal and official capacity, TUCKER CONNINGTON, in his personal and official capacity, and BRIAN LILLO, in his personal and official capacity,

Defendants.

---------------------------------------------------X

DEPOSITION OF DOMINIC SANTULLI

White Plains, New York

Monday, October 26, 2020

Reported by: Leonora L. Walker

JOB NO. 185656

October 26, 2020
10:08 a.m.

Deposition of DOMINIC SANTULLI, held at the offices of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 1133 Westchester Avenue, White Plains, New York 10601, before Leonora L. Walker, a Notary Public of the State of New York.

A P P E A R A N C E S:

POLLOCK COHEN
Attorneys for Plaintiff,
60 Broad Street
New York, New York 10004
BY: STEVE COHEN, ESQUIRE

WILSON ELSER MOSKOWITZ EDELMAN & DICKER
Attorneys for Defendants
1133 Westchester Avenue
White Plains, New York 10604
BY: JOHN FLANNERY, ESQUIRE

ALL COUNSEL APPEARING VIRTUALLY:

LAWRENCE A. GARVEY & ASSOCIATES
Attorneys for Defendant - Frank DiZenzo
235 Main Street
White Plains, New York 10601
BY: LAWRENCE GARVEY, ESQUIRE

A P P E A R A N C E S: (Continued)

MCDERMOTT & MCDERMOTT ATTORNEYS AT LAW
Attorneys for Defendant - Robert Klein
293 Route 100
Somers, New York
BY: MICHAEL MCDERMOTT, ESQUIRE
FAUSTA MCDERMOTT, ESQUIRE

LYONS MCGOVERN
Attorneys for Defendant - Brian Lillo
399 Knollwood Road
White Plains, New York 10603
BY: LISA FANTINO, ESQUIRE

DARREN JAY EPSTEIN ATTORNEY AT LAW
Attorney for Witness: Dominic Santulli
254 South Main Street
New City, New York 10956
BY: DARREN EPSTEIN, ESQUIRE

ALSO PRESENT:

Leslie Kahn - Town Attorney Town of Clarkstown
Charles Connington
Brittany Cordero

---------------------I N D E X----------------------

| EXAMINATION OF DOMINIC SANTULLI | PAGE |
| --- | --- |
| BY MR. COHEN | 6 |
| BY MS. FANTINO | 219 |

-------------------E X H I B I T S-------------------

| SANTULLI DEPOSITION | PAGE |
| --- | --- |
| Exhibit 1 - Complaint | 17 |
| Exhibit 2 - Memo to Frank and Tucker | 65 |
| Exhibit 3 - Memo | 71 |
| Exhibit 4A- Bates No. TOWN-1602 | 85 |
| Exhibit 4B- Bates No. TOWN-1603 | 85 |
| Exhibit 5 - Text Messages | 108 |
| Exhibit 6 - Journal | 110 |
| Exhibit 7 - Memo to Frank DiZenzo | 160 |
| Exhibit 8 - Video | 186 |
| Exhibit 9 - Video | 188 |
| Exhibit 10- Video | 189 |
| Exhibit 11- Video | 191 |
| Exhibit 12- Video | 196 |
| Exhibit 13- Video | 199 |
| Exhibit 14- Calendar | 202 |
| Exhibit 15- Additional Calendar page | 204 |
| Exhibit 16- Photograph of Calendar | 205 |

A. Yes.
Q. Wayne Ballard?
A. Yes.
Q. Andrew Lawrence?
A. No.
Q. David Salvo?
A. No.
Q. Robert Klein?
A. No.
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. Tucker Connington?
A. No.
Q. Brian Lillo?
MS. FANTINO: Objection.
MR. McDERMOTT: Michael McDermott. I object on behalf of Robert Klein.
BY MR. COHEN:
Q. So when was Ms. Malone subjected to sexual and gender-based harassment?
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. Approximately? Was it once in her experience that you saw? Was it more than once?

A. It was more than once.
Q. Okay. About how often do you think?
A. I would say -- are you looking for, like, once every other week?
Q. You tell me.
A. Time frame like that?
Q. Was it once every other week?
A. I would say that's fair.
Q. So if she worked there over 15 years currently, at least every other week she was subjected to some form of sexual or gender-based harassment?
A. Yes.
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. In what ways? Give me some examples, if you could.
A. One example was somebody left an pornographic magazine on the seat of her plow truck or the plow truck assigned to her.
Q. Okay.
A. That would be one way. Wayne Ballard did ban her from using the only female restroom in our building. You know, those are the some of the

examples that she had to put up with.
Q. Okay. Let's move on and we'll dig into some of these as we go along, okay?
A. Okay.
Q. Second sentence, would you agree from what you saw and what you knew about the highway department, that, quote, the department tolerated and encouraged a toxic atmosphere in which male employees constantly made disgusting and degrading sexual comments in front of Ms. Malone and within earshot of supervisory employees?
MR. FLANNERY: Objection.
THE WITNESS: I would disagree with encouraged.
BY MR. COHEN:
Q. Okay. But take out encourage. They tolerated?
MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Okay. Who tolerated?
A. Meaning?
Q. Individuals?
A. I would say that at some point everybody at

the highway department tolerated it.
Q. Including Wayne Ballard?
A. Yes.
Q. Including Frank DiZenzo?
A. Yes.
Q. Including --
MR. GARVEY: Objection.
BY MR. COHEN:
Q. Okay. Andrew Lawrence?
A. Yes.
Q. David Salvo?
A. Yes.
MR. GARVEY: Objection.
BY MR. COHEN:
Q. Robert Klein?
A. Yes.
MR. McDERMOTT: Objection. McDermott. What was the answer to that?
MR. COHEN: He answered yes.
BY MR. COHEN:
Q. Tucker Connington?
MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:

D. SANTULLI

time?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Did you ever see Ms. Malone in the presence of people talking about sex while on the job?

A. Ms. Malone talking about sex?

Q. No. Other people talking in her presence?

A. Yes.

MR. FLANNERY: Objection.

THE WITNESS: It's hard to say. A lot of it occurred in our time clock room, which is behind a closed door from us in the supervisor's office. You know, it's -- there's quite a few of guys that's standing there. To narrow it down to specific guys and specific incidences is very hard.

BY MR. COHEN:

Q. Was it commonplace though? Did it happen a lot?

MR. FLANNERY: Objection.

THE WITNESS: I wouldn't say commonplace.

BY MR. COHEN:

D. SANTULLI

Q. Did it happen more than ten times?

MR. FLANNERY: Objection.

THE WITNESS: In the 15 years she's worked there?

BY MR. COHEN:

Q. Yes.

A. Yes.

Q. Did it happen more than 50 times in the 15 years?

MR. FLANNERY: Objection.

THE WITNESS: It's hard to say. I would say right around there.

BY MR. COHEN:

Q. Right around 50 times, okay. Thank you.

Were any of the supervisors, deputies aware of the sexual comments or gestures that were being made around Ms. Malone?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Who?

A. I would say myself, Tucker, Joe Profina, Andy Lawrence. Those were the four deputies. She was transferred before Jeff Davidson and Donald

D. SANTULLI

Warbach came into the office.

Q. Did any of the supervisors ever take any action about these comments being made in her presence?

A. We did.

Q. What?

A. We would go out and ask the guys to stop or tell them to knock it off.

Q. And did they?

A. Yes.

Q. Who did you tell to knock it off?

A. You would open the door and you would tell them, guys, that's enough. You know, there's a line that you can't cross. Knock it off. And then they would change the conversation.

Q. And what was that like?

A. I don't know. It would be, again, one of things that she referred to of like eating out like a gazelle; and the previous one, that would be one that would warrant us coming out and saying enough is enough.

Q. Okay. Was any disciplinary action taken against anyone for making these comments?

MR. FLANNERY: Objection.

D. SANTULLI

THE WITNESS: Not that I'm aware of.

BY MR. COHEN:

Q. Do you have any recollection of a snowstorm in 2009 after which Ms. Malone fell asleep at the highway department?

MR. FLANNERY: Objection.

THE WITNESS: Not specifically.

BY MR. COHEN:

Q. Okay. Do you recall her falling asleep after a snowstorm ever?

A. Yes.

Q. And do you have any idea when that was?

A. It's pretty commonplace after a snowstorm.

Q. It is, okay.

Do you recall any men making sexual comments or gestures while staring as Ms. Malone's body while she was asleep?

MR. FLANNERY: Objection.

THE WITNESS: I do.

BY MR. COHEN:

Q. Tell me, what do you remember?

A. I remember them lined up. Ms. Malone had fallen sleep on the counter of our lunchroom. She was facing the wall. Her posterior was facing out

D. SANTULLI

MR. GARVEY: Objection.

THE WITNESS: No. Just those incidence.

BY MR. COHEN:

Q. Okay. Please read paragraph 29 to yourself. Let me just check to make sure it's the same.

Yes, it is the same.

A. Okay.

Q. Did you ever hear that Ms. Malone was not allowed to use the women's bathroom?

A. Yes.

Q. When was that approximately?

A. When her father first declared that he was running against Wayne for the position of superintendent of highways.

Q. So what happened?

A. There is one female bathroom in the building; it happens to be in the office where Wayne's office -- on the side of the office in which Wayne's office is on. And I'm not sure of the exact reasoning why, but she was no longer allowed to use it.

Q. Did you ever hear Wayne Ballard speak about it?

D. SANTULLI

A. Not directly.

Q. Directly, what did you hear?

MR. FLANNERY: Objection.

THE WITNESS: I heard that he was nervous she might overhear his strategy for the campaign --

BY MR. COHEN:

Q. Okay.

A. -- and he didn't want her over on that side of the office.

Q. So Ms. Malone was forced to use a men's bathroom?

MR. FLANNERY: Objection.

THE WITNESS: It was a bathroom, yes.

BY MR. COHEN:

Q. For approximately how long did she have to use a men's bathroom?

MR. FLANNERY: Objection.

THE WITNESS: I'm not sure years-wise.

BY MR. COHEN:

Q. Was it more than a month?

A. Yes.

Q. Was it more than a year?

A. Yes.

D. SANTULLI

Q. Was it more than two years?

A. I can't say for sure.

Q. So it could have been somewhere between one year and two years?

A. Yes.

Q. Okay. Did you ever hear Andy Lawrence say anything about it?

A. Not indirectly.

Q. Indirectly?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. At some point, was Ms. Malone forced to use an electrical closet as a changing room?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Why was that?

A. At the time on the operations side, there was no facilities for her to change, female facilities.

In the past, one of the secretaries who had worked there would use that electrical closet as her locker room.

D. SANTULLI

Q. So -- and Ms. Malone -- other than the secretaries, Ms. Malone was the only woman at the highway department as a laborer?

A. That is correct.

MR. FLANNERY: Objection.

BY MR. COHEN:

Q. Whose decision was it to have Ms. Malone use the electrical closet, if you know?

A. I don't know.

Q. Okay. Do you know, did the room properly lock?

A. Lock.

Q. And why was that? Any idea?

A. The lock -- no.

Q. Did people know that the room didn't lock properly?

A. I'm not sure.

Q. But you knew?

A. I did.

Q. How come you knew?

A. I knew because the mechanics would come up and jimmy the lock to take the toilet paper and paper towels out of it.

Q. And there was no COVID crisis on toilet

D. SANTULLI

A. Yes.
Q. Okay. And did he say anything to you about your testimony?
A. No.
Q. Okay. Were you and Mr. Connington deputies at the same time?
A. We were.
Q. You were.
And did you work in close proximity to each other?
A. We did.
Q. Did you ever see or hear Mr. Connington do anything that might be perceived as harassing Ms. Malone?
MR. FLANNERY: Objection.
THE WITNESS: I did not.
BY MR. COHEN:
Q. Okay. Did you ever see him do anything that might be intimidating to Ms. Malone?
MR. FLANNERY: Objection.
THE WITNESS: I did not.
BY MR. COHEN:
Q. Did she ever complain about that to you about Mr. Connington's behavior?

D. SANTULLI

MR. FLANNERY: Objection.
THE WITNESS: Other than the incident underneath the canopy.
BY MR. COHEN:
Q. The answer is no?
A. No.
Q. Got you. Thank you. Thirty-four, if you would read that one to yourself.
A. Okay.
MR. EPSTEIN: Just to we're clear, 34 is referring to Frank DiZenzo?
MR. COHEN: Yes.
BY MR. COHEN:
Q. First, Mr. Santulli, did you ever see highway department employees urinate in front of Ms. Malone?
A. I did not.
Q. Okay. Do you know what a Go Girl is?
A. I do.
Q. And have you ever seen one?
A. Not in person.
Q. And how do you know what it is?
A. I've seen it on the Internet.
Q. Were you aware that Mr. Santulli gave one to

D. SANTULLI

Ms. Malone?
MR. GARVEY: Objection.
THE WITNESS: I was.
BY MR. COHEN:
Q. How were you aware of it?
A. He did so in the office in front of myself and a few other supervisors.
Q. I'm a little confused.
You never saw it?
A. It was wrapped.
Q. It was wrapped.
But how did you know it was Go Girl?
A. Victoria told me.
Q. And when did it happen?
A. Shortly after Frank DiZenzo took office.
Q. In what context did he give it to her?
MR. GARVEY: Objection.
THE WITNESS: He handed it to her and said, now you don't have to come back in here; you can pee on the road like everybody else.
BY MR. COHEN:
Q. Was this at a party?
A. No.

D. SANTULLI

Q. You're shaking --
MR. FLANNERY: Objection.
THE WITNESS: No. I apolo -- no.
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. It was in the office?
A. Yes.
Q. To be clear -- did anyone at the highway department talk about this incident?
MR. FLANNERY: Objection.
THE WITNESS: Not that I recall.
BY MR. COHEN:
Q. Did anybody else see it?
MR. FLANNERY: Objection.
THE WITNESS: Andy Lawrence and Joe Profina were in the office.
BY MR. COHEN:
Q. Did you ever say to Mr. DiZenzo that giving Ms. Malone a Go Girl would be inappropriate?
MR. GARVEY: Objection.
THE WITNESS: I did say that it might not be a good idea. I did not use the word "inappropriate."
BY MR. COHEN:

D. SANTULLI

Q. Okay. Not a good idea.
Why wouldn't it be a good idea?
A. In my opinion, when you go from a colleague to a supervisor, certain things that may be viewed as a joke as a colleague are different when you become a supervisor.
Q. So in the supervisor position, it was workplace inappropriate; would you agree with that?
MR. FLANNERY: Objection.
THE WITNESS: I would.
BY MR. COHEN:
Q. You would, okay.
What if a colleague gave it to her?
MR. GARVEY: Objection.
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. Would that be inappropriate as well?
A. Yes.
Q. Okay. When you suggested to Mr. DiZenzo that it might not be a good idea to give her a Go Girl, what did he say to you?
A. I don't recall his exact response.
Q. But he went ahead and gave it to her anyway?
A. He did.

D. SANTULLI

Q. And do you remember Ms. Malone's reaction?
A. She kind of laughed it off.
MR. GARVEY: Objection.
BY MR. COHEN:
Q. Paragraph 39, if you would.
A. Okay.
Q. Okay. Do you recall an incident involving Ms. Malone and Mr. Salvo involving gloves?
A. I do not.
Q. Let's move on.
What about a flagging incident?
A. I do not.
Q. Let's move on.
Did you ever hear Mr. DiZenzo express displeasure with Ms. Malone for filing a union grievance?
MR. FLANNERY: Objection.
MR. GARVEY: Objection.
THE WITNESS: No, I did not.
BY MR. COHEN:
Q. Were you aware that she filed a union grievance?
A. No.
Q. Paragraph 40, if you would read that to

D. SANTULLI

yourself.
A. Okay.
Q. Did you ever hear Mr. Connington say anything about Ms. Malone's complaints?
MR. FLANNERY: Objection.
THE WITNESS: No, I did not.
BY MR. COHEN:
Q. About her filing any union grievances, did you ever hear him say anything about that?
A. Other than they were filed, no.
Q. But did he comment to you that they were filed?
MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Did he tell you what they were about?
A. No.
Q. You mentioned before that maybe you didn't -- maybe you didn't. Withdrawn.
Did Mr. Connington ever change Ms. Malone's work assignments?
MR. FLANNERY: Objection.
THE WITNESS: Mr. Connington changes everybody's work assignments based on

D. SANTULLI

personnel and the tasks that need to be accomplished.
BY MR. COHEN:
Q. Got you. What about opportunities for overtime pay?
A. Not that I can recall off the top of my head.
Q. Okay. Did you ever see him take any retaliatory action against Ms. Malone at all?
MR. FLANNERY: Objection.
THE WITNESS: No.
BY MR. COHEN:
Q. Okay. Put this one aside. We're going to go to a different exhibit. Do you want to take a break for two minutes?
A. I'm all right.
Q. Okay. Let's keep going.
We're going to go to Plaintiff's Exhibit 2, which is Bates stamped Malone 000174. Okay. And I'm going to give one to counsel.
(Whereupon Exhibit 2 was marked for identification.)
BY MR. COHEN:
Q. Tell me when you're ready.

D. SANTULLI

A. I am ready.
Q. All right. Do you recognize it?
A. I do.
Q. And what is it?
A. This is a memo I wrote to Frank and Tucker about a complaint Victoria made to me about an incident with Brian Lillo.
Q. How did you become aware of the incident?
A. Victoria told me about it.
Q. Okay. You took Ms. Malone's complaint seriously?
A. I did.
Q. Why is that?
A. She handed it to me in writing.
Q. And is that unusual?
A. Yes.
Q. Why is that?
A. Generally people don't put complaints in writing unless they feel very strongly about it.
Q. And why is that?
MR. FLANNERY: Okay.
THE WITNESS: I'm not sure.
BY MR. COHEN:
Q. Okay. And you said in your memo, if I'm

D. SANTULLI

reading correctly, quote, I am notifying my superiors so that you can take the proper measures to ensure this threatening behavior is corrected, correct?
A. That is correct.
Q. Okay. Do you know if this behavior was discussed in the highway department?
MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. By whom?
A. Frank DiZenzo and Tucker Connington.
Q. What was said?
A. They investigated the complaint. Frank DiZenzo several weeks later came to me and said that the specific incident with the chainsaw was reviewed. The security footage was reviewed. The police investigated it, and that they did not feel that Brian was threatening Tori at that point, and that they are to stay away from each other.
Q. And was that the extent of the highway department's investigation --
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. -- looking at the videotape?

D. SANTULLI

A. I'm not sure.
MR. FLANNERY: Objection.
THE WITNESS: I can't speak directly. Once the memo was given to Tucker and Frank, I was not involved in the investigation.
BY MR. COHEN:
Q. So you don't know if either Tucker or Frank interviewed Brian Lillo?
MR. FLANNERY: Objection.
THE WITNESS: I do not.
BY MR. COHEN:
Q. Should they have interviewed Brian Lillo?
MR. FLANNERY: Objection.
THE WITNESS: Again, it's not for me to say. I wasn't handling it.
BY MR. COHEN:
Q. Would you have interviewed Brian Lillo --
MR. FLANNERY: Objection.
MR. GARVEY: Objection.
BY MR. COHEN:
Q. -- if you were in charge?
MR. FLANNERY: Objection.
THE WITNESS: I would have.
BY MR. COHEN:

D. SANTULLI

Q. You would have.
Would you have interviewed Tori?
MR. FLANNERY: Objection.
THE WITNESS: I would have.
BY MR. COHEN:
Q. Are you aware if either Mr. DiZenzo or Mr. Connington interviewed Tori?
A. I am not.
Q. Was any action taken against Brian Lillo?
A. Not that I know of.
Q. Should someone have talked to him about the incident?
MR. FLANNERY: Objection.
THE WITNESS: I don't know.
BY MR. COHEN:
Q. If you were in charge, would some action have been taken against Mr. Lillo?
MR. FLANNERY: Objection.
MR. GARVEY: Objection.
MS. FANTINO: Objection.
MR. EPSTEIN: In what sense?
BY MR. COHEN:
Q. Would you have said don't kick chairs around her?

D. SANTULLI

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Would you say don't bring a chainsaw too close to someone when you take it out of the back of the truck?

MS. FANTINO: Objection. Fantino objecting.

THE WITNESS: Again, I didn't see the tape; I don't know how close the chainsaw was to Ms. Malone. Hard for me to say.

BY MR. COHEN:

Q. If it came within a foot of her, would you have said something to --

MS. FANTINO: Objection. Fantino objection.

BY MR. COHEN:

Q. Hypothetically, if it had come within a foot of her, would you have said something to Brian Lillo?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Two feet?

MR. FLANNERY: Objection.

D. SANTULLI

THE WITNESS: No.

BY MR. COHEN:

Q. Okay. Let's move onto the next exhibit. I'm going to show what is marked Plaintiff's Exhibit 3, which is Bates stamped Malone 000214.

(Whereupon Exhibit 3 was marked for identification.)

BY MR. COHEN:

Q. Tell me when you've read it.

A. Okay.

Q. All right. Do you recognize it?

A. I do.

Q. What did this involve?

A. It's a memo I wrote. Victoria came to me about an incident involving roll-off 333 that occurred between her and Mr. Connington.

Q. And what had happened?

A. Victoria came to me. What the memo said, the truck wasn't stopped, didn't stop. She brought it in and she was confronted underneath -- we have a canopy at work -- by Mr. Connington, who she felt verbally abused her at that point.

Q. Were you there?

A. I was not.

D. SANTULLI

Q. But she told you about it when?

A. Pretty close to after it happening; within a day or so, I would say.

Q. Is it pretty unusual for someone to complain about a deputy's behavior?

MR. McDERMOTT: Objection.

MR. FLANNERY: Objection.

THE WITNESS: In writing, yes.

BY MR. COHEN:

Q. So she did this one in writing as well?

A. Yes.

Q. And so you took it seriously?

A. I did.

Q. Did you investigate it at all?

A. I did not.

Q. Did anybody investigate it?

MR. FLANNERY: Objection.

THE WITNESS: I cannot speak to that. Once the memo was handed to Frank DiZenzo, it would be up to him to investigate it as the superintendent of highways.

BY MR. COHEN:

Q. Did Mr. Connington ever say anything to you about it?

D. SANTULLI

A. He did not.

Q. Did Mr. DiZenzo say anything to you about it?

A. He did not.

Q. Did anybody else?

A. Other than Ms. Malone, no.

Q. Other than Ms. Malone?

A. No.

Q. So it wasn't the talk of the highway department?

A. No.

Q. Is it unusual for a deputy to -- I'll use the word berate, but if you want to --

A. Okay.

Q. -- change that word, you may.

-- berate an underling?

MR. FLANNERY: Objection.

THE WITNESS: I wouldn't say it's unusual.

BY MR. COHEN:

Q. Is it unusual for someone to complain in writing about it?

A. Yes.

Q. Why is that?

D. SANTULLI

49 in the amended complaint.

MR. COHEN: Thank you. I appreciate it. And I apologize.

BY MR. COHEN:

Q. Take a look at those.

A. Okay.

Q. Were you a -- do you recognize these documents?

A. I do not.

Q. Okay. Were you aware of an incident involving Ms. Malone and a roll-off truck with a cable snapping?

A. Aware in what sense? Did I hear about it?

Q. Did you hear about it?

A. Yes.

Q. What did you hear?

A. I heard that Tori was taking the roll-off box off the truck and the cable snapped.

Q. And is that unusual for the cable to snap?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. Is it serious?

A. Yes.

D. SANTULLI

Q. Because someone can get hurt with this --

A. Yes.

Q. -- container rolling off --

A. Yes. And the cable --

Q. -- and the cable snapping itself?

Is it unusual -- do you ever see invoices from vendors?

A. When I was in charge of the shop, yes. After I was no longer in charge of the shop, no, I did not see vendor's invoices.

Q. And 4A refers to the cable that snapped on the truck that she was driving, right?

A. Yes.

Q. And it's dated the 24th of January 2019, correct?

A. Yes.

Q. And it's pretty detailed what they're replacing, right?

A. Correct.

Q. And the second part of the -- part B of the exhibit is a letter from the same company; is that right?

A. It appears to be.

Q. And it refers to the same truck?

D. SANTULLI

MR. EPSTEIN: If you know.

BY MR. COHEN:

Q. If you know.

A. I do not know.

Q. Okay. I'll represent to you that it is; it was provided by the town and refers to the same truck.

A. Okay.

Q. Is it unusual for a vendor to write a letter some six weeks later about a repair that they did?

MR. FLANNERY: Objection.

THE WITNESS: I've never seen it before.

BY MR. COHEN:

Q. And would it be unusual for them to make a conclusion, the broken end of the cable looked like normal wear and tear?

MR. FLANNERY: Objection.

THE WITNESS: I'm sorry. Can you repeat the question?

BY MR. COHEN:

Q. Sure. Would it be unusual for a vendor to say after they have replaced the part -- withdrawn. Let's move on.

D. SANTULLI

Are you aware of an incident in which a wheel of a snowplow Ms. Malone was driving came off?

A. Yes.

Q. What's your recollection of that?

A. Because I'm her direct supervisor, she notified me. She called me, said, my wheels fell off. I'm on Pecan Valley Drive.

I said, okay. Are you okay?

Yes.

Okay. No problem. Hang tight. I'll call the mechanics and I'll meet you out there.

Q. How often do wheels fall off of trucks?

A. In my 23 years, I've seen it two other times.

Q. Two other times in 23 years.

So it's unusual, yes?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. And potentially serious?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Okay. Were you disturbed by this incident

D. SANTULLI

in any way?

MR. FLANNERY: Objection.

THE WITNESS: I was not.

BY MR. COHEN:

Q. Concerned?

A. Always concerned when tires fall off a truck, not only the driver's safety, but anybody who happens to be on the road where that tire is headed towards.

Q. Were you aware that the two incidents involving Ms. Malone, the cable snapping and the wheel falling off, took place in less than a span of a month?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. You were aware?

A. Yes.

Q. Did that concern you in any way?

A. No.

Q. Did the highway department conduct an investigation?

A. Yes.

Q. And what was the result of that

D. SANTULLI

investigation?

A. I'm not sure.

Q. Did anything come of it?

A. Not that I know of.

Q. Okay. In fact, wasn't -- didn't Mr. DiZenzo move Ms. Malone out of the highway department?

MR. FLANNERY: Objection.

MR. McDERMOTT: Objection.

THE WITNESS: He did.

BY MR. COHEN:

Q. Did he discuss that with you?

A. He did not.

Q. Did you hear anything about that decision to move Ms. Malone out?

MR. FLANNERY: Objection.

MR. McDERMOTT: Objection.

THE WITNESS: Just from her.

BY MR. COHEN:

Q. And what did you hear?

MR. McDERMOTT: Objection.

MR. FLANNERY: Objection.

THE WITNESS: She showed me the letter that she was being transferred, and that she was to report on that Monday to the town

D. SANTULLI

garage.

BY MR. COHEN:

Q. Did that surprise you?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Why?

A. In what I recall of reading that memo that was sent to her, it surprised me the fact that she was moved because the highway wasn't safe for her to work at.

Q. Did you think the highway department was a safe place for her to work?

MR. FLANNERY: Objection.

THE WITNESS: As in physical harm coming toward her, I didn't see, feel that was coming toward her.

Again, these two specific incidences, I thought were just bad luck and coincidences.

BY MR. COHEN:

Q. What about non physical harm, was it a safe place for her to be?

MR. FLANNERY: Objection.

THE WITNESS: Again, words don't cause

D. SANTULLI

physical hurt towards people, so safe in what manner?

BY MR. COHEN:

Q. You tell me. I'm hearing words, but I'm not sure I'm really understanding.

MR. FLANNERY: Objection.

THE WITNESS: Right. I'm not sure that I'm understanding what you're asking me.

Are you asking me --

MR. EPSTEIN: Ask him to rephrase.

BY MR. COHEN:

Q. Was it a good place for Ms. Malone to be working at that time?

MR. EPSTEIN: I'll object to the form.

MR. FLANNERY: Objection.

BY MR. COHEN:

Q. Was the highway department a good place for Ms. Malone to be working at that time given what was happening to her?

MR. McDERMOTT: Objection.

MR. FLANNERY: Objection.

MR. EPSTEIN: I'll object to the form as well. It's very broad in terms of what you're asking.

D. SANTULLI

A. 2013.
Q. You said 2013?
MR. EPSTEIN: Yes.
By MR. COHEN:
Q. I'm sorry. We spoke over each other. I apologize.
A. Yes.
Q. Two thousand --
MR. EPSTEIN: Thirteen.
BY MR. COHEN:
Q. -- thirteen?
And this is now what year?
MR. EPSTEIN: Appears to be 2017.
BY MR. COHEN:
Q. Would you agree that it's 2017 approximately, Mr. Santulli?
A. Yes.
Q. So problems with Tori's bathroom going on over the course of four years?
A. Yes.
Q. Four years, okay.
MR. EPSTEIN: I'm just going to object to the form of that because we don't know what this problem is. We don't know if

D. SANTULLI

that's the same problem or a different problem.
BY MR. COHEN:
Q. Do you recall what the problem is?
A. No, I do not.
Q. Okay. And what happened here? Did someone actually do something?
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. Who's B. McDonald?
A. Beth McDonald is the president of the union.
Q. And she asked Frank DiZenzo to do something about it?
MR. GARVEY: Objection.
BY MR. COHEN:
Q. Well, what does it say?
A. She reached out to him about guys using the bathroom, slash, locker room.
Q. And what did Frank DiZenzo do?
MR. GARVEY: Objection.
THE WITNESS: I don't recall.
BY MR. COHEN:
Q. In the "her" in this sentence, talked to her, is it to talk to Beth McDonald or talk to Tori?

D. SANTULLI

A. Talk to Tori.
Q. And do you know if that happened?
A. I do not.
Q. Okay. Four nine -- last four lines on 4955, please read those, read that aloud, last four lines.
A. Starting with, I had no idea, or I used to handle this?
Q. I used to handle this.
A. I use handle this. One more thing, FDZ, FDZ has cut me out of -- K. Kunz is going to jet vac to pick up the tube today. Also, FDZ said there is no way he can Salvo on the OC foreman's list. FDZ said Salvo called looking for another favor. MEO III was the first favor.
Q. Okay. What's going on? Let's start with the first part of the sentence, I used to handle this.
A. Okay.
Q. One more thing, FDZ has cut me out?
A. Yes.
Q. What's he cut you out of know?
MR. McDERMOTT: Objection.
MR. FLANNERY: Objection.
THE WITNESS: In the line before that?

D. SANTULLI

BY MR. COHEN:
Q. Yeah.
A. It says, Frank tries, came to measure dump bodies today.
Q. What does that mean?
A. We have dump trucks that we spec and order, and that was something that I used to do -- or that I did.
Q. These are container bodies, not human bodies?
A. No. Dump truck bodies.
Q. Right. And that had been part of your responsibility?
A. Yes.
Q. And Frank DiZenzo took it away from you?
A. Yes.
Q. Do you know why?
A. No.
Q. He never talked to you about it?
A. No.
Q. Okay. Then what's going on with Salvo?
A. It looks like Dave was jobbing for the foreman's position.
Q. What about the favor, was the first favor?

D. SANTULLI

workers putting colleagues on their shoulders?
A. Yes.
Q. In what context?
A. To do squats to show off that they can squat certain amounts of weight.
Q. And is that what you think might be happening here?
A. It's hard to tell from just a picture.
Q. Okay. And is it appropriate workplace behavior?
A. No.
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. Mr. Santulli, look, you've been very generous of your time and your candor, let me ask this: Would you describe the Clarkstown highway department when Ms. Malone worked there as a hostile work environment for women?
MR. FLANNERY: Objection.
MR. McDERMOTT: Objection. McDermott.
MR. GARVEY: Objection.
THE WITNESS: I don't know if I would classify it as hostile. "Difficult" would be the word that I would use to describe it.

D. SANTULLI

BY MR. COHEN:
Q. In what way difficult?
A. Guys act a certain way around other guys; and some of them treated Tori like she was one of the guys. And she had to prove herself on a daily basis that she could work at the same level as the men did in that place --
Q. Was she --
A. -- in the highway department.
Q. Was she subjected to -- would you call it hazing?
MR. FLANNERY: Objection.
BY MR. COHEN:
Q. What would you call it? You said "difficult" and I want to explore that a little bit.
A. I think she was subjected to some hazing, yes.
Q. Okay. Some crude behavior?
MR. FLANNERY: Objection.
MR. McDERMOTT: Objection. McDermott.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Some lewd behavior?
MR. McDERMOTT: Objection.

D. SANTULLI

MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Some unfair treatment?
MR. FLANNERY: Objection.
MR. McDERMOTT: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Anything else you would describe it as?
A. No.
Q. You have sons, not daughters, right?
A. That is correct.
Q. Do you have any nieces?
A. I do.
Q. Would you want your nieces to work at the highway department?
MR. EPSTEIN: Objection.
MR. FLANNERY: Objection.
THE WITNESS: It's a tough question to answer.
BY MR. COHEN:
Q. Happily you're on the hot seat and not me.
A. Yes, in one hand it is a good job. The benefits are well, it pays well.

D. SANTULLI

On the other hand, to feel that they have to come in and prove themselves equal to the other men working there would be very tough.
Q. Do they have to endure offensive conduct?
MR. FLANNERY: Objection.
MR. EPSTEIN: Objection.
BY MR. COHEN:
Q. Would you be concerned about that?
A. Yes.
Q. Would you be concerned that they would have to endure sexual comments?
MR. FLANNERY: Objection.
THE WITNESS: Yes.
BY MR. COHEN:
Q. Sometimes that behavior by some of the men being serious?
MR. EPSTEIN: Objection as to form. I don't know what you mean by that.
MR. COHEN: I'll withdraw. I'll rephrase.
BY MR. COHEN:
Q. Would you be concerned that women in the highway department would have to endure unpleasant, severe, or unpleasant behavior by guys?

D. SANTULLI

MR. FLANNERY: Objection.

MR. EPSTEIN: Objection as to form. It's way too general.

BY MR. COHEN:

Q. If you understand.

A. I'm not sure I understand what you're asking.

Q. Okay. You said you wouldn't want your -- you're not sure you would want your nieces because they would have to show they were -- no, you didn't say show. They prove they're one of the guys.

But put up with what?

A. I said that --

MR. FLANNERY: Objection.

THE WITNESS: -- they would have to prove themselves equal to the men that worked there.

BY MR. COHEN:

Q. Prove themselves equal in a performance way or in another way?

A. In a performance way.

Q. And why would that be different for a woman than for a man coming onto the job?

A. I don't think it's necessarily different for

D. SANTULLI

a woman and a man. The men prove themselves to each other also.

There are some tasks that some employees, some men can physically not perform. And, you know, it's -- I feel that, you know, the women have to do the same thing in -- that the men do.

Q. Is there a macho component to this?

MR. FLANNERY: Objection.

THE WITNESS: For some, there is.

BY MR. COHEN:

Q. Can it be intimidating?

A. In what sense? Would a woman be intimidated working there? Is that what --

Q. Would they?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. If they had to put up with abusive comments, would it be intimidating?

MR. FLANNERY: Objection.

THE WITNESS: Hard to say. It depends on the person.

BY MR. COHEN:

Q. And, in fact, Tori had to put up with

D. SANTULLI

abusive comments, didn't she?

MR. FLANNERY: Objection.

MR. EPSTEIN: Objection. He wasn't present for those.

BY MR. COHEN:

Q. Were you ever present for any abusive comments towards Tori?

MR. FLANNERY: Objection; it's been asked and answered several times.

THE WITNESS: Directly at her?

BY MR. COHEN:

Q. In her presence?

A. Yes.

Q. And sexually suggestive comments or behaviors in her presence?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Do you think she was discriminated against in any way because of her sex?

MR. FLANNERY: Objection.

MR. EPSTEIN: Objection.

BY MR. COHEN:

Q. Your opinion, do you think Tori was

D. SANTULLI

discriminated against in any way because of her sex?

MR. EPSTEIN: Objection. You're asking him to a legal conclusion.

MR. COHEN: No. I'm asking for his opinion.

MR. FLANNERY: On a legal conclusion.

MR. EPSTEIN: You're asking for a legal conclusion. It's directly related to this case.

BY MR. COHEN:

Q. The common -- I'm not asking for a legal definition of discrimination. I'm asking as a person with an education, who has worked in this environment for more than 20 years --

A. Yes.

Q. -- do you think Tori was discriminated against because she was a woman?

MR. EPSTEIN: Objection. You're asking him for a direct conclusion as to this case. You can't do that. He is not an expert in the field --

MR. COHEN: No, he's not. I'm not asking him to testify as an expert. I'm asking for his personal opinion.

D. SANTULLI

MR. EPSTEIN: Again, you're asking him for a legal conclusion to this matter.

BY MR. COHEN:

Q. Do you want to offer a legal conclusion to this matter?

A. I do not.

Q. Okay. Did Wayne Ballard allow that hostile work environment to continue when he was superintendent?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Did he encourage it in any way?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. Did he contribute to it in any way?

MR. FLANNERY: Okay.

THE WITNESS: Yes.

BY MR. COHEN:

Q. And I think you testified how he did that.

Is there anything else you want to add to that about Wayne Ballard's behavior?

MR. FLANNERY: Objection.

D. SANTULLI

THE WITNESS: No.

BY MR. COHEN:

Q. What about Frank DiZenzo, did he allow a hostile work environment to continue while he was superintendent?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. And did he encourage it in any way?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. Did he contribute to it in any way other than the Go Girl incident?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. Okay. Did Tucker Connington allow the hostile work environment to continue while he was deputy?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. In what way?

D. SANTULLI

MR. FLANNERY: Objection.

THE WITNESS: In not encouraging Frank or Wayne to step up and stop it.

BY MR. COHEN:

Q. Anything else?

A. That's it.

Q. Okay. Did he encourage it?

MR. FLANNERY: Objection.

THE WITNESS: No.

BY MR. COHEN:

Q. Did he contribute to it?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. In what way?

A. I think the incident underneath the canopy contributed to it. Besides that incident that was brought to my attention, I cannot think of anything else.

Q. Okay. You've known Tori for a long time now, more than 15 years?

A. Since she started at the highway department as seasonal work is when I first met her.

Q. So it's more than 15 years?

D. SANTULLI

A. I'm not sure when she started; I can't give you an exact year of when she started.

Q. And you described a hostile, difficult environment that she's put up with for 15 years?

MR. FLANNERY: Objection.

THE WITNESS: Yes.

BY MR. COHEN:

Q. Did you see it have any effects on her?

MR. FLANNERY: Objection.

THE WITNESS: In what manner? Work performance?

BY MR. COHEN:

Q. Did it have any impact on her work performance?

A. No.

Q. Did it have any impact on her outward appearance of happiness?

MR. FLANNERY: Objection.

THE WITNESS: Not that I could tell.

BY MR. COHEN:

Q. Of comfort?

MR. FLANNERY: Objection.

MR. EPSTEIN: What do you mean by comfort?